United States District Court
Southern District of Texas
FILED

APR 3 0 1997

Michael N. Milby, Clerk of Court

2

# IN THE

## UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF TEXAS

UNITED STATES OF AMERICA,        )
        PLAINTIFF-RESPONDENT,   )
                            )
Vs                               )
                            )
FELIPE MOLINA-URIBE,             )
        DEFENDANT-PETITIONER.    )

# B-97-97

CIVIL N° _____

CRIM. DOCKET N° __B-87-01-S1__

### MEMORANDUM WITH POINTS OF LAW IN SUPPORT OF MOTION TO VACATE, SET ASIDE OR CORRECT SENTENCE FOR A PERSON IN FEDERAL CUSTODY.

**COMES NOW,** Defendant-Petitioner, Felipe Molina-Uribe, hereinafter referred to as Petitioner or Molina and files this his pro se Motion To Vacate, Set Aside or Correct Sentence For a Person in Federal Custody, and supporting such motion, a Memorandum With Points Of Law and respectfully shows this court as follows:

## J U R I S D I C T I O N

This court's jurisdiction is established pursuant to Title 28 USC §2255 and the rules applicable thereto for persons whose offense occurred prior to April 24, 1996.

- 1 -

# I S S U E S   P R E S E N T E D   F O R   R E V I E W
## G R O U N D   O N E

**PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF
COUNSEL AT TRIAL.**

## S T A T E M E N T   O F   T H E   C A S E

On February 21, 1987, the Federal Grand Jury sitting in the United States Federal District for the Southern District of Texas returned a four-count superseding indictment against Felipe Molina-Uribe, charging him along with codefendants Cavazos and Garcia with violation of 21 USC §846, consipiracy with intent to distribute in excess of 100 kilograms of marijuana, a Schedule I controlled substance. **Count Two,** charged all three defendants with violation of 21 USC §841(a)(1), the substantive charge of the conspiracy. **Count Three,** charged Felipe Molina-Uribe with having been placed under arrest, and while attempting to escape, murdered a United States Drug Enforcement Agent in violation of Title USC §1111, 1114. **Count Four,** charged Felipe Molina-Uribe with violation of 18 USC §924(c), using a firearm during and in relation to a crime of violence described in count three.

Felipe Molina-Uribe entered a plea of guilty to counts one and two on April 13, 1987, but proceeded to jury trial on Count three and four. On April 16, 1987, the jury returned verdicts of guilty on counts three and four and, on May 13, 1987, the district court imposed a term of twenty-five years each on

- 2 -

Counts one and two and a life sentence on count three and five years on count four. The district court ordered the twenty-five year sentence to run consecutive and the life sentence to run concurrently. The five year sentence on the firearm was ordered to run consecutively to the other terms of incarceration as required by statute.

Timely notice of appeal was filed to the district court and appeal taken to the U.S. Court of Appeals for the Fifth Circuit. On August 24, 1988, the Court of Appeals affirmed the convictions but, reversed, in part, and remanded with allowance to withdraw the guilty plea as to counts one and two for a core violation of Rule 11, Federal Rules of Criminal Procedure.

## S T A T E M E N T    O F    T H E    F A C T S*

Sometime before 3:00pm on December 31, 1986, in McAllen, Texas, Felipe Molina-Uribe and his codefendant, Jesus Farcia-Neito, were looking for a buyer for over 300 pounds of marijuana when they met the other codefendant Benito Cavazos-Lamas, in McAllen and asked if he knew of a possible buyer, Cavazos indicated he did and without knowing that Robert Raul Ortiz was a paid undercover DEA informant, arranged a meeting of Molina and Garcia with the CI (confidential informant) Ortiz who

---

\* **The** narration of the facts are those taken by the investigative authorities and are not adopted or accepted by Petitioner as accurate or reliable in every detail.

was accompanied to the meeting by Ernesto Rodriguez-Rameriz, another paid undercover DEA informer.

Ortiz, the CI, at various times between the first contact by Cavazos and completion of the sale arrangements, was in communication with the DEA agents to obtain instructions as the negotations progressed. Finally, after several phone conversations between Ortiz and Molina and meetings in four different locations, it was arranged that DEA Special Agent Ramos, working undercover, but represented to Molina and Garcia as being a Cuban from New York, would be the buyer or the marijuana and a quantity of pills described as ionamines and pasadrenes which Molina and Garcia also had for sale. Delivery and payment was to be made at 7:00pm in the parking lot of Junior's Supermarket in Las Milpas, Texas. Molina had been relucant to deal with any Cubans and made this fact known to Ortiz, mainly because Cubans had a history of ripping drug dealers off and robbing them of drugs and money. Nevertheless, the agreement was made to meet at the grocery store parking lot.

Ramos, Ortiz and Rodriguez arrived at the parking lot in an undercover vehicle shortly after 7:00pm. When Molina arrived about 7:20pm in a van loaded with large plastic bags containing the marijuana, Ortiz and Rodriguez went to Molina's van to inspect the marijuana following when they an Molina walked to the undercover vehicle where Ramos, the alleged Cuban, was waiting in the driver's seat. Molina entered the rear seat of the car. The plan was that Ramos and Molina would swap vehicles

- 4 -

and later, re-exchange them after Molina had removed the money
from Ramos' car and Ramos removed the marijuana form Molina's
van.

     After a brief conversation about the money, Ortiz and
Rodriguez walked to the rear of the Ramos car, obstensibly to get
the money from the truck for Molina's inspection. By
prearrangement, the lifting of the trunk lid was the signal for a
number of surveilling DEA agents to converge on Ramos' vehicle.
As the trunk lid was opened, Ortiz observed through the car's
rear window that Ramos had turned in his seat, drawn his revolver
and pointed it at Molina, Whereupon Molina grabbed Ramos and the
revolver, attempting to wrest it away from Ramos. With the car
shaking from the struggle going on within and Ramos calling for
help, Ortiz went forward to assist Ramos who was then partly in
the back seat with Molina. Amid the confusion, Ortiz entered the
car ordering Molina to release his hold on Ramos and the gun,
admonishing Molina that he could get in serious trouble if he
didn't. Meanwhile, Rodriguez was pulling on Molina's leg when
the revolver discharged. Ortiz then repeated his order to Molina
to let go of the gun and told Molina that Ramos was a cop at
which time Ramos said "I already told him." As the struggling
continued, the revolver discharged again, striking Rodriguez who
was involved with Ortiz and Ramos in the struggle. Upon being
hit in the hand, Rogriguez retreated from the struggling going on
in the car. As the struggle continued, two more shots were fired
from the revolver. Ortiz again told Molina they were cops, to

- 5 -

which Ortiz said Molina replied in spanish, the translation which indicated that Molina thought Ramos and Ortiz were going to kill him or hurt him and steal the marijuana. As they continued to struggle for the gun, the fourth shot was fired and the bullet went into Ramos' chest, killing him. DEA agents Watkins and Alvarez arrived at the car almost immediately following the final shot and Watkins entered the car, identifying himself as a Federal Agent, put his revolver to Molina's head and took the gun from Molina's left hand. Molina was taken into custody and Ramos was taken to the hospital in McAllen, Texas, where he expired at 7:35pm. During the strugle, Molina was shot in the leg by Ramos' revolver.

## ISSUE PRESENTED FOR REVIEW

## GROUND ONE

**WHETHER PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL?**

Petitioner claims his attorneys at trial did not render him effective assistance of counsel, and committed egregious errors that results in severe predjudice affecting constitutional rights and fundamental fairness. The trial errors will be set forth in the body of this argument along with the historical facts to support this claim as well as relevant legal cites and concepts of fairness required for persons charged with criminal offenses.

- 6 -

CStPDF - www.fasite.com

Ineffective assistance of counsel is a cognizable claim
under 28 USC §2255 and, in fact, is the applicable and preferred
avenue for challenging errors on the ineffectiveness of counsel.
**See**, **United States v. Galloway**, 56 F.2d 1239 (10th Cir 1994);
**United States v. Robinson**, 967 F.2d 287 (9th Cir 1992); **United
States v. Klein**, 13 F.3d 1182 (8th Cir 1994)   **United States v.
Gonzales**, 929 F.2d 213, 215 (6th Cir 1991); **United States v.
Pierce**, 959 F.2d 1279 (5th Cir 1992).   When a prisoner files a
motion under 28 USC §2255, the court is required to grant him a
hearing unless the motion, files and the record conclusively
shows he is entitled to no relief.  **See**, **28 USC §2255**, **Rogers v.
Israel**, 746 F.2d 1288 (6th Cir 1984); **Baumann v. United States**,
692 F.2d 565 (9th Cir 1982); **Moore v. United States**, 950 F.2d 656
(10th Cir 1991); **United States v. Nino**, 818 F.2d 101 (3rd Cir
1989);    **United States v. Auten**, 632 F.2d 478 (5th Cir 1980);
**Kirkpatrick v. Whitley**, 992 F.2d 491 (5th Cir 1993).

The claim of ineffective assistance of counsel is
grounded on the Sixth Amendment to the United States Constitution
as the right of an accused to assistance of counsel which
includes the right to **effective** assistance.  **McMann v. Richarson**,
397 US 759, 25 F.2d 835 (5th Cir 1987).  The leading case in the
area of ineffective assistance of counsel is **Strickland v.
Washington**, 466 US 668, 104 S.Ct. 2052 (1984), whereas the
Supreme Court set the two prong test that a Petitioner must
satisfy in order to establish his claim.  Petitioner must show
(1) that the representation he received fell below an objective

- 7 -

standard of reasonableness, and (2) a reasonable probability that, but for the errors of counsel, the results of the trial would have been different. The court defined reasonable probability as "A probability sufficient to undermine confidence in the verdict." The proper standard to be applied is an objective standard of reasonableness given the totality of the facts and circumstances and "more specific guidelines are not appropriate." **Strickland**, 104 S.Ct. at 2067.

The Supreme Court ventured forth to say that a convicted defendant who makes a claim of ineffective assistance of counsel must specifically identify the acts or omissions of his counsel and must affirmatively show prejudice because of the ineffective assistance. **Strickland**, 104 S.Ct. at 2068. So, apparently, the term "reasonable probability" is not the equivalent of a preponderance of the evidence, or any kind of "greater likelihood" test. **Strickland** provides that a court does not need to determine whether a defendant's counsel engaged in a dificient performance before examining the prejudice suffered by a defendant as a result of the deficiency. It is not the object of a court to grade counsel's performance. As an ineffective assistance of counsel claim is an attack on the fundamental fairness of the trial.

Petitioner specifically identifies critical instances of errors attributable to the attorneys who were appointed by the district court to represent him at trial, sentencing, and on direct appeal. These acts (errors) of omission and comission are

- 8 -

CMsPDF - www.fesisi.com

set forth below, not in any particular strategic order because each error claimed is in and of itself extremely prejudicial to the extent Petitioner was denied a fundamental constitutional right to due process.

(1)     Trial counsel failed to allow Petitioner to testify in his own defense.

(2)     Trial counsel failed to investigate and interview witnesses.

(3)     Trial counsel failed to obtain an independent expert to analyze the blood specimen taken from Petitioner to determine the presence of tetrahydrocannabinal (THC) and the ionamines and pasadienes. (downers)

(4)     Trial counsel failed to present Molina's theory of defense.

(5)     Trial counsel failed to bring before the jury Molina's state of mind.

(6)     Trial counsel failed request a jury instruction on self-defense or manslaughter.

(7)     Counsel fialed preserve these issues and raise them on direct appeal.

In the first instance, Petitioner at all times had wished to testify in his own defense, however, during trial, even though defense counsel had agreed it was necessary for him to testify, he soon became evasive about the situation to the point that he informed Petitioner he was not going to put him on the stand. Counsel gave absolutely no reason for this decision, and upon Molina's insistence to testify, the court would not allow him to because he (trial counsel) had not included Molina's name on the witness list and had not claimed an alibi defense whatever

- 9 -

that meant. Molina from the very start of this case had been
totally honest with the attorneys and coversed with them openly
about what had happened during the event that brought on the
confrontation and the ensuing struggle that resulted in Agent
Ramos' death. Once the government witness began giving their
account of the facts relating to the incident Petitioner realized
these witnesses were giving testimony that was different from the
actual happenings that occurred, or leaving out critical facts
that went to the very copus of Petitioner's claim that Ramos and
Garcia had informed Molina that they were federal agents.
Petitioner claims neither Ramos or Ortiz ever told him they were
federal agents. Petitioner recalls sometime during the struggle
between the four of them, someone mentioned they were cops -
never was the term federal agents or DEA used by anyone. Thus, it
became critical that Molina testify so he could tell the jury
what had occurred. For instance, when the CI gave testimony that
he observed agent Ramos draw his revolver on Molina and tell him
he was under arrest, this was a total fabrication because both
CI's were at the rear of the vehicle and the trunk lid had been
opened. Thus, Ortiz testified falsly when he stated he could see
the agent and Molina at this point in time. Several of the
witnesses were giving testimony that was inaccurate with
reference to the CI Rodriguez being outside the car. The fact
is, both Ortiz and Rodriguez were in the back seat of the
automobile as was agent Ramos, struggling with Molina as he was
trying to push the revolver away from where agent Ramos was

- 10 -

trying to get it to Molina's head. The shots that were fired occurred when Ramos had the revolver and Petitioner was in death struggle between the three alleged drug dealers. This was relevant testimony that Felipe Molina wanted the jury to hear. Trial counsel made a unilateral decision not to allow Petitioner to testify. There was never any waiver, in fact, the attorney cautioned Molina if he continued to insist on how he wanted to defend the case, that he and the other attorney would withdraw from the case and allow Molina to be his own attorney and to represent himself. Thereafter, Petitioner stopped his efforts to get the attorney to allow him to take the stand in his own defense.

It is well established that a defendant has the right to testify in his own behalf, a right that the Supreme Court has deemed essential to the adversarial nature of the American Justice System. **See**, **In Re Oliver**, 333 US 257, 273, 92 L.Ed. 682, 68 S.Ct. 449 (1948); **Cole v. Arkansas**, 333 US 196 (1948); **Davis v. Reynolds**, 890 F.2d 1105 (10th Cir 1989); **Pluckett v. Estelle**, 709 F.2d 1004, 1009 (5th Cir 1983) Cert. denied 104 S.Ct. 1000 (1984). The Supreme Court has found that right implicit as well in the Compulsory Process Clause of the Sixth Amendment. **Rock v. Arkansas**, 483 US 44, 97 L.Ed.2d 37, 107 S.Ct. 2704 (1987) ("we gave further recognition to the right of an accused to testify in his or her own word, and noted that this in turn was related of his own will"). Id. at 53, 97 L.Ed.2d at 37, 104 S.Ct. at 2704.

- 11 -

The right to testify in one's own behalf has sources in
several provisions of the Constitution, it is one of the rights
that are essential to due process of law in a fair adversarial
system. The necessary ingredients of the fifth and the
Fourteenth Amendments guarantees that no one shall be deprived of
life or liberty without due process of law which includes the
right to be heard and to offer testimony in his own defense. A
defendant's right to his day in court is the basic components of
our system of justice, and this right at a minimum, includes the
right to examine the witnesses against him, to offer testimony
and to be adequately represented by counsel. **In Re Oliver**, 333
US 257 (1948); **Ferguson v. Georgia**, 365 US 570 (1961). Before
**Ferguson**, it may have been argued that a defendant's ability to
present an unsworn statement would satisfy this right. Once that
procedure was eliminated, however, there was no longer any doubt
that the right to be heard, which is so essential to due process
in an adversary system of justice could be vindicated only by
affording a defendant an opportunity to testify before the
factfinder. The right to testify is also found in the Compulsory
Process Clause of the Sixth Amendment which grants the right for
a criminally charged defendant to "call witnesses in his favor";
a right that is guaranteed in criminal courts of the various
states by the Fourteenth Amendment. **See, Washington v. Texas**,
388 US 14 (1966)). Logically included in the right to call
witnesses whose testimony is material and favorable to his
defense, is a right to testify himself should he decide it is in

- 12 -

his favor to do so.  In fact, the most important witness for the
defense in many cases such as this instant case, is the defendant
himself.  There was no justification or adequate reason in this
case not to allow Molina to give his accounting of the facts nor
to offer his testimony.  Much of the absolutely critical
historical facts were either omitted or not fully developed.  The
evidence of Molina smoking a marijuana cigarette when the
discussion of the sale of the drugs was never expounded on,
neither was it ever fully developed that Molina had done some
pasadrenes earlier and they had "hit his face".  This evidence
was passed over by trial counsel because he failed to explore
what effect the pasadrenes had on how many Molina had taken.
This evidence would have been brought up had Petitioner been
allowed to testify.  Another important material fact which
Molina's testimony would have revealed was the discussion about
how Molina was reluctant to deal with any Cubans because of their
propensity for violence, as well as the well known fact that
Cubans have a history of ripping off drug dealers for their drugs
as well as their money.  This conversation between Molina and his
codefendant, Jesus Garcia, about dealing with a Cuban was so
indepth that, at one point, Molina and Garcia had decided to buy
a more dependable vehicle than the van they owned and drive to
Dallas, Texas, where they had a buyer for the marijuana.  This
was discussed to the point where Molina and Garcia traveled to
Pharr, Texas, to a car auction to find an appropriate vehicle to
deliver the marijuana to the buyer in Dallas.  At the automobile

- 13 -

auction, Molina and Garcia could find no vehicle that was appropriate for the trip and Molina reluctantly agreed to sell the marijuana, pasadrenes and ionamines to the purported New York base Cuban Drug dealer. Thus, because of trial counsel's refusal to allow Petitioner to testify, none of this evidence was developed for presentation to the jury because counsel unilaterally made a decision that Molina would not testify and the jury was never allowed to hear Petitioner's as he would relate the facts that occurred on that day leading up to the event which resulted in agent Ramos' death. The jury was never given an opportunity to make its decision upon the true facts and circumstances of the events in this case because Petitioner was not allowed to testify.

In **Rock v. Arkansas**, **supra**, 484 US 44 (1987, the Supreme Court explicitly confirmed that criminal defendants have a constitutional right to testify in their own behalf and because the right to testify is a fundamental constitutional guarantee, only the defendant is empowered to waive that right. **Jones v. Barnes**, 463 US 745 (1983) (the accused has the ultimate authority to make certain fundamental decisions regarding the case as to whether to testify in his own behalf). **Washington v. Sykes**, 433 US 72 n.1 (1977). Moreover, the defendant's waiver of his right to testify, like his waiver of other constitutional rights should be voluntarily and knowingly. **See, Boykin v. Alabama**, 395 US 238 (1969) (defendant's guilty plea must be made intelligently and voluntarily because it entails waiver of constitutional rights to

- 14 -

trial by jury, to confront one's accusers and against self-incrimination); **Johnson v. Zerbst**, 304 US 458 (1938) (waiver of right to counsel must be intelligently and competently made).

In this instant case, Felipe Molina made repeated attempts to convince his attorneyys it was in his best interest for his defense that he give testimony that in some instances clarified and expanded the facts of the other witnesses and in other instances, his testimony would have controverted the erroneous testimony and evidence the government was presenting. Thus, there was no waiver. The closest thing to a waiver would be Molina's silence once the attorneys had threatened to withdraw from the case and to let him continue on his own. Petitioner was therefore afraid to say more on the subject for the very reason he is not an attorny and further because Petitioner does not speak or comprehend English, he was at an extreme disadvantage to know and understand what was occurring except for the testimony that was given in spanish.

Felipe Molina claims his trial counsels did not properly counsel him on the issue involved in this case, especially Petitioner is not aware of whether there is such a rule whereas, the opposing counsel is not apprised of a certain defense, or that in order to testify both the court and the government must be advised by written notice before trial, however, even if that is true, then it was incumbent upon trial counsel to provide such notice otherwise, a criminal defendant's fundamental constitutional right will be frittered away simply

- 15 -

CutePDF - www.cutepdf.com

because defense counsel made a procedural error.  In this context, even if defense counsel's statement were true - "that he did not timely file Molina's name with the court as a witness, there must be some procedural avenue where the court has discretion to allow the procedural violation be forgiven in the interest of justice so that a defendant does not suffer constitutional rights violations.  Before a waiver can ever be held valid, defense counsel is required to make a reasonable decision of the consequences or advantages a defendant is looking at by waivering a constitutional right to testify.  Counsel may and should advise the defendant of the prejudice that could attach if he testifies, however, the ultimate decision of whether to testify is for the defendant to make and not the attorneys' decision, just as is the right of a defendant to represent himself.  **See**, **Faretta v. California**, 422 US 806 (1975), and the right to forego an appeal, and he need have no good or rational reason for his decision.  **Shifflett v. Commonwealth of Virginia**, 447 F.2d 50 (4th Cir 1971) **Cert**. **denied** 405 US 994 (1972).  The wisdom or unwisdom of the defendant's choice does not diminish his right to make it.  In making the choice on whether to testify, just as whether to represent himself, the defendant elects whether to become an active participant in the proceedings that affects his life and liverty and to inject his own action, voice and personality into the process to the extent the system permits.

In the narrow would of the courtroom, the defendant may have faith, even if mistaken, in his own ability to persuasively

- 16 -

CUtePDF - www.fasiia.com

determined to speak before their fate was pronounced. Socrates who condemned Athenial Justice heedless of the cup of hemlock, Charles I, who challenged the jurisdiction of the Cromwellians over a devine monarch; Susan B. Anthony, who argued for the female ballot; and Sacco and Vanzetti, who revealed the flaws of their tribunal. To deny a defendant the right to tell his story from the stand dehumanizes the administration of justice.

Petitioner was never allowed to exercise his Fifth Amendment right to testify and bring before the jury the mitigating circumstances that caused this tragic event to occur. Petitioner was not permitted this constitutional right because of the decision of his counsel made without Molina's waiver or consent the flagrant error of defense counsel in refusing to allow him to testify resulted in his conviction for an offense for which he was neither morally or legally guilty of committing. A decision cannot stand that allows a jury to condemn to death or life imprisonment a defendant who wishes to speak without ever having heard the sound of his voice. **McGantha v. California**, 404 US 183 (1971).

## FAILURE TO INVESTIGATE AND CALL WITNESSES

These errors are inextricably intertwined with the defense Petitioner urged his attorneys to present, that specifically went to the fact that four people were struggling between themselves for the revolver, the investigation required in this case required an independent examination of tests and reports made by the federal Bureau of Investigation and/or the

- 18 -

tell his story to the jury. He may desire, as Molina wished, to face his accusers and the jury, state his position, and tellthe jury in his own words about what he thought was happening and how he thought the three men, Ramos, the proported Cuban, Ortiz and Rodriguez were going to kill him and take his money. He may, just as Molina wished, to submit to cross-examination and to explain his feelings and emotions on that ill-fated evening. His interest (Molina) extended beyond the context of hope that his testimony would have a personalized impact upon the jury, or a hope to have gained an advantage from having taken the stand rather than to seek the shelter of the Fifth Amendment or, without regard to the impact upon the jury, his desire to tell his side of the story in a public forum, may be of overriding importance to him. Indeed, in some circumstance, like this instant case, the defendant , without regard to the risks, may wish to speak from the stand, over the head of the judge and the jury to a larger audience that he is not a copkiller. It **is not** for his attorney to muzzle him as occurred in this instant case.

In **Green v. United States**, 365 US 301 (1961). Justice Frankfurter recognized the personal and fundamental nature of a defendant's right to address his accusers. "The most persuasive counsel may not be able to speak for himself. Id. at 304. The same is true in the case at bar, even though Petitioner is a Mexican with no education, unable to speak or conprehend English, he nevertheless wished to espress his story to the jury. Our history is replete with trials of defendants who faced the court

- 17 -

lack of any reports. Fingerprint identification on the revolver, and the fact that Petitioner's prints were not on the revolver. Tests performed that can determine the existence of, and amounts of, nitrates from the firing of the revolver as well as the examination of the blood sample taken of all the presons involved in the struggle.

The evidence shows, a blood sample was taken from Felipe Molina and sent to the laboratory of the Federal Bureau of Investigation, and a report was made that revealed thests were conducted to determine the blood alchol content of .057, however, this was not challenged by defense counsel, nor was a forensic expert employed by the defense to make an independent examination analysis of the blood sample, not just for blood alchol content, but an independent analysis to determine the amount of THC and any other drugs in the sample of Felipe Molina's blood. There was ample evidence to put defense counsel on notice that Felipe had ingested some pills previously called pasadrenes, and had smoked some marijuana cigarettes. Defense counsel failed to properly investigate and failed to contact a forensic expert to make these analysis. Defense counsel failed also to consult with a qualified expert to give testimony as to the effect alchol, marijuana and pasadrenes would have as to the receptors of the central nervous system of humans and whether singly or in combination the effect on a persons perceptions and mental processes.

The defense in this case failed to put the trial to the

- 19 -

required adversarial testing by relying solely on the evidence as gathered and tested by the government. Petitioner claims the blood sample of his blood contained exculpatory evidence that should have been obtained by defense counsel under **Brady v. Maryland**, 373 US 83 (1963)

Trial counsel further failed to interview witnesses and to investigate the background of the two paid confidential informants who had a history of robbing drug dealers as well as violence. Further, there exists some evidence that agent Ramos had a similar history. Trial counsel failed to interview FBI agent Gonzales who had purportedly interviewed agent Ramirez who confirmed that no one in his presence had told Molina he was under arrest or that they were federal agents. The above failure to investigate and call witnesses results in errors that go directly to Petitioner's defense and releates to his state of mind as to what he perceived was occurring. It should be noted this event occurred in a very narrow time frame. The record shows Molina arrived at the scene shortly after 7:20pm. The records at the hospital in McAllen, Texas reveal that agent Ramos died at 7:35pm. Thus, the entire event occurred in less than 15 minutes including the response time in getting agent Ramos to the hospital in McAllen, Texas.

Petitioner claims trial counsel failed to interview and call the witnesses that any reasonable attorney would have called. He further failed to investigate into the area of forensic expert witness whose testimony was absolutely necessary

- 20 -

for the defense. These were egregious errors that resulted in a denial of Molina's rights under the Fifth Amendment for due process, and compromised his right to have Compulsory Process which in turn results in a violation of the sixth Amendment guarantee that a defendant have assistance of counsel that is **effective** for his defense.

A substantial body of Fifth Circuit case law has developed over the years which insists that effective counsel must conduct a reasonable amount of pretrial investigation. **See, Martin v. Maggio**, 711 F.2d 1273, 1280 (5th Cir 1980); **Kennedy v. Maggio**, 725 F.2d 269, 272 (5th Cir 1984); **Bell v. Watkins**, 692 F.2d 888 (5th Cir 1982); **Rummel v. Estelle**, 590 F.2d 103-04 (5th Cir 1979). The duty to investigate is reflected in the American Bar Association Standards of Criminal Justice, 4-4, 11 (2d ed 1990),("The Defense Function), which is considered a guide for determining what is reasonable under the circumstances. These specific obligations must temper to some degree the amount of deference a court can give to the trial counsel's action in evaluating his performance or lack thereof.

In this case, defense counsel made no attempt to obtain or investigate the very essence of Petitioner's defense, thus, he was prepared to do little more than sit on his hands at trial and accept every concept of the government's case without controverting the erroneously presented prosecution. Trial counsel was more an advocate for the government and, because of a failure to investigate was forced to call the government's expert

witness as a defense witness.  The errors were substantial and resulted in extreme "actual prejudice" that violates Molina's fundamental rights.

## FAILURE OF DEFENSE COUNSEL TO PRESENT PETITIONER'S THEORY OF DEFENSE

Petitioner claims from the very start of this case that he had acted in self defense and requested the defense counsel to present this theory of defense to the jury and to request the court for an appropriate jury instruction that covered a self defense position and an involuntary manslaughter defense.  Trial counsel failed to pursue this theory or present to the jury evidence of Molina's state of mind.

Count three in the indictment charged Molina with murdering agent Ramos in violation of 18 USC §1111 and §1114. Section 1114 of Title 18 USC makes the punishment provided in §1111 applicable in the case of murder of an officer or employee of the Drug Enforcement Adminstration while in the performance of his official duties at death or life in prison.  The crime of murder is defined as:    § 1111  – MURDER –    (a)   Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, rape, burglary, or robbery; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of an human being other than him who is killed, is murder in the first degree.

Any other murder is murder in the second degree.

Petitioner claims the offense of murder under 18 USC §1111 is a specific intent crime that requires the defendant's state of mind to be examined.  Under Federal Law, malice is an

element of murder.  Malice, as the term used here, is but another
name for a certain state or condition of a person's mind or
heart.  Because no one can look into the heart or mind of
another, the only means of determining whether or not malice
existed at the time of a killing is by inferences, drawn from the
surrounding facts and circumstances as shown by the evidence in
the case.  The evidence in this case is questionable as to
Molina's state of mind because defense counsel failed to bring up
the relevant evidence that Molina had a hesitancy to do any
business with the purported drug buyer because he was allegedly a
Cuban from New York, and Molina had expressed his concern about
being robbed, thus, Petitioner and his codefendants had proceeded
to consumate the drug deal only when Molina had been unable to
purchase a vehicle in which to deliver the drug to another ready
buyer in Dallas, Texas.  A very important defense factor that set
the tone of Molina's state of mind.

    The evidence in this case clearly shows no malice
aforethought because Molina came to the parking lot for the
meeting unarmed, and entered into the rear seat of the vehicle
for the purpose of setting up the proposed exchange of the drugs
for the money.  When the two Confidential Informants went to the
rear of the vehicle, and raised the trunk lid, the signal was
thereby given for the agents surveilling the automobile to come
down for the arrest.  One of the Confidential Informants
testified he saw Molina and agent Ramos wrestling in the car over
the revolver, however, the witness' testimony is suspect in that

he stated he observed this through the rear window of the vehicle
which would be an absurd statement because testimony was that the
trunk lid was up and would block the view of anything being seen
through the rear window of the automobile. Further, agent
Alvarez, upon questioning by the FBI, stated he did not hear
anyone yell they were federal agents. One of the Confidential
Informants who was involved in the struggle, testified he did not
hear anyone tell Molina they were federal agents. Further
evidence demonstrates that Molina made a statement immediately
afterward that he did not want to do this thing, that he thought
they were going to hurt him. This statement by Molina goes
directly to his state of mind that existed prior to going to the
meeting. That is, "he did not want to do this thing" - it could
have been viewed in more than one context, first, that "he did
not want to do this thing" could have been inferred as to mean he
did not want to deal any drugs with Cubans, second, it could be
inferred that he did not want this event to happen, meaning that
he did not want the struggle for the firearm to occur, and,
third, he did not want the purported drug dealer agent Ramos to
get shot. All of these state of mind reasonings are further
supported by the final phrase Molina said - 'that the gun went
off by itself'. The forensic evidence shows Molina's
fingerprints were not on the revolver, only the prints of the
Confidential Informant, Rodriguez's prints were found on the
revolver. It seems relevant that the only persons whose prints
were on the firearm, could not give any testimony regarding the

- 24 -

alleged statement that they were federal agents.  Thus, the only
evidence of whether agent Ramos had identified himself as a
federal agent and told Molina he was under arrest came from the
highly suspected hearsay testimony of the Condifential Informant,
Ortiz.  More evidence was presented that the revolver belonged to
agent Alvarez, which opens up another avenue that is highly
suspect in that agent Ramos' own service revolver was found
inside the automobile.  While this was explained away by evidence
that the automobile was an undercover vehicle checked out to
agent Alvarez, and the revolver was placed in a side pocket of
the vehicle, it does not explain why agent Ramos used this
revolver rather than his own.  Several more evidentiary facts are
subject to review concerning Molina's state of mind and the
bizarre circumstances where four people are struggling with each
other for a firearm, and three of the four are shot.  The
evidence shows four shots were fired.  One struck Molina in the
leg, one struck confidential informant Rodriguez in the hand and
one struck agent Ramos in the chest, and, obviously, one shot
missed.  The relevant issue is - did the first shot strike Molina
in the leg?  Or was it the second shot?  This goes directly to
Molina's state of mind.  If he had been shot with the first
firing, his state of mind would certainly be consistent with his
statement that "he thought they were going to hurt him."  For
sure, the last shot was not when Molina was injured, thus, the
fact that Molina was shot before the agent was is extremely
important and should have been presented in that fashion to the

- 25 -

jury.   The testimony was at trial that, after the struggle, the firearm was in Molina's left hand, this also was relevant to Petitioner's claim of self defense or involuntary manslaughter in that Molina is right handed, which would support the defense theory as well the statement the gun went off by itself.

Petitioner claims he was entitled to his theory of defense, that he acted in self defense and had no knowledge that Ramos was a federal agent and there was absolutely no malice aforethought. In other words, Molina had no specific intent to deliberately kill Ramos or to act with callous or reckless disregard for human life.   Molina contends he was struggling for his life because he believed Ramos was a Cuban drug dealer whose intent was to rob him and kill him and this mental state was further reinforced by the actions of Ortiz and Rodriguez.   Thus, malice or aforethought was never shown in this case, there was not one shred  of evidence from which any inferences could be drawn by a reasonable factfinder that Molina demonstrated a wanton and depraved spirit, a mind bent on evil mischief without regard for its consequences.   **See**, **Government of the Virgin Islands v. Lake**, 362 F.2d 770 (3rd Cir 1966); **United States v. Fleming**, 739 F.2d 945 (4th Cir 1984); **United States v. Paul**, 37 F.3d 496 (9th Cir 1994), nor was it ever demonstrated by any preponderance of the evidence that Molina committed and **deliberate** cruel act against agent Ramos, suddenly without provication as required to find murder was committed.   **See**, **Mulaney v. Wilbur**, 421 US 684 (1975); **Patterson v. New York**, 432

- 26 -

CMPDF - www.fxexo.com

US 197 (1977). Malice in the absence of provocation is part of the element of the offense Petitioner was charged with and his theory of defense negates this element and there was substantial evidence to support Petitioner's theory of defense.

A defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor. **Mathews v. United States**, 485 US 58, 63 (1988); **United States v. LaMorte**, 950 F.2d 80, 84 (2nd Cir 1991); **United States v. Young**, 464 F.2d 160 (5th Cir 1972); **United States v. Browner**, 889 F.2d 549, 555 (5th Cir 1989); **United States v. Plummer**, 789 F.2d 435, 438 (6th Cir 1986); **United States v. Wellington**, 754 F.2d 1457, 1463 (9th Cir 1985), Cert. denied 474 US 1032 (1986); **United States v. Hyman**, 741 F.2d 906, 912 (7th Cir 1984); **See also**, **United States v. Durham**, 825 F.2d 716 (2nd Cir 1987).

Thus, defense counsel erred by failing to develope and bring before the jury, Molina's state of mind, and failed to request an instruction on his defense of self defense or involuntary manslaughter. Petitioner's mental state was of extreme importance because of a defendant killed with the mental state required for murder - i.e., intent to kill or recklessness with extreme disregard for human life, he is guilty of murder. However, if the killing occurred by some factor of provocation or fear , or in the heat of passion, then that would negate the malice that would otherwise be attacked. By contrast, the absence of malice in involuntary manslaughter arises not because

of provocation induced passion, but rather because the offender's mental state is not sufficiently culpable to meet the traditional malice requirements. **See, United States v. Browner**, 889 F.2d at 159; **See also, United States v. Skinner**, 667 F.2d 1306, 1309-10 (9th Cir 1982) ("Involuntary manslaughter is an unintentional homicide"). Petitioner's mental state was no sufficiently culpable to establish malice aforethought, or any form of malice. Petitioner's mental state, that is his mind and his heart were filled with fear that he was going to be robbed, hurt or killed. Adequate evidence supports this theory and defense counsel's fialure to request this theory of defense be presented to the jury was an egregious error that violates Petitioner's right to have effective assistance of counsel.

## E V I D E N T I A R Y    H E A R I N G

Section 2255 of 28 United States Code provides that unless the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall grant a prompt hearing, determine the issues and make findings fo fact and conclusion of law. And when §2255 motion are based on alleged occurrences outside the record which, if true, would support relief, the court must conduct a hearing on those allegations, unless viewing the petition against the record, its allegations do not state a claim for relief or are so patently frivolous or false as to warrant summary dismissal. **See, Baumann v. United States**, 692 F.2d 565 (9th Cir 1982); **Meeks v. Singletary**, 963 F.2d 316,

CVisPDF - www.fasiso.com

Case 1:97-cv-00097   Document 2   Filed in TXSD on 04/30/1997   Page 29 of 31

319 (11th Cir 1992); **Moore v. United States**, 950 F.2d 656, (10th Cir 1991); **United States v. Auten**, 632 F.2d 478 (5th Cir 1980); **O'Bryan v. Estelle,** 714 F.2d 365 (5th Cir 1983); **Streetman v. Lynaugh,** 812 F.2d 950 F.2d (5th Cir 1987); **Kirkpatrick v. Whitley**, 992 F.2d 491 (5th Cir 1993).

## C O N C L U S I O N

Petitioner has presented this petition in a straight forward manner as a pro se litigant raising a cognizable claim under 28 USC §2255, that his trial/appellate counsel failed to provide effective assistance of counsel in that he failed to put the case to an adversarial testing and allowed the government to obtain a conviction without meeting its required proof. The errors of trial attorney allowed the jury to find guilt without proper instruction to clearly deliniate the conduct of Petitioner, which would have demonstrated a lack of malice aforethought. The necessary element of the charge of murder. Petitioner claims an error has occurred that affects his substantial and fundamental rights that is cognizable under the plain error rule. **United States v. Young**, 470 US 1  , 105 S.Ct. 1038, 84 L.Ed.2d 1, (1985); Federal Rule of Criminal Procedure 52(b); **United States v. Olano**,507 US - (1993).

Petitioner moves this Court to conduct an evidentiary hearing and take testimony and evidence which, upon proof of error, to grant Petitioner a new trial or, in the alternative, to find by the evidence that he is guilty of a lesser  included or

demostrated element or offense, and resentence him accordingly.

Respectfully submitted,

*Felipe Molina Uribe*

**FELIPE MOLINA URIBE**

Petitioner Pro Se

CVisPDF - www.fasisio.com

# C E R T I F I C A T E    O F    S E R V I C E

I, THE UNDERSIGNED, CERTIFY THAT ON THIS 18TH DAY OF

APRIL , 1997, I FORWARDED A TRUE AND CORRECT COPY OF THE FOREGOING:

.28 USC §2255 MOTION AND MEMORANDUM WITH POINTS OF LAW

VIA U.S. MAIL IN THE FOLLOWING MANNER:

YES    NO
[ X ] [    ]    POSTAGE PREPAID
[ X ] [    ]    CERTIFIED
[ X ] [    ]    RETURN RECEIPT REQUESTED
[    ] [    ]    REGISTERED
[    ] [    ]    OTHER (list):

to the person(s) listed below:

 US Attorney's Office
Southern District of Texas
Attn: Paula Offenhauser, AUSA
P.O. Box 61129
Houston, TX  77208-1129

Signed, Sworn, Certified and mailed on
this 18th day of   April     , 1997.      *Felipe Molina Uribe*
FELIPE MOLINA URIBE
Reg. N° 39209-079
3901 Klein Blvd.
Lompoc, CA 93436