IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

UNITED STATES COURTS
SOUTHERN DISTRICT OF TEXAS

APR 22 1999

Michael N. Milby, Clerk

| | | |
|---|---|---|
| FELIPE MOLINA-URIBE, | * | |
|       Defendant-Movant, | * | CIVIL ACTION |
| versus | * | No: B97-097 |
| | * | CRIMINAL ACTION |
| UNITED STATES OF AMERICA, | * | No: B-87-001 |
|       Respondent. | * | |

FRIEND-OF-COURT MOTION

FOR ENLARGEMENT OF TIME IN WHICH TO FILE FORMAL APPLICATION
FOR CERTIFICATE OF APPEALABILITY

COMES NOW the above-captioned Defendant-Movant, by and through undersigned
inmate-legal advisor, and moves this Honorable Court pursuant to Fed.R.Civ.P.
6(b) to grant an enlargement of time in which Defendant-Movant may file a
formal Application for Certificate of Appealability, and in support thereof
says unto as follows:

Defendant-Movant (hereinafter "Molina") is presently in involuntary
adminstrative segregation.  He is a Mexican-National with a poor grasp of
the English language and absolutely no understanding of law or legal proceedings.
For these reasons, he is entirely reliant upon the undersigned inmate-legal
advisor to pursue his pro se attack on an unconstitutional conviction.

The undersigned has drafted a complete Application for Certificate of
Appealability, as well as a Brief in Support.  The Application and Brief total
47 pages in length.  While in the process of copying the Application for service
upon the Government, three simultaneous stabbings occurred on the compound of

the United States Penitentiary in Atlanta, Georgia (USP Atlanta), where both Molina and the undersigned are confined.[1]   As a result, the entire compound, including general population, is on indefinite lockdown.  The undersigned had completed only one copy before the incident described and, now, is unable to complete the necessary copy for service upon the Government.

Unfortunately, the undersigned cannot request a definite period of enlargement because the period of lockdown is unknown and completely at the discretion of the Warden.  For this reason, he must request in Molina's behalf an enlargement beginning on the date this Motion is filed and continuing until further notice.

As an alternative, the undersigned will include with the instant Motion a single copy of the Application for Certificate of Appealability to be copied and served by the Clerk of Court for the Southern District of Texas.


**WHEREFORE,** foregoing premises considered, Molina prays for this Honorable Court to grant an enlargement of time continuing until further notice or, in the alternative, an Order directing the Clerk to copy and serve upon the Government the enclosed Application for Certificate of Appealability, and for such other or further relief as deemed appropriate or entitled to this pro se Defendant-Movant.

---

[1]   The undersigned is in general population.  He is confined to his cell but has a typewriter therein.  However, he is completely out of Whiteout, has only four sheets of typing paper remaining, and is almost out of typewriter ribbon.

Respectfully submitted

WILLIAM SHANE HICKS
Reg. No: 41513-019
USP Atlanta
Box PMB
Atlanta, GA  30315
Inmate-Legal Advisor

FELIPE MOLINA-URIBE
Reg. No:  39209-079
USP Atlanta
Box PMB
Atlanta, GA  30315

## VERIFICATION

I, the above-signed Inmate-Legal Advisor, do hereby swear under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the contents of the foregoing Motion are true and correct to the best of my knowledge and belief, and swear further that I have the express permission of Defendant-Movant Felipe Molina-Uribe to address the Court in his behalf, on this the Eighteenth day of April, 1999.

## CERTIFICATE OF SERVICE

Based on the reasons set forth in the foregoing Motion, I humbly ask of the Clerk of Court for the Southern District of Texas to serve upon the assistant U.S. Attorney for the Southern District of Texas, located at P.O. Box 61129, Houston, Texas, 77208-1129, a true and exact copy of the foregoing, as well as a copy of the enclosed Application for Certificate of Appealability.

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

| | | |
|---|---|---|
| FELIPE MOLINA-URIBE, | * | |
| Defendant-Movant, | * | CIVIL ACTION |
| versus | * | No: B97-097 |
| | * | CRIMINAL ACTION |
| UNITED STATES OF AMERICA, | * | No: B87-001 |
| Respondent. | * | |

## APPLICATION FOR ISSUE OF CERTIFICATE OF APPEALABILITY

**COMES NOW** the above-captioned Defendant-Movant, pro se, pursuant to 28 U.S.C. § 2253(c)(1)(b), and files this application for issue of a certificate of appealability, and in support thereof says unto as follows:

### Preliminary Statement

This is an application for issue of a certificate of appealability from a judgment of the Court entered February 22, 1999, dismissing with prejudice a pro se motion under 28 U.S.C. § 2255 to Vacate, Set Aside or Correct the sentence of Defendant-Movant Felipe Molina-Uribe (hereinafter "Molina").

All references to the Record are directed to the six volumes of trial transcripts utilized on direct appeal: TR.Page Number.

CibPDF - www.fastio.com

## Issues

### GROUND ONE

WHETHER THE DISTRICT COURT COMMITTED CLEAR ERROR WHEN IT
DISMISSED THE SECTION 2255 MOTION AS TIME-BARRED WITHOUT
FIRST CONDUCTING AN INQUIRY TO DETERMINE WHETHER THE
MOTION WAS DEPOSITED WITH PRISON AUTHORITIES WITHIN THE
PRESCRIBED TIME?

Molina answers in the affirmative.

### GROUND TWO

WHETHER MOLINA WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL
WHEN DEFENSE COUNSEL FAILED TO ADEQUATELY INVESTIGATE
BEFORE SELECTING MOLINA'S SOLE DEFENSE THEORY?

Molina answers in the affirmative.

### GROUND THREE

WHETHER MOLINA WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL
WHEN DEFENSE COUNSEL PURSUED A DEFENSE THEORY BASED ON A
TRANSPARENT LIE WHEN A MORE CREDIBLE DEFENSE WAS
AVAILABLE?

Molina answers in the affirmative.

### GROUND FOUR

WHETHER MOLINA WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL
WHEN DEFENSE COUNSEL FAILED TO ADVISE MOLINA OF HIS RIGHT
TO TESTIFY AND, FURTHER, THREATENED TO ABANDON MOLINA IF
HE CONTINUED TO INSIST ON TELLING THE JURY HIS SIDE OF
THE STORY?

Molina answers in the affirmative.

## Statement Of The Case

On February 21, 1987, a federal grand jury sitting in the
Southern District of Texas returned a superseding indictment

-2-

against Molina and two co-defendants, Benito Cavazos-Lamas and Jesus Garcia-Nieto. Count One alleged the co-defendants conspired to possess with intent to distribute in excess of 100 kilograms of marijuana, in violation of 21 U.S.C. § 846. Count Two charged the trio with the substantive drug offense, in violation of 21 U.S.C. 841(a)(1). Count Three, brought under 18 U.S.C. §§ 1111 and 1114, charged that Molina, after having been placed under lawful arrest by Drug Enforcement Administration (DEA) special agent William Ramos and while attempting to escape, murdered Ramos while in the performance of his official duties by shooting him with Ramos' service revolver. Count Four alleged that during and in relation to the crime of violence described in Count Three, Molina used the firearm described in that count in violation of 18 U.S.C. § 924(c).

Prior to the start of trial on April 13, 1987, Molina entered pleas to Counts One and Two, but proceeded to trial on Counts Three and Four. The jury returned verdicts of guilty on April 16, 1987.

On May 13, 1987, the court imposed a term of twenty-five years each on Counts One and Two and a life sentence on Count Three. The Court ordered the twenty-five year sentences to run consecutive and the life sentence concurrently with those sentences. The Court imposed a five-year sentence as to Count Four, to be served consecutively to the other sentences.

Timely notice of appeal was filed with the Court and appeal taken to the United States Court of Appeals for the Fifth

-3-

Circuit. On August 24, 1988, the Fifth Circuit affirmed the Convictions on Counts One, Three and Four, but reversed in part and remanded with allowance to withdraw the guilty plea entered on Count Two for a violation of Fed.R.Crim.P. 11(c)(1).

On April 18, 1997, Molina deposited with prison authorities a Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct his sentence. This motion was filed with the Clerk of Court for the Southern District of texas on April 30, 1997.

On December 2, 1998, United States Magistrate Judge John William Black filed a Report and Recommendation, recommending that Molina's § 2255 motion be denied as time-barred under the provisions of the Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA). Molina filed objections, but the Court subsequently adopted the recommendation of Magistrate Judge Black and dismissed Molina's § 2255 motion, in an Order filed February 22, 1999. Molina now timely files this Application for Issue of a Certificate of Appealability.

## Statement Of Facts

On the afternoon of December 31, 1986, in McAllen, Texas, Molina and co-defendant Jesus Garcia-Nieto were in possession of over 300 pounds of marijuana and were out looking for a buyer. TR.211, 235. By chance, they encountered the other co-defendant, Benito Cavazos-Lamas, that same afternoon and asked himif he kenw of a possible buyer. Id. He indicated he did and, without knowing Roberto Ortiz was a paid DEA undercover informant, arranged a meeting between the parties. TR.211, 229, 237.

-4-

CIVPDF - www.texisa.com

A series of meetings took place.  TR.212, 229-33, 239-42.
Accompanying Roberto Ortiz was another paid DEA undercover
informant, Ernesto Rodriguez Ramirez.  TR.212, 229-33, 249.
Details for the sale of marijuana were worked out, and samples
were passed.  TR.212, 239-42.  The last of these meetings was
attended by agent Ramos, who was represented to Molina as
being a Cuban drug buyer from New York.  TR.212, 217, 254-55.
Agent Ramos received a sample of marijuana from Molina.  TR.212,
260.

The final arrangement was for the parties to meet in the
paring lot of Junior's Supermarket in Las Milpas, Texas, at
7:00 p.m.  TR.212, 262-64.  The plan was for Molina to arrive
with the marijuana in a beige van, and the presumed drug dealers
to arrive in a car with the agreed upon sum of money.  TR.213,
263-64.  The parties would then swap vehicles and later
re-exchange them after Molina removed the money from Ramos' car
and Ramos removed the marijuana from Molina's van.  TR.213, 269,
271.

Agent Ramos and the two confidential informants (CIs)
arrived a few minutes after 7:00 p.m.  TR.271.  It was dark at
that time.  TR.272, 300.  In the vicinity were a number of other
DEA agents to assist in the take-down and arrest of Molina.
TR.274.  By prearrangement, the lifting of Ramos' trunk lid was
the signal for the surveilling agents to converge on the
vehicle and arrest Molina.  TR.273-74, 300, 343.  Molina soon
arrived in the beige van and parked in front of Ramos' car.

-5-

TR.275-76.  The two CIs walked to the van and asked to see the drugs, at which time they were shown the marijuana.  TR.277-79. It was then suggested by CI Ortiz that Molina examine the money and the exchange be completed.  TR.279.

The two CIs and Molina then walked from the van to the car occupied by agent Ramos, the purported Cuban drug dealer. TR.279, 302.  CI Ortiz opened the passenger door and advised agent Ramos that the marijuana was in the van and everything was set.  Id.  He then asked Ramos for the trunk key, as well as where he should seat Molina while he was retrieving the money. TR.279-80.  Molina was asked to sit in the front seat with agent Ramos, but he declined and instead sat on the rear seat, somewhere in the middle.  TR.280.  With CI Rodriguez standing at the rear of the car, CI Ortiz proceeded to the trunk and opened it -- the prearranged arrest signal.  TR.281, 564.

Ortiz opened the trunk but then quickly lowered it to see what was going on in the car.  TR.281.  He saw agent Ramos turn in his seat with his revolver drawn and point it at Molina's head.  TR.282.  An immediate struggle ensued between Ramos and Molina over control of the gun.  TR.282, 565.  Ramos yelled in English for assistance.  Id.  Soon, both Ramos and Molina were in the back seat fighting for the gun, with Molina on his back and Ramos on top positioned across his midsection.  TR.282, 346, 570, 670.

Upon hearing the calls for help, CI Ortiz entered the car to assist Ramos.  TR.283.  He was followed closely by CI

-6-

Rodriguez. TR.303, 565. At this point in the struggle, both
agent Ramos and Molina had a hand on the gun. TR.284. CI Ortiz
grabbed Molina's free hand and put a knee on Molina's right leg
in an effort to assist Ramos in gaining control. TR.285.
Meanwhile, CI Rodriguez assisted by pulling on Molina's leg with
one hand and grabbing for the gun with the other. TR.565. CI
Ortiz testified that at this point he advised Molina to let go
of the gun, that they were federal agents. TR.285. However, CI
Rodriguez testified that he did not remember Molina being
advised that they were federal agents. TR.572, 709. Moreover,
shortly after the incident, he gave a statement to an agent with
the Federal Bureau of Investigation (FBI) that no one told
Molina they were federal agents. TR.682-83. Further, CI Ortiz
later apparently contradicted himself by testifying that prior
to the first shot being fired, neither he nor agent Ramos
advised Molina that he was under arrest. TR.705.

A shot was fired, which according to the testimony of CI
Rodriguez -- struck him in the hand. TR.286, 565. Rodriguez
withdrew in pain from the struggle at this point. TR.565. CI
Ortiz testified that he again advised Molina that Ramos was a
federal agent, at which time Ramos responded, "I already told
him that he is under arrest but he doesn't want to pay
attention." TR.286. Two more shots were fired, one of which is
alleged to have stricken Molina in the leg. TR.286, 531, 544.
CI Ortiz testified that he again advised Molina that Ramos was a
federal agent, to which Molina responded in Spanish, the

-7-

translation of which indicated Molina thought Ramos and the
CIs were going to rob him or hurt him with the gun.  TR.287,
700.

A fourth shot was then fired, striking Ramos in the chest.
TR.289, 290, 332.  Two of the surveilling DEA agents arrived
almost immediately following the final shot.  The first agent
entered on the passenger side with a gun pointed at Molina's
head.  TR.289, 304.  A second agent entered almost
simultaneously on the driver side and took the pistol away from
Molina.  TR.348.  Molina offered no further resistance.  TR.304.
He was handcuffed and placed under arrest.  TR.351.  Agent Ramos
was rushed to a local hospital, where he was pronounced dead.
TR.290-91, 317, 323, 331.

Prior to trial, the Government decided not to seek the
death penalty.  TR.9-10.  The theory of prosecution was that
Molina killed agent Ramos while engaged in an attemped escape
from custody pursuant to a lawful arrest.  TR.216.

The Court appointed two attorneys to represent Molina at
trial, J.M. Ramirez and Joseph A. Connors.  TR.7-10.  These
attorneys presented as a defense to the charge of first-degree
murder only one theory:  Agent Ramos was indeed the victim of a
malicious, premeditated murder; however, he was killed not by
Molina, but by his fellow DEA agents.  TR.406.  Strangely, this
"Patsy" theory was pursued despite the fact that Molina had not
only made inculpatory statements on the scene of the shooting
(TR.800-05), but also confessed to firing the fatal shot to an

-8-

CWPDF - www.texis.com

FBI agent shortly afterward.  TR.21, 23, 132, 141.

To support the "Patsy" theory, defense counsel made many futile attempts do demonstrate for the jury a number of exculpatory points, including, inter alia, the following:  (1) the evidence had been "monkeyed" with (TR.528); (2) more than four shots had been fired in the car (TR.509, 530-31, 534-46, 552-53, 556-57); (3) the agents deliberately delayed medical treatment by not driving Ramos to the nearest hospital (TR.450-53, 500-02, 504-05, 608-13, 636-39); (4) Molina's prints were not on the gun, so he could not have fired the fatal shot (TR.715-16); and (5) the bullet found in Molina's leg was not fired from the same gun which killed agent Ramos (TR.748-51). Each and every one of these defense allegations were persuasively rebutted by the Government.  See, respectively, TR.550-51, 547-550, 639, 720-21, and 754-56.  Moreover, minutes after the jury heard testimony from a defense witness which indicated that Molina said he accidently shot agent Ramos, the defense rested. TR.807.

Three times during trial, the Court made comments regarding the inadequate performance of defense counsel.  The first instance occurred when defense counsel did not know whom to call as a witness.  TR.362.  The Court seemed to express amazement at this shortcoming on the part of defense counsel.  TR.362.  Later, the Court advised the defense team that "they had not elicited one bit of exculpatory evidence yet" from the witnesses. TR.601-02.  The third instance occurred when the Court advised

-9-

CSMPDF - www.fesius.com

the defense team that he had not "seen any indicia or any exculpatory testimony being adduced from any of the witnesses" to support the defense theory.  TR.622-23.  The Court was not the only one to speak out during trial with regard to the performance of defense counsel.  At one point, a woman juror spoke up to correct an obvious misunderstanding of -- or attempt to distort -- the testimony of a witness.  TR.767.

At the close of the presentation of evidence and outside the presence of the jury, the Court granted a defense motion to exclude from the jury charge the Government's "escape" theory. TR.812, 833.   In subsequent discussions regarding the substance of the jury charge, the Court reminded the defense team that they put forth only one theory; i.e., Ramos was assassinated by his fellow DEA agents.  TR.825.

Closing arguments for the defense began with a brief recount by counsel Joseph A. Connors of what he perceived to be inconsistent testimony by the experts as to how the numerous bullet holes came about.  TR.880-81.  However, he soon switched horses and began arguing that a first-degree murder had not been committed because there was no premeditation on the part of Molina, that, at best, the crime committed was voluntary manslaughter.  TR.881-82.  Defense counsel Connors even argued that Molina killed agent Ramos accidentally (TR.883), and he took the gun away because Molina perceived agent Ramos to be a "bad guy."  TR.886.

Startlingly, defense counsel J.M. Ramirez then addressed

-10-

the jury with an entirely different story.  He returned to the
"Patsy" theory, arguing that agent Ramos had been killed by
agents and operatives of his own DEA team, that he was the
victim of a "conspiracy."  TR.889-905.  The Government later
highlighted for the jury the inconsistencies in defense
theories.  TR.918-20.

The Court charged the jury, advising them to disregard the
"and while attempting to escape" clause of Count Three.  TR.933.
The Court charged the jury on first-degree murder (TR.933-37),
second-degree murder (TR.937-39), voluntary manslaughter
(TR.939-41), and self-defense (TR.941-43).  The jury entered
deliberations sometime before 11:45 a.m.  TR.952.  At 3:05 p.m.,
they requested the definitions to the different categories of
charges on the verdict sheet.  TR.953.  The Court submitted to
the jury a list enumerating the elements constituting first-
degree murder, second-degree murder and voluntary manslaughter.
TR.953-54.  At 4:20 p.m., the jury requested a dictionary.
TR.954.  The Court denied this request, instead instructing the
jury to give words their ordinary meaning unless the Court had
defined them otherwise.  TR.954-55.  At 4:55 p.m., the jury
returned guilty verdicts on all counts.  TR.955.

## Summary Of The Arguments

The district court abused its discretion when it dismissed
as time-barred the § 2255 motion.  The motion was placed in the
prison legal mail box on April 18, 1997, six days before the
deadline for Molina to file his motion with the Court.

The defense team of J.M. Ramirez and Joseph A. Connors provided ineffective assistance when they failed to conduct a reasonable investigation before selecting a theory of defense. This lack of adequate investigation manifested itself during the course of the trial when each and every attempt to adduce testimony supporting the defense theory was either ruled out as irrelevant by the Court or clearly rebutted by the evidence.

As a result of the inadequate investigation by the defense team, they provided ineffective representation when they presented as a defense theory an  obviously transparent lie, one clearly without evidentiary support, when a much more plausible and factually-compelling defense was available.

Finally, the defense team was ineffective when they failed to advise Molina of his fundamental right to testify, and later threatened to withdraw if Molina continued to insist on telling the jury his side of the story.  Though Molina's testimony would have been contrary to the defense theory, it would have been consistent with the evidence adduced by the Government and could have resulted in a conviction of the lesser-included offense of voluntary manslaughter.  Regardless, the choice whether to testify rested exclusively with Molina, not the defense team.

## Argument

### GROUND ONE

> **WHETHER THE DISTRICT COURT COMMITTED CLEAR ERROR WHEN IT DISMISSED THE SECTION 2255 MOTION AS TIME-BARRED WITHOUT FIRST CONDUCTING AN INQUIRY TO DETERMINE WHETHER THE**

-12-

**MOTION WAS DEPOSITED WITH PRISON AUTHORITIES WITHIN THE PRESCRIBED TIME?**

The Anti-terrorism and Effective Deah Penalty Act of 1996 (AEDPA) provides that a § 2255 motion is governed by a one-year statute of limitations. The AEDPA specifies four triggering events, each beginning a new one-year period within which a federal inmate can bring a motion challenging judgment. The one-year period of limitations runs of:

(A)   the date on which the judgment of conviction becomes final;

(b)   the date on whcih the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

(C)   the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recongnized by the Supreme Court and made retroactively applicable to cases on collateral review; or,

(D)   the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

The United States Supreme Court denied Molina's petition for writ of certiorari on February 21, 1989 (489 U.S. 1022); therefore, judgment of conviction became final on that date. Under a literal reading of § 2244(d)(1), Molina has long since been time-barred from seeking habeas relief. However, the Fifth Circuit has determined that petitioners must be afforded a "reasonable time" following the passage of the AEDPA before claims which have accrued before the AEDPA's passage will be

-13-

time-barred.  United States v. Flores, 135 F.3d 1000, 1004
(5th.Cir.1998); see also United States v. Simmonds, 111 F.3d
737 (10th.Cir.1997); Calderon v. United States, 112 F.3d 386
(9th.Cir.1997); Lind v. Murphy, 96 F.3d 856 (7th.Cir.1996),
rev'd in part, 521 U.S. 320 (1997).  In determining what a
"reasonable time" is, the Fifth Circuit joined the Seventh,
Ninth and Tenth Circuits holding that ". . . one year commencing
on April 24, 1996, presumptively constitutes a reasonable time
for those prisoners whose convictions had become final prior to
the enactment of the AEDPA to file for relief. . . ."  Flores
at 1006; see also Lind at 866; Calderon at 390; Simmonds at
746-47.  Accordingly, no § 2255 motion filed before the 24th
of April 1997, can be deemed time-barred pursuant to Title
28 U.S.C. § 2244(d).  Davis v. Johnson, 158 F.3d 806, 810
(5th.Cir.1998); Flanagan v. Johnson, 154 F.3d 196, 200 (5th.
Cir.1998).

However, the issue of timeliness does not end here, because
the district court did not receive Molina's § 2255 motion until
April 30th, six days after the "reasonable time" deadline due
§ 2255 movants  such as Molina.  On its face, Molina's § 2255
motion is out of time, and, normally, this would be fatal to his
cause.  The courts, however, have viewed a § 2255 motion filed
by a pro se prisoner as unique and have tailored a different
rule for the filing of § 2255 motions for pro se prisoners.

In Houston v. Lack, 487 U.S. 266, 276 (1988), the United

-14-

CMsPDF - www.texla.com

States Supreme Court held that pro se prisoners' notices of
appeal are filed at the moment of delivery to prison authorities
for forwarding to a district court.  Justice Brennan, writing
for the majority in Houston, gave this rationale for the
holding, popularly termed the "mailbox rule":

> Unskilled in law, unaided by counsel, and unable to leave
> the prison, [the prisoner's] control over the precessing of
> his notice necessarily ceases as soon as he hands it over
> to the only public officials to whom he has access -- the
> prison authorities -- and the only information he will
> likely have is the date he delivered the notice to those
> prison authorities and the date ultimately stamped on his
> notice.

487 U.S. at 271-72 (1988).

It is worth noting that this exact scenario applies to
Molina's situation, except that here no determination was made
by the district court as to exactly when Molina gave his motion
to prison authorities.  However, the record does show that
Molina signed his motion on April 18, 1997, and it was filed by
the Clerk on April 30, 1997, making it entirely reasonable to
assume, then, that on or before April 18, 1997, Molina
deposited his § 2255 motion with prison officials for forwarding
to the Court.

The underlying question in the analysis of whether Molina's
§ 2255 motion is timely filed is whether Houston's "mailbox
rule" applies to the filing of § 2255 motions by pro se
prisoners.  Although it appears the Fifth Circuit has not yet
decided this exact question, it has extended the mailbox rule to
state habeas motions in Spotville v. Cain, 149 F.3d 374 (5th.Cir

-15-

1998).  "We hold that a pro se prisoner's habeas petition is
filed, for purposes of determining the applicability of the
AEDPA, when he delivers the papers to prison authorities for
mailing."  Id at 378.

The Third Circuit last year was faced with this exact
issue and applied Houston's rationale to § 2255 motions, noting
that "at least one court [the Sixth Circuit] has applied
Houston to a motion . . . to file a second or successive § 2255
motion."  Burns v. Morton, 134 F.3d 109, 112 (3rd.Cir.1998),
citing in re Sims, 111 F.3d 45 (6th.Cir.1997).  In Burns, the
Third Circuit concluded that, as in other situations where
Houston's rule has been applied, a § 2255 movant "remains
entirely at the mercy of prison officials."  Id at 113.

> A pro se prisoner's habeas petition is deemed filed at the
> moment he delivers it to prison officials for mailing to
> the district court because . . . we see no reason why
> federal prisoners should not benefit from any such rule,
> and for the purposes of clarity and uniformity, we extend
> tis holding to the filing of motions under § 2255.

Id. at 113; see also  Peterson v. Demskie, 107 F.3d 92, 93 (2d.
Cir.1997) (applying Houston to its consideration of when a
section 2254 petition is filed for purposes of determining
whether it was filed within a reasonable time of the effective
date of the AEDPA).

Molina's § 2255 motion should have been deemed as "filed"
by the district court when it was deposited with prison
authorities for mailing, on April 18, 1997.  Cf Sonnier v.
Johnson, 161 F.3d 941, 945 (5th.Cir.1998), citing Spotville,

-16-

149 F.3d at 378.  Accordingly, the district court clearly erred when it dismissed Molina's § 2255 motion as time-barred under the AEDPA.

GROUND TWO

> WHETHER MOLINA WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN DEFENSE COUNSEL FAILED TO ADEQUATELY INVESTIGATE BEFORE SELECTING MOLINA'S SOLE DEFENSE THEORY?

I.

The principles governing ineffective assistance of counsel claims are familiar to all in the legal community, and Molina need not belabor them here.  Basically, a defendant has a Sixth Amendment right not just to counsel, but to "reasonably effective assistance" of counsel.  Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).  To gain relief for a violation of this right, a defendant must show both unprofessional conduct and, in most cases, prejudice as a result.  More precisely, the defendant must show that (1) his or her attorney's performance was, under all circumstances, unreasonable under the prevailing norms, Id. at 687-91, 104 S.Ct. at 2064-66, and unless prejudice is presumed, that (2) there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S.Ct. at 2068.  However, a defendant need not show that a different result "would be more likely than not." McFadden v. Cabana, 851 F.2d 784, 787 (5th. Cir.1988).  A reasonable probability is a probability

-17-

sufficient to undermine the confidence in the outcome.
<u>Strickland</u> at 694, 104 S.Ct. at 2068.

                              II.

     Molina would argue that the complete lack of diligent and
adequate investigation by the defense team manifested itself
during the course of the trial when testimony by the witnesses
clearly rebutted the theory of defense.  For example, defense
counsel J.M. Ramirez at one point tried to lead the jury to the
conclusion that someone had been "monkeying with [the]
evidence."  TR.528.  Had defense counsel's attempt momentarily
put any doubt in the minds of the jurors, that doubt was soon
erased when the Government adduced testimony from the relevant
witness that no one "monkeyed" with the evidence, and any
indication otherwise was merely the result of routine
investigation by the officers.  TR.550-51.  This was but the
least harmful of counsel's blind assertions.

     Defense Counsel put forth considerable effort in a futile
attempt to demonstrate for the jury that more than four shots
had been fired in the car driven by agent Ramos (TR.509, 530-
46, 552-53, 556-57), and the bullet found in Molina's leg was
not fired from the same gun which killed Ramos (TR.748-51).
The evidence told a different story.  Hearing both direct- and
cross-examination testimony from the witnesses, no rational
juror could have possibly harbored any doubt whether any number
other that four shots had been fired.  There existed absolutely
no compelling evidence otherwise.  In fact, at one point a

                             -18-

juror spoke up to correct defense counsel J.M. Ramirez' apparent misunderstanding of -- or thinly veiled attempt to distort -- the "bullet hole" evidence.  TR.767.

Defense counsel Ramirez spent a nearly equal amount of time and effort in an apparent attempt to imply that the agents who drove Ramos to the hospital deliberately and maliciously delayed treatment by driving to the hospital located furthest away from the scene of the shooting.  TR.450-53, 500-02, 504-05, 608-13, 636-39.  Incredibly, this effort was continued despite early testimony revealing that the hospitals were very close to one another, almost "adjacent to each other."  TR.501.  Counsel eventually abandoned this issue when the agent who drove Ramos to the hospital testified that he drove to the McAllen Medical Center because it was "considered to be the best in South Texas." TR.639.  Such explanation foreclosed further rational inquiry.

Defense counsel Ramirez' lack of investigation was especially apparent when he boldly stated to the Court, before the jury, that a witness gave an "incorrect" answer to a question regarding whether that witness could determine which gun fired the bullet found in Molina's leg.  TR.748.  Counsel was relying on a report which stated, in part, that the bullet bore "no microscopic marks of value for comparison purposes." TR.749.  Much to counsel's chagrin, the witness proceeded to explain how bullets are comprised of two parts, the core and the jacket, and sometimes these two components separate upon impact.  TR.749-51.  The section of the report referenced by

-19-

CMxPDF - www.texis.com

counsel referred to the core, which, according to the witness, often bears no microscopic marks. Id. However, the witness continued, fragments of the jacket were also submitted to the lab for comparison. TR.752. Tests of these fragments appeared on the report as Specimen Q5. TR.852. It was from these fragments that the witness was able to determine that the bullet extracted from Molina's leg was fired from the same gun which killed agent Ramos, "to the exclusion of every other firearm." TR.756.

Even more telling was defense counsel's obvious surprise near the end of the trial when a witness testified that Molina uttered a highly inculpatory statement about the shooting of agent Ramos. TR.801. Minutes later, counsel had the witness repeat the inculpatory statement and agree that Molina had meant that he shot Ramos by accident. TR.804, 805. Having the witness repeat this highly inculpatory utterance is puzzling, because the entire theory of defense up to that point had consisted of an argument that Molina **did not** shoot Ramos.

Finally, defense counsel asked a series of questions meant to impress upon the jury that Molina could not have fired the fatal shot because the gun bore none of his fingerprints. TR.715. As with all previous defense attacks and innuendos, this too was rebutted by testimony adduced by the Government. TR.720-21. The fingerprint expert gave testimony which would lead any prudent juror to the obvious, logical conclusion that a gun involved in a struggle would likely not bear the prints of

-20-

CMsPDF - www.fasina.com

the participants, because an item being "twisted in your hand" will cause the latent prints to be smeared.  TR.720-21, 723-24.

### III.

"A substantial body of Fifth Circuit case law insists . . . that effective counsel conduct a reasonable amount of pretrial investigation."  Nealy v. Cabana, 764 F.2d 1173, 1177 (1985). The scope of the required investigation "is a function of the 'number of issues in the case, the relative complexity of those issues, the strength of the government's case and the overall strategy of trial counsel'. . . ."  Id. (quoting Martin v. Maggio, 711 F.2d 1273, 1280 (5th.Cir.1980); Baldwin v. Maggio, 704 F.2d 1325, 1333 (5th.Cir.1983).  Moreover, "this circuit has recognized that, at a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case."  Nealy at 1177 (footnote omitted).

Counsel's futile attempts to adduce exculpatory testimony from the witnesses certainly leads one to infer a complete failure to investigate. [1]  Had counsel conducted even minimal investigation, it is difficult to conclude that he would have questioned the witnesses in the manner in which he did.  Most telling involved the bullet fragment evidence.  Even a cursory glance at the FBI report would have revealed that items Q5 and Q6 of Defendant's Exhibit Three were two parts of the same

---

[1]    The foregoing instances were but a few of the numerous attacks on the evidence that were wholly unsupported by the evidence.  For a full (cont'd ...)

bullet -- the jacket and the core -- with the jacket confirmed to have been fired from the same gun which killed Ramos.  TR.749-52.

But even if this information was not obvious to counsel, he could have consulted with someone knowledgeable in that area for an informed interpretation of the report.  He could have invested a few minutes reading time in a forensic ballistics manual, which no doubt would have provided counsel Ramirez with the knowledge he needed for an informed evaluation of the report.  Such minimal pretrial investigation would have not only spared the embarrassment before the jury of having wrongly accused an expert witness of giving incorrect testimony, but also would have weighed heavily against the incredible defense theory chosen by counsel.  Indeed, had the defense team conducted a thorough investigation, both factual and legal, which is absolutely required to determine if matters of defense could be developed, see Coles v. Peyton, 389 F.2d 224, 226 (4th.Cir.1968), it stands to reason that they would not have chosen a defense theory with not a scintilla of evidentiary support.

Equally revealing of counsel's failure to investigate is he shift in defense theory at the end of trial.  When a witness testified that Molina uttered an admission which implied he shot agent Ramos accidentially (TR.807), co-counsel Connors immediately recognized that the most prudent theory fell under a claim of manslaughter.  He pursued this theory in closing

---

understanding of the ludicrousness of the defense theory and the futility of the defense attacks, the Court is encouraged to read the defense.  TR.406-807.

-22-

arguments, arguing that Molina shot agent Ramos accidently and without premeditation. TR880-81, 886.

The defense team's ignorance of this highly inculpatory utterance by Molina belies any presumption that they fulfilled their duty to "make reasonable investigations or to make reasonable decisions that make particular investigations unnecessary." Strickland at 691, 104 S.Ct. at 2066. Rather, their actions paint a clear picture reflecting a complete failure to investigate. Situations such as this were summed up nicely by the Third Circuit:

> Ineffectiveness is generally clear in the context of complete failure to investigate because counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made.

United States v. Gray, 878 F.2d 702, 711 (1989).

Clearly, the defense team's lack of pretrial investigation rendered their performance "below an objective standard of reasonableness." Strickland at 688, 104 S.Ct. at 2064. Accordingly, Molina was denied effective assistance of counsel as contemplated under the Sixth Amendment to the United States Constitution. [2]

**GROUND THREE**

**WHETHER MOLINA WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL WHEN DEFENSE COUNSEL PURSUED A DEFENSE THEORY BASED ON A TRANSPARENT LIE WHEN A MORE CREDIBLE DEFENSE WAS AVAILABLE?**

---

[2]    To avoid redundancy, the "prejudice" component for Grounds Two - Four will be discussed together.

-23-

I.

In reviewing ineffective assistance of counsel claims, courts do not sit to second guess considered professional judgments with the benefit of 20/20 hindsight. Washington v. Watkins, 655 F.2d 1346, 1355 (5th.Cir.1981); Easter v. Estelle, 609 F.2d 756 (5th.Cir.1980). The Fifth Circuit has consistently held that counsel will not be regarded constitutionally deficient merely because of tactical decisions. See United States v. Guerra, 628 F.2d 410 (5th.Cir.1980), cert. denied, 450 U.S. 934; Buckelew v. United States, 575 F.2d 515 (5th.Cir.1978); United States v. Beasley, 479 F.2d 1124, 1129 (5th.Cir.), cert. denied, 414 U.S. 924 (1973); Williams v. Beto, 354 F.2d 698 (5th.Cir. 1965). Even where an attorney's strategy may appear wrong in retrospect, a finding of constitutionally ineffective representation is not automatically mandated, Baty v. Balkcom, 661 F.2d 391, 395 n. 8 (5th.Cir.1981); Baldwin v. Blackburn, 653 f.2d 942, 946 (5th.Cir.1981), because courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" and that the "challenged action might be considered sound trial strategy." United States v. El-Zoubi, 993 F.2d 442, 448 (5th.Cir.1983) (quoting Strickland v. Washington at 687, 104 S.Ct at 2064).

However, "the mere incantation of the word 'strategy' does not insulate attorney behavior from review. The attorney's choice of tactic must be **reasonable** under the circumstances." Carver v. Singletary, 975 F.2d 1513, 1538 (11th.Cir.1992)

-24-

evidence as to whether agent Ramos and the CIs announced their
true identities as police agents, it was undisputed that agent
Ramos was screaming for help in English at the outset of the
struggle (TR.282), a language not very well understood -- if at
all -- by Molina at the time.  See, e.g., TR.199 (the Court
provided in interpreter for Molina).

It is difficult to imagine a greater provocation for a
"fight or flight" response than having a gun pointed at one's
head by a man screaming in an unfamiliar language and
simultaneously being attacked by two presumably dangerous men in
a dark parking lot.  The jury, having been shown the relevance
of these facts, could have easily drawn an inference that,
lacking option of "flight," Molina reasonably chose the only
alternative available:  To "fight."  In short, defense counsel
could have argued that Molina acted in the "heat of passion."

Third, defense counsel could have highlighted and explained
for the jury the relevance of the statement made by Molina
during the course of the life and death struggle.  While on his
back and presumably fighting for his life with three men for
control of a gun, Molina screamed out in Spanish, the translation
of which indicated his belief that the three men were intending
to rob him or hurt him with the gun.  TR.700.  Most compelling,
though, would have been evidence as to Molina's state of mind at
the time spoken from his own mouth.  He would have explained how
he harbored fear of selling the marijuana to a Cuban drug buyer,

-27-

fear that he would be robbed and possibly killed as a result. Molina would have explained how those fears suddenly came to life when the man he believed to be a Cuban drug buyer turned on him with a gun pointed at his head. Molina would have explained further how he did not hear the alleged -- and arguably disputed -- announcements that the drug buyers were in reality police officers. He would have recounted a different set of facts with regard to the sequence of the gunshots, telling the jury that it was he who shot first. But most importantly, he would have told the jury that he never would have struggled with agent Ramos in the first place had he even suspected him to be a police officer.

These and numerous additional favorable material facts could have and should have been brought out for the jury's consideration. Unfortunately, the jury was never favored with any of the foregoing exculpatory evidence, because defense counsel was bent on a defense theory not only totally without evidentiary support, but also preposterous and absolutely incredible. It was only near the end of trial, when it became abundantly clear the "Patsy" theory was doomed (See TR.829), that one of the defense team realized the best defense should have been a manslaughter theory. But at this point, it was too late. The intelligence of the jury had been insulted, and not one iota of evidence had been adduced by the defense team to support a manslaughter theory.

Surprisingly, it was the Government who elicited the most favorable evidence for Molina, though not in the context of the

-28-

"Patsy" theory.  Late in trial a witness being corss-examined by
the Government testified that, at the scene of the shooting,
Molina uttered in Spanish that "he didn't want to do that thing
and that the gun had gone off by itself."  TR.801.  Seizing on
this late revelation, defense counsel Ramirez had the witness
twice repeat what Molina said.  TR.804-05.  He then elicited from
the witness that witness' interpretation of what Molina meant by
the utterance.  TR.805.  The witness testified that he thought
Molina was admitting he accidently shot Ramos.  Id.  It is
significant to recognize that the utterance defense counsel had
the witness twice repeat was contrary and **highly** prejudicial to
the "Patsy" theory.

It was during closing arguments, though, that the defense
team made on of its most egregious and unforgivable errors.
Speaking first for the defense, counsel Joseph A. Connors
briefly touched on what he proclaimed to be inconsistent testimony
by the witnesses as to how many bullet holes resulted from the
gunfire.  TR.880-81.  However, he quickly abandoned the defense
theory argued throughout trial and , instead, switched horses to
a manslaughter theory.  TR.881-86.  In the course of his
argument, he more or less admitted that Molina shot agent Ramos,
but argued that the killing was done accidently and without
premeditation or malice.  Id.

Defense counsel Ramirez then addressed he jury.  Incredibly,
he returned to the "Patsy" theory and argued that Molina **did not**

-29-

shoot Ramos, that Ramos was the victim of a "conspiracy" and was killed by agents of his own DEA team. TR.889-905. The Government, of course, later highlighted for the jury the inconsistency in defense theories. TR.918-20.

### III.

"[I]t is rarely a good strategic decision to advance a transparent lie as your client's primary defense, and certainly not when there is a far more plausible defense available." Sanders v. Ratelle, 21 F.3d 1446, 1460 (9th.Cir.1994) (holding that an attorney's choice to eliminate a certain defense cannot be viewed as "strategic" where counsel "failed to conduct even the minimal investigation that would have enabled him to come to an informed decision"). Moreover, "even if the most well-intentioned lawyer earnestly pursues a strategy that he believes to be in the best interest of his client, an ineffective assistance of counsel claim will lie if that startegy is objectively unreasonable under professional norms. . . ." DeLuca v. Lord, 858 F.Supp. at 1346.

It is difficult to dispute that the "Patsy" theory was a lie fabricated by defense counsel. Indeed, Molina had confessed to shooting agent Ramos to an FBI agent. Moreover, he was entirely truthful with defense counsel Ramirez with regard to his shooting Ramos. Why counsel Ramirez chose the incredible "Patsy" theory over the much more reasonable and factually-supported theory of manslaughter is beyond explanation.

Surely Ramirez was aware that the Fifth Circuit had many

CDsPDF - www.lawia.com

years prior declared manslaughter to be a lesser-included offense
of first-degree murder.  See United States v. Collins, 690 F.2d
431, 337 (5th.Cir.1983).  Perhaps counsel was under the
impression that because Molina was accused of killing agent Ramos
while attempting to escape from lawful custody -- which mandates
a first-degree murder conviction -- he felt he had nothing to
lose by trying to beat the case outright.  If so, that impression
was the result of a failure to investigate and was unreasonable
under the circumstances.

At the time of Molina's trial, several circuits had
concluded that mens rea [4] was a necessary element to the crime of
escape under 18 U.S.C. § 751(a).  See, e.g., United States v. Nix,
501 F.2d 516, 519 (7th.Cir.1974); United States v. Snow, 485 F.2d
811 (D.C.Cir.1973).  In United States v. Spletzer, 535 F.2d 950
(5th.Cir.1976), the Fifth Circuit passed on the "difficult
question of whether specific intent [i.e. mens rea] is always
required under § 751." Id. at 954 n. 4.  However, later opinions
suggested that the crime of escape does include an element of
intent.  See United States v. Panter, 688 F.2d 268, 271 (5th.Cir.
1982); United States v. Brackett, 582 F.2d 1027, 1028 (5th.Cir.
1978) ("the crime of escape . . . includes an element of volition,
i.e., the Government must show that the accused failed to return
'knowingly,' 'willfully,' and 'unlawfully' ").; United States v.
Kelley, 546 F.2d 42 (5th.Cir.1977) ("Kelley's coercion request

---

[4]     Mens rea is defined as "criminal intent."  Blacks Law Dictionary (Sixth
Edition p. 985.

did, however, highlight the necessity to instruct the jury
properly with regard to the intent <u>required</u> under § 751)
(emphasis added).  Thus, the Government would have been
compelled to prove to the Court's satisfaction that Molina
willfully and knowingly attempted to escape from lawful custody.
Otherwise, the Court would not charge the jury on that theory. [5]

The evidence was far from compelling that Molina
"knowingly" attempted to escape from lawful custody.  First,
testimony by the witnesses was inconsistent as to whether Molina
was advised he was under arrest, and uncertain as to whether the
alleged advisements were spoken in a language Molina understood.
Second, testimony revealed that in the midst of the struggle
Molina screamed out in Spanish, the translation of which
indicated his fear of being robbed and/or hurt by the three
presumed assailants.  Indeed, the weight of the evidence was
against any presumption that Molina knew he was under arrest.
He thus lacked the requisite <u>mens</u> <u>rea</u> to be held accountable
under the Government's "and while attempting to escape" theory
of first-degree murder.

Armed with all the relevant facts gleaned from a thorough
investigation, it stands to reason that a reasonable attorney
with his client's best interest at heart would have realized the
probability of overcoming the "escape from custody" theory, and

---

[5]     It is worthy to recall that this is exactly what occurred.  The Court
refused to charge the jury under the theory of an attempted escape from
custody.  TR.812, 833.  Moreover, the Court made several comments throughout
the course of the trial indicating its difficulty with the "escape" theory.
TR.360, 807, 809.

would have pursued a defense theory based on the turth and supported with at least some evidence. This, defense counsel did not do. He inexplicably chose a defense based on a transparent lie, a defense with not one scintilla of evidentiary support. Whatever the reason, it is irrelevant to Molina's claim, because the defense strategy chosen by counsel was "objectively unreasonably" under the circumstances. See Seidel v. Merkle, 146 F.3d 750, 756 (9th.Cir.1998) ("Counsel's disregard for conspicuous pieces of evidence that pointed to a potentially fruitful trial strategy cannot be described as anything short of defective representation); Ward v. United States, 995 F.2d 1317, 1322 (6th.Cir.1993); DeLuca v. Lord at 1346. While Molina certainly recognized the benefit of hindsight in evaluating counsel Ramirez' defense strategy, he would argue that, all things considered, it is not hindsight that should guide the Court to conclude that Ramirez' failure to present the manslaughter theory of defense was tantamount to deficient performance, it is common sense.

## IV.

With regard to the inconsistent defense theories urged by the attorneys in closing arguments, Molina would argue that such a scenario -- which judging from the lack of applicable case law is highly rare -- was best summed up by the Ninth Circuit:

> Inconsistencies between the theories presented by the defense and prosecution are a given. However, when those inconsistencies also arise from the defense's own camp, "there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would
have been different."

Bland v. California Dept. of Corrections, 20 F.3d 1469, 1479
(9th.Cir.1994) (quoting Strickland at 694, 104 S.Ct. at 2068).

The Court is encouraged to read the closing arguments by
the defense team to get a full understanding of just how
truly ineffective was their representation of Molina. See
TR.880-905. The first to speak, counsel Joseph A. Connors,
touched briefly on the perceived inconsistencies between
witness testimony regarding the number of bullet holes found
in Ramos' car. However, he soon switched horses by arguing
that Molina in fact shot Ramos but did so by accident and
without malice nor premeditation. He argued that the crime
committed was, at best, voluntary manslaughter.

J.M. Ramirez then followed up with an entirely different
story. He saddled the original horse, arguing that Molina did
not shoot agent Ramos, that Ramos was killed by agents of his
own DEA team and was the victim of a conspiracy.

One can only guess what was going through the minds of the
jurors as they sat through such a bizarre and contradictory
performance by the defense team in closing arguments. What
can be said with certainty, however, is the "performance was,
under all circumstances, unreasonable under the prevailing
norms." Strickland at 687-91, 104 S.Ct. at 2064-66. The
conduct of the defense team was plainly deficient under the
first-prong of the Strickland analysis.

**GROUND FOUR**

> **WHETHER MOLINA WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL
> WHEN DEFENSE COUNSEL FAILED TO ADVISE MOLINA OF HIS RIGHT
> TO TESTIFY AND, FURTHER, THREATENED TO ABANDON MOLINA IF
> HE CONTINUED TO INSIST ON TELLING THE JURY HIS SIDE OF THE
> STORY?**

**I.**

The Fifth Circuit concluded over twenty-five years ago that
the right to testify is a fundamental constitutional right that
is personal to the defendant and cannot be waived by counsel.
Winters v. Cook, 489 F.2d 174, 178-79 (5th.Cir.1973); see also
Wright v. Estelle, 572 F.2d 171 (5th.Cir.) (en banc), cert.
denied, 439 U.S. 1004 (1978).  This conclusion was later restated
by the Court in Emery v. Johnson, 139 F.3d 191 (5th.Cir.1997)
(the right to testify can be waived only by the defendant, not
by his attorney), and Jordan v. Hargett, 34 F.3d 310, 312 (5th.
Cir.1994) (vacated for reasons not related to the decision), 53
F.3d 95 (1995) (same), and recoginzed by the United States Supreme
Court in Rock v. Arkansas, 483 U.S. 44, 52 (1987).  Any waiver
of this right must be knowing, intelligent and voluntary.  Jordan
at 312, citing United States v. Teague, 953 F.2d 1525, 1532 (11th.
Cir.1992).  The right to testify is violated if the final
decision not to testify is made against the defendant's will.
Id. [6]

---

[6]   Molina's conviction became final before the opinions issued in
Jordan and Teague, but the Court is reminded that the holdings are not "new"
rules within the meaning of Teague v. Lane, 489 U.S. 288 (1989).  Both

-35-

Moreover, "[i]t is beyond question that an attorney cannot threaten to withdraw during a trial in order to coerce the defendant to relinquish his fundamental right to testify." <u>Nichols v. Butler</u>, 953 F.2d 1550, 1553 (11th.Cir.1992) (en banc); <u>Lambrix v. Singletary</u>, 72 F.3d 1500, 1508 (11th.Cir.1996). "[T]o coerce [a] client into remaining silent by threatening to abandon him mid-trial goes beyond the bounds of proper advocacy." <u>Nichols</u> at 1553.

## II.

Molina would argue that neither defense counsel J.M. Ramirez nor Joseph A. Connors advised him of his fundamental right to testify. He would argue further that during the course of the trial he periodically asked defense counsel J.M. Ramirez whether he could tell the jury what really happened the night of the fatal shooting, and he was told each and every time he could not. He would further argue that in response to his repeated requests to tell the jury his side of the story, defense counsel J.M. Ramirez threatened to abandon him, telling Molina he would have to defend himself if he did not drop the issue.

As was stated in Ground Three (p. 27-28, <u>supra</u>), Molina wanted to tell the jury his initial fears of doing business

---

<u>Jordan</u> and <u>Teague</u> relied upon <u>Rock v. Arkansas</u> to hold that an accused has the ultimate right to testify, and the language of <u>Rock</u> explicitly indicates the Court was merely applying a well-settled principle in noting that there is a constitutional right to testify. "At this point in the development of our adversary system, it cannot be doubted that a defendant in a criminal case has the right to take the witness stand and to testify in his or her own defense." <u>Id</u>. at 49. Furthermore, the Fifth Circuit had long since recognized this principle in <u>Winters</u> and <u>Wright</u>, <u>supra</u>.

-36-

with the presumed Cuban drug buyer, how he was afraid the
Cuban would rob him.  He wanted to explain for the jury how he
was merely reacting by life-sustaining instinct when his fears
became reality, i.e, the "Cuban" turned on him with a gun, and
the two presumably dangerous individuals with agent Ramos
atacked him.  Molina would have told the jury that he in fact
shot agent Ramos, but he did so presumably to defend his own
life, that he thought at the time that agent Ramos and the two
CIs were trying to kill him to accomplish a robbery.  He wanted
to explain to the jury how he did not comprehend the alleged
advisements that the attackers were police officers or federal
agents.  Indeed, Ramos was screaming out in English, a language
not understood by Molina at the time.  But most importantly, he
would have told the jury that he never would have struggled
with agent Ramos in the first place if had know Ramos to be a
police officer. [7]

### III.

At this point Molina would advise the Court that he faced
a difficult decision with regard to how to properly present this
claim.  The Eleventh Circuit has determined that a claim of
a violation of the right to testify is properly framed as a
claim of ineffective assistance of counsel.  United States v.

---

[7]
    Molina recognizes such testimony would have been contrary to the "Patsy"
theory, but would argue that he was never given the option by defense
counsel to select the defense theory nor advised of his right to do such.

Teague, 953 F.2d at 1535.  However, the Fifth Circuit has stated that to treat "a claimed denial of the defendant's right to testify as an ineffective assistance of counsel claim ignores recognition of the right as one personal to the defendant which can never be waived by counsel, competent or not."  Jordan v. Hargett, 34 F.3d at 316 n. 5 (disagreeing with the Teague court's conclusion that a denial of the right to testify should be viewed as an ineffective assistance of counsel claim under Strickland v. Washington).  This presents apparent conflicts to this pro se Movant when considered together with the Supreme Court's requirement under United States v. Frady, 465 U.S. 152, 162-69, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982), that claims raised for the first time on habeas review must show "cause" for the procedural default and actual "prejudice" arising therefrom.  If Molina cannot frame his claim under ineffective assistance of counsel, then he has no other means by which to satisfy the "cause" and "prejudice" test. [8]

With this difficult decision in mind, Molina would nevertheless present the claim under ineffective assistance of counsel, but ask the Court to consture the claim under the standard deemed appropriate.  See Haines v. Kerner, 404 U.S. 519 (1972).

---

[8]     Molina would point out the distinction between Jordan and Teague.  The petitioner in Jordan sought relief under § 2254 from a state conviction, whereas the movant in Teague sought relief under § 2255 from a federal conviction.  Molina would argue that Teague controls.

-38-

CIVPDF - www.texia.com -

Molina would argue that the performance of the defense team was clearly ineffective when they failed to advise him of his fundamental right to testify in his own defense. Jordan v. Hargett at 312, citing United States v. Teague at 1533; Winters v. Cook at 178-79; see also Wright v. Estelle, 572 F.2d 171. He would argue further that the actions of counsel J.M. Ramirez, in "coerc[ing] [Molina] into remaining silent by threatening to abandon him mid-trial[,] [went] beyond the bounds of proper advocacy." Nichols v. Butler at 1553. In sum, the performance of the defense team, both separately and jointly, was such that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland at 687, 104 S.Ct. at 2064. Molina had the ultimate right to decide whether or not to testify, and that right was denied by the defense team.

However, this conclusion is not enough for the Court to find that Molina's counsel was ineffective. To do so, the Court must hold that, at the time of Molina trial, a defense counsel's failure to inform his client that he had the ultimate right to decide whether or not to testify falls outside the bounds of competent representation. Such a finding, however, cannot withstand the Supreme Court's retroactivity analysis. Teague v. Lane's "new rule" definition has been interpreted to include all rules whose validity under existing precedents is "susceptible to debate among reasonable minds." Wright v. West,

-39-

505 U.S. 277, 291, 112 S.Ct. 2482, 2489, 120 L.Ed.2d 225 (1992).  Clearly, the disagreement among the judges concurring and dissenting in United States v. Teague illustrates that the rule Molina wishes the Court to adopt is susceptible to debate among reasonable minds.  See DeLuca v. Lord at 1359.

However, the Supreme Court has established two exceptions to the general rule of non-retroactivity for cases on collateral review, Teague v. Lane at 311-13, 109 S.Ct. at 1075-76, one of which "applies new 'watershed rules of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding."  United States v. Salerno, 964 F.2d 172 (2d.Cir.1992) (quoting Saffle v. Parks, 494 U.S. 484, 486 (1990); see also DeLuca at 1359.

The new rule, urged by Molina, holding a defense counsel responsible for informing his client that he has both the right to testify, and the ultimate authority to decide whether or not to take the stand, fits within the second Teague v. Lane exception and thus can be adopted on collateral review.  DeLuca at 1359.

In conclusion, "[D]efense counsel has the crucial responsibility of protecting his clients fundamental right to testify and assuring that any waiver of that right is both knowing and voluntary."  Id. at 1360.  Consequently, if counsel has failed to inform the defendant that the ultimate right to decide whether or not to testify belongs to the defendant, and

the preponderance of credible evidence indicates that the
defendant was not independently aware of this right, then
counsel has rendered ineffective assistance to his client.
Id.; see United States v. Teague, 953 F.2d at 1534.

## IV.
### Prejudice Component

Grounds Two through Four are so inextricably connected
that the "prejudice" component is most appropriately addressed
together. See p. 23, n. 2 supra. This is true because
the lack of investigation by the defense team most assuredly
led them to pursue the incredible defense theory. Additionally,
had the defense team properly investigate the facts and law
and thereafter pursued the proper, factually-compelling defense
theory of voluntary manslaughter, then Molina's testimony
would have been the cornerstone of the defense.

To prevail on an ineffective assistance of counsel claim,
Molina must show there is a "reasonable probability that, but
for counsel's unprofessional errors, the results of the
proceeding would have been different," Strickland at 694, 104
S.Ct. at 2068, though he need not go so far as to show that a
different result "would be more likely than not." McFadden v.
Cabana, 851 F.2d 784, 787 (5th.Cir.1988). A reasonable
probability is a probability sufficient to undermine the
confidence in the outcome. Strickland at 694, 104 S.Ct. at
2068.

The prejudice suffered at the hands of the defense team is

-41-

so obvious that it would almost be insulting to explain it in detail.  First, the defense team's lack of pretrial investigation can be the only logical explanation for the presentation of the "Patsy" theory.  The theory had absolutely no evidentiary support and was, under any circumstances and all favorable presumptions, an affront to the intelligence of both the Court and jury.  It was preposterous.

Even a minimal amount of pretrial investigation by either defense counsel would have enlightened them to the possibilities of the manslaughter theory of defense.  Indeed, all exculpatory evidence pointed in that direction.  Significant is the fact that at one time a witness on the scene later told an investigating FBI agent that no one advised Molina that the parties were police officers.  Moreover, CI Ortiz testified that prior to the first shot, no one told Molina he was under arrest.  He further testified that agent Ramos was screaming out in English, a language not understood by Molina at the time.  Most telling, though, of Molina's knowledge of the advisements and his state of mind at the time is the exclamation screamed out in Spanish during the struggle for the gun, the translation of which expressed his fear of being robbed and/or killed by the presumed drug buyers.

Additionally, the Court must not forget the bullet fragment evidence.  Not only did defense counsel Ramirez wrongly accuse an expert witness of giving incorrect testimony before the jury, he did so in the face of a lab  report that plainly

-42-

explained the point in contention.

These are facts that counsel should have known prior to trial.  Again, the only reasonable explanation is a total lack of diligent investigation, which is directly tied to the presentation of the "Patsy" theory.

Only a defense based on the theory that aliens from Mars momentarily invaded the planet and killed agent Ramos would have been less credible than the "Patsy" theory contrived by the defense team.  As the Government aptly pointed out in closing arguments, the defense team -- specifically counsel Ramirez -- would have had the jury to believe that everyone even remotely connected with the death of agent Ramos was part of a vast conspiracy to assassinate him.  Local doctors, hospital personnel, county Sheriff's deputies and police, and FBI experts from Washington, D.C., all played a role in either the death of Ramos or a later cover-up according to the innuendo-based arguments of counsel J.M. Ramirez.

The theory was so preposterous that even defense counsel Joseph A. Connors abandoned it in closing arguments.  He could plainly see the evidence pointing to Molina's involvement in the shooting.  Indeed, Molina confessed to shooting agent Ramos.  But on the same token, Connors saw how the evidence demonstrated a lack of premeditation and malice in Molina's actions.  Although much too late, he saw the persuasiveness of a manslaughter defense.

Evidently, it was not only counsel Connors who saw the

manslaughter defense, it was the jury as well.  With no
favorable evidence adduced by the defense to support the
"Patsy" theory nor a voluntary manslaughter verdict, the jury
nevertheless requested the definitions to the different
categories of charges on the verdict sheet.  Over an hour later,
the jury requested the use of a dictionary.  This request was
denied by the Court.  Thirty-five minutes later, after more
than five hours of deliberations, the jury returned a guilty
verdict on first-degree murder.  The actions of the jury are
telling:  Some, or perhaps all, of the jurors were having
difficulty with a first-degree murder verdict.

While it cannot be said with certainty how receptive the
jury would have been to a defense theory of voluntary
manslaughter, the juror's various requests and deliberation
time should at least cast some doubt as to the confidence in
the verdict reached in its absence.  Accordingly, Molina has
demonstrated a reasonable probability that the results of the
proceeding would have been different but for the errors of
defense counsel.  Counsel's deficient performance prejudiced
the defense.  Strickland at 694, 104 S.Ct. at 2068.

Likewise, it is at least reasonably probable that had
Molina testified, "the results of the proceeding would have
been different."  Id.  "The testimony of a criminal defendant
at his own trial is unique and inherently significant.  'The
most persuasive counsel may not be able to speak for a
defendant as the defendant might, with halting eloquence, speak

-44-

for himself." <u>Nichols v. Butler</u>, 953 F.2d 1550, 1553 (11th.
Cir.1992) (quoting <u>Green v. United States</u>, 365 U.S. 301, 304
[1961]); <u>DeLuca v. Lord</u> at 1361.

In many criminal cases, "the most important witness for
the defense . . . is the defendant himself." <u>Rock v. Arkansas</u>,
at 52, 107 S.Ct. at 2709. Nowhere would this truism have been
more applicable than in the instant case. Had Molina taken
the stand, his testimony would have been the cornerstone of a
defense that, if successfully presented, could have explained
for the jury that he, in fact, shot agent Ramos, but he did
so in a heat of passion brought on by a sudden, unprovoked and
unexpected attack by presumably dangerous drug buyers in a
dark parking lot. He could have explained how he either did
not hear, or did not comprehend at the time, the alleged
advisements that the attackers were in reality police officers.
He could have further explained that it was he who was shot
first, and how that wound exacerbated his fears that the
"Cuban" was intent on killing him to take his marijuana. But
most importantly, he could have explained how he never would
have struggled for the gun had he even suspected the drug
buyers were actually police officers.

Molina's testimony could have fit the missing pieces of
the puzzle in place, pieces that evidently gave the jury pause
in deliberations. Unfortunately, Molina was never provided the
opportunity to favor the jurors with insight from his

-45-

perspective.  He was not only never advised that he had the
ultimate right to decide whether or not to testify, but he
also was told he could not testify when he asked defense
counsel if he could tell the jury his side of the story.
And if that were not enough, at one point defense counsel
threatened to abandon him mid-trial if he continued in his
requests to testify.  Under these circumstances, there can
be no doubt that Molina received constitutionally ineffective
assistance of counsel.  Accord DeLuca v. Lord at 1363-64;
see Nichols v. Butler at 1553-54.

## Conclusion

     Based on the foregoing, Molina would argue that he has
demonstrated that the issues presented are debatable among
jurists of reason; that a court **could** resolve the issues in
a different manner; or that the questions are adequate to
deserve encouragement to proceed further.  Drinkard v. Johnson,
97 F.3d 751, 755 (5th.Cir.1996).  With regard to Ground One,
binding precedent of this Circuit inarguably sides with Molina.
As for Grounds Two through Four, the facts of the case and the
precedents cited in support of the arguments leave little
doubt that another court could resolve the issues differently.
At the very least, the issues deserve encouragement to
proceed further.

     Accordingly, the Certificate of Appealability should be
granted.

Respectfully submitted,

*Felipe Molina Uribe*

Felipe Molina-Uribe
Reg. No:  39209-079
USP Atlanta
Box PMB
Atlanta, GA  30315

## VERIFICATION

I, the above-signed Movant, hereby swear under penalty of
perjury that the contents of the foregoing Application for
Issue of a Certificate of Appealability are true and correct to
the best of my knowledge and belief, on this Fifteenth day of
April, 1999.

-47-