United States Court of Appeals
Fifth Circuit
**F I L E D**
August 24, 2005
Charles R. Fulbruge III
Clerk

# In the
# United States Court of Appeals
# for the Fifth Circuit

United States District Court
Southern District of Texas
FILED
NOV - 1 2005
Michael N. Milby
Clerk of Court

Nº 04-40534

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

VERSUS

FELIPE MOLINA-URIBE,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Texas
Nº 1:87-CR-1-ALL

Before GARWOOD, SMITH, and CLEMENT, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Felipe Molina-Uribe was convicted of first degree murder of a DEA agent and sentenced to life imprisonment in 1987.[1] In 1997 he filed for relief under 28 U.S.C. § 2255. In March 2003, after a two-day evidentiary hearing, a magistrate judge recommended that relief be granted on the ground that Molina-Uri-

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[1] That life sentence is being served concurrently with a cumulative sentence of thirty years that the district court imposed for drug trafficking and firearm convictions.

be's trial counsel was ineffective. The district court adopted that recommendation and vacated the conviction.

Although Molina Uribe's trial defense was at least arguably of questionable quality, we and the district court must nonetheless observe the standards for evaluating tactical decisions as set forth in § 2255 and the associated caselaw. Under those standards, we reverse the order granting § 2255 relief and remand for further proceedings.

I.
A.

This case arises from the killing of DEA Special Agent William Ramos by a drug trafficker during an undercover drug deal. Sometime before 3:00 p.m. on December 31, 1986, in McAllen, Texas, Molina-Uribe and his co-defendant, Jesus Garcia Nieto, were looking for a buyer for over 300 pounds of marihuana. They met the other co-defendant, Benito Cavazos-Lamas, in McAllen. Cavazos-Lamas indicated that he knew a buyer. Molina-Uribe, without knowing that Roberto "Raul" Ortiz was a paid undercover DEA informant, arranged a meeting for Molina-Uribe, Garcia Nieto, and Ortiz, who was accompanied to the meeting by Ernesto Rodriguez-Ramirez, another paid undercover DEA informer.

Ortiz, at various times between the first contact by Cavazos-Lamas and completion of the sale arrangements, communicated with the DEA agents to obtain instructions as the negotiations progressed. The parties ultimately arranged that Ramos, working undercover but representing himself to be a New York drug dealer, would be the buyer of the marihuana and of a quantity of illegal pills. Delivery and payment were to be made at 7:00 p.m. in the parking lot of a supermarket.

Ramos, Ortiz, and Rodriguez-Ramirez arrived at the parking lot in an undercover vehicle at about 7:00 p.m. Molina-Uribe arrived shortly thereafter in a van loaded with large plastic bags containing the marihuana. Ortiz and Rodriguez-Ramirez went to Molina-Uribe's van to inspect the marihuana, then all three men walked to the undercover vehicle where Ramos was waiting in the driver's seat.[2] Molina-Uribe entered the rear seat of the car. The plan was for Ramos and Molina-Uribe to swap vehicles and later to re-exchange them after Molina-Uribe had removed the money from Ramos's car and Ramos the marihuana from Molina-Uribe's van.

After a brief conversation about the money, Ortiz and Rodriguez-Ramirez walked to the rear of Ramos's car to get the money from the trunk so Molina-Uribe could inspect it. By pre-arrangement, the lifting of the trunk lid was the signal for a number of DEA agents to converge on Ramos's vehicle. As the lid was opened, Ortiz observed through the car's rear window that Ramos had turned in his seat, drawn his revolver, and pointed it at Molina-Uribe, whereupon Molina-Uribe grabbed Ramos and the revolver and attempted to wrest it from Ramos. With the car shaking from the struggle and Ramos calling for help, Ortiz and Rodriguez-Ramirez sprang to assist Ramos.

Ortiz entered the car to help Ramos while

---

[2] The car was a government vehicle assigned to DEA Special Agent Alvarez. The revolver that Ramos used and with which he was ultimately shot was issued to Alvarez; it was a second gun that Alvarez kept on the door side of the driver's seat of his car. The revolver discharged four rounds during the incident. Ramos was also carrying a revolver, issued to him, but he did not discharge it.

2

yelling they were federal drug agents, ordering Molina-Uribe to release the gun and admonishing him that he could get into serious problems if he failed to act as ordered. Rodriguez-Ramirez remained outside on the right side of the car but leaned into it and began pulling on Molina-Uribe's boots. About then, the revolver discharged; the shot struck Rodriguez-Ramirez in the hand, and he quickly retreated in pain. Ortiz then repeated his order to Molina-Uribe and told him that Ramos was a federal agent. Ramos then said, "I already told him that he is arrested and he does not want to pay attention."[3]

As the struggle for the gun continued, the revolver discharged two more rounds. Again Ortiz admonished Molina-Uribe to release the gun and told him they were federal agents. Ortiz said Molina-Uribe then made a statement in Spanish indicating that he thought Ramos and Ortiz were about to steal the marihuana and hurt him. Finally, with Molina-Uribe in possession of the gun and while Ramos had a hand on Molina-Uribe's wrist trying to push the gun hand to the side, Molina-Uribe forced the gun downward toward Ramos's chest and fired the fourth shot into his chest, fatally wounding him.

DEA Agents Watkins and Alvarez arrived at Ramos's car almost immediately following the final shot. Watkins entered the car and put his revolver to Molina-Uribe's head. Alvarez removed Ramos's gun from Molina-Uribe's left hand, and the agents took him into custody.

---

[3] Rodriguez was unable to testify concerning Ortiz's statements to Molina-Uribe or to Ramos's statement to Molina-Uribe, as testified by Ortiz, because he was paying attention only to what he was doing at the time.

B.

Molina-Uribe, Cavazos-Lamas, and Garcia Nieto were jointly charged in counts 1 and 2 of a superseding indictment returned on February 21, 1987.[4] Count 3, brought under 18 U.S.C. §§ 1111 and 1114, charged that Molina-Uribe, having been placed under arrest by Ramos and while attempting to escape, murdered Ramos, while Ramos was in the performance of his official duties, by shooting him with the agent's revolver. Count 4 alleged that during and in relation to the crime of violence described in count 3, Molina-Uribe used the firearm described in that count in violation of 18 U.S.C. § 924(c). Molina-Uribe pleaded guilty to counts 1 and 2, and the jury convicted him on counts 3 and 4.

C.

Molina-Uribe testified that he conveyed his version of the incident to his attorneys, Ramirez and Connors,[5] explaining the struggle between himself and the agents. The district

---

[4] Count 1, pursuant to 21 U.S.C. § 846, alleged the co-defendants conspired to possess with intent to distribute in excess of 100 kilograms of marihuana, a Schedule I controlled substance, in violation of 21 U.S.C. § 841(a)(1). In count 2, the three were charged with the substantive offense.

[5] Molina-Uribe testified, at the evidentiary hearing before the magistrate judge, that he arrived at the location of the sting to complete a drug transaction with Ramos. Molina-Uribe testified that he thought Ramos and the other agents were drug dealers. Molina-Uribe did not take a gun to the scene but noticed one in the car's side pocket; Ramos then turned with his gun drawn and, believing the men to be drug dealers, Molina-Uribe construed the drawn weapon as a violent threat to shoot him and take the drugs. Throughout the struggle he could not ascertain who had control of the gun during each discharge, but instead he was focused on avoiding the bullets.

3

court appointed Ramirez to represent Molina a week after the grand jury returned the indictment. During pretrial motions Ramirez argued that the case was complex, and he made a number of discovery requests. He sought the appointment of Connors as additional counsel. The court granted the requests.

The record indicates that Ramirez pursued an unusual defense theory to which the various litigators referred as the "conspiracy theory," the gist of which was that Ramos's colleagues disliked Ramos for a variety of reasons and orchestrated the sting operation to assassinate him. It is uncertain whether the theory involved the agents' shooting Ramos directly or planting the gun hoping that Molina-Uribe would kill Ramos with Alvarez's revolver. Counsel introduced little or no direct evidence to support this theory.

Molina-Uribe testified that he did not understand his attorneys' pursuit of this defense in light of the absence of evidence to support it. He also stated that he requested that his attorney cease pursuing that theory and instead advance a self-defense or accident theory, a story conforming far better to the evidence and his own testimony. He did not insist on testifying.[6]

The district court's instructions to the jury included the issues of self-defense, accident, and heat of passion. These matters were also argued, albeit only quite briefly, by Connors in closing argument.

## II.

The Sixth Amendment guarantees criminal defendants the effective assistance of counsel. *See Yarborough v. Gentry*, 540 U.S. 1, 5 (2003). Section 2255 provides that a

> prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence.

Molina-Uribe argues that his trial counsel's assistance was ineffective because they pursued a far-fetched theory. To make a substantial showing of the denial of his Sixth Amendment right to reasonably effective assistance of counsel, Molina-Uribe must satisfy the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 686 (1984). He must therefore demonstrate "that counsel's performance was deficient," *id.* at 687, and that "the deficient performance prejudiced [his] defense." *Id.*[7]

To establish deficient performance, Molina-Uribe "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 687-88. Our scrutiny of counsel's performance must be "highly deferential." *Id.* at 689. We must make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the

---

[6] The magistrate judge's report that the district court adopted states that "[t]he Government points to the record of the pre-trial suppression hearing, which shows that Molina was aware of his right to testify and upon advice of counsel, decided not to exercise this right." It appears that although Molina-Uribe wanted to testify, he deferred to the expertise of his attorneys.

[7] Because counsel's performance was not constitutionally deficient, we do not reach the prejudice prong.

4

time." *Id.* There is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

The degree of deference we are to afford to Molina-Uribe's trial counsel obviously drives the outcome of our deliberations. To prevail on an ineffective assistance claim Molina-Uribe must argue more than mere sub-optimal trial tactics. Our role under § 2255 is not to audit decisions that are within the bounds of professional prudence.

### A.

We "review a district court's conclusions with regard to a petitioner's § 2255 claim of ineffective assistance of counsel *de novo*."[8] We review § 2255 findings of fact for clear error. *United States v. Faubion*, 19 F.3d 226, 228 (5th Cir. 1994). Any subsidiary findings of basic, historical fact made by the district court after a § 2255 evidentiary hearing are subject to review under the clearly erroneous standard of Federal Rule of Criminal Procedure 52(a).[9] In determining whether Molina-Uribe received effective assistance of counsel, we thus make an independent evaluation based on the district court's subsidiary findings. *See United States v. Rusmisel*, 716 F.2d 301, 305 (5th Cir. 1983).

### B.

*Washington*, 466 U.S. at 689-91, requires us to assess the tactics of the attorneys against what courts would expect from an attorney of average competence. Alternately phrased, the proper measure of attorney performance is reasonableness under prevailing professional norms. *See Lyons v. McCotter*, 770 F.2d 529, 533 (5th Cir. 1985). Although we give strong deference to trial counsel's tactical decisions, *see Washington*, 466 U.S. at 689-91, those decisions must stem from "reasoned strategic judgment." *See Wiggins v. Smith*, 539 U.S. 510, 534 (2003).

The record suggests that the district judge held Ramirez and Connors in high regard. The judge recognized Ramirez to be a very competent, experienced, and well respected criminal defense attorney. The judge chose Connors as an additional counsel because he viewed Connors as experienced in both criminal trials and appeals.

We view counsel's performance in light of the fact that the case was very difficult to defend. Trial counsel had to consider a number of variables in the course of developing Molina-Uribe's defense, not the least of which was the potential sanctions associated with suborning perjury. Counsel performed all necessary investigation and discovery. Most of the time, viable ineffective assistance claims arise from some failure to pursue certain types of evidence during discovery with sufficient vigor.[10]

---

[8] *United States v. Conley*, 349 F.3d 837, 839 (5th Cir.2003) (citing *United States v. Bass*, 310 F.3d 321, 325 (5th Cir.2002); *United States v. Faubion*, 19 F.3d 226, 228 (5th Cir.1994)).

[9] These are facts "in the sense of a recital of external events and the credibility of their narrators." *Washington v. Watkins*, 655 F.2d 1346, 1351 (5th Cir. Unit A Sept.1981).

[10] *See, e.g., United States v. Lampazianie*, 251 F.3d 519, 527 (5th Cir. 2001) (discussing in *dictum*, the viability of a § 2255 claim, the substance of which involved how fervently the defendant's attorney sought information during discovery); *Matthew v. Johnson*, 201 F.3d 353, 363 n.14 (5th Cir. 2000). We, however, do not mean to imply this is the only context in which such claims can or do arise.

5

Molina-Uribe, however, does not question the fervor with which trial counsel acquired evidence; he instead doubts the theory propounded at trial, given the admissible evidence his counsel collected. Various courts, at different stages of this case, have remarked that there was no admissible evidence supporting the conspiracy theory.[11] The magistrate judge's report explains this:

> In this case, there was no apparently sound reason for counsel to predicate his client's entire defense on a theory that is not only bizarre, but devoid of evidentiary underpinnings. This was not merely a flawed trial tactic or a below par strategy. In essence, there was no strategy when a completely idiosyncratic theory of defense was used in place of a viable and supportable theory.

These assertions, however, miss the point. The soundness of the defense cannot be evaluated in the relative vacuum of an appeal. Trial counsel obviously had alternatives available to them, and it seems they chose this particular defense strategy because those alternatives exposed Molina-Uribe and his attorneys to other legal risks.

Thus, Molina-Uribe's counsel had a perfectly legitimate reason to pursue unusual defenses: Pursuing more conventional ones would require putting Molina-Uribe on the stand. Counsel's concern about this was acute, because Molina-Uribe had been tested by a polygraph examiner, and his answers were deceptive, suggesting any testimony based on self-defense or any other customary theory would constitute perjury.

Now, in pursuit of § 2255 relief, Molina-Uribe places great significance on the following passage from the prosecution's closing argument:

> I am not sure that I was in the same courtroom with J.M. Ramirez when I was listening to his arguments here a moment ago. What horse is the defense riding in this case? According to Mr. Ramirez, Felipe Molina didn't even have the gun. He didn't shoot [Ramos]. According to Mr. Connors, maybe it was an accident. Maybe it was self-defense. Maybe it was voluntary manslaughter.... What horse are they going to ride, folks[?] ... Why would J.M. Ramirez say that Felipe Molina didn't shoot [Agent Ramos] when the evidence clearly showed he did? ... [W]hy would Mr. Connors argue for self-defense or accident, so find him not guilty, if he didn't shoot the gun? Because they don't care how they get that verdict.

We are puzzled by the repeated invocation of this passage throughout the § 2255 litigation. At least insofar as it bears on the ineffective assistance claim, those comments help us very little. Of course the prosecution is going to characterize the defendant's trial arguments as incoherent—that is the government's job. If anything, the statement serves as an inadvertent testimonial to the presentation of self-defense and accident theories—theories that Molina-Uribe now insinuates were not argued.

---

[11] See, e.g., United States v. Molina-Uribe, 853 F.2d 1193, 1200 (5th Cir. 1988) ("There was not a scintilla of evidence to support this theory."). The government argues that trial counsel gathered some information suggesting that an extramarital affair and a pending case against the United States Attorney General could furnish a motive for the alleged DEA conspirators. The district court correctly excluded this evidence as irrelevant, so it could not have formed the evidentiary basis for counsel's tactical decision to propound the conspiracy theory.

6

The district court characterized Molina-Uribe's defense theory as "bizarre" and "devoid of evidentiary underpinnings." The court stated, "In essence, there was no strategy when a completely idiosyncratic theory of defense was used in place of a viable and supportable theory." Although we appreciate the court's consternation, its denunciation of Molina-Uribe's defense is largely rhetorical and, to the extent that it is not, it is factually inaccurate.

There is no complaint or finding that defense counsel wrongfully failed to discover or present any evidence favorable to Molina-Uribe; or wrongfully failed to have excluded any evidence harmful to him; or wrongfully conceded any fact or point of law harmful to him; or that the jury was not adequately instructed on all elements of the offense and all available defenses, including accident, self-defense, and heat of passion. The *entire essence* of the complaint of counsel's performance is that counsel only briefly *argued* accident, self-defense, and heat of passion and instead overwhelmingly emphasized the bizarre conspiracy theory.

The district court asserts that there were other "viable" and "supportable" theories but ignores the fact that those theories would have arguably required Molina-Uribe's counsel to suborn perjury. For us to grant Molina-Uribe's petition on the ground that his attorneys' tactical decisions were utterly without reason at the time they were made would constitute Monday-morning quarterbacking on a Thursday.

The order granting § 2255 relief is REVERSED, and this matter is REMANDED for further proceedings as appropriate.

7