IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Plaintiff-Respondent, | § | |
| | § | |
| vs. | § | C.A. No.  B-97-97 |
| | § | C.R. No.  B-87-01 |
| | § | |
| FELIPE MOLINA-URIBE, | § | |
| Defendant-Movant. | § | |

UNITED STATES' RESPONSE TO
DEFENDANT'S POST-REMAND MEMORANDUM

The United States of America, Respondent, by the United States Attorney for

the Southern District of Texas, files this response to Defendant Molina-Uribe's Post-

Remand Memorandum.

1.     In its opinion in *United States v.  Molina-Uribe*, 429 F.3d 514, (5th Cir.  2004),

*cert. denied,* ___ U.S. ___, 126 S.Ct.  616 (2006), the Fifth Circuit reversed the Judge

Vela's order granting the Magistrate Judge's report and recommendation finding that

counsel for Molina-Uribe ("Molina")  rendered ineffective assistance at trial and

remanded for further proceedings as appropriate.  In his present motion, Molina

argues that the Magistrate Judge did not rule on all of his claims of ineffective

assistance of counsel and limited its recommendation and report to only his claim that

his counsel presented an implausible and bizarre theory of defense.

[1]

2.    The United States Court of Appeals for the Fifth Circuit addressed Molina's

claim that his trial counsel rendered ineffective assistance of counsel in light of the

record of the entire pretrial and trial proceedings, his prior direct criminal appeal in

*United State v. Molina-Uribe*, 853 F.2d 1193 (5th Cir. 1988), *cert. denied,* 489 U.S.

1022 (1989), the claims and arguments raised by Molina in his original motion to

vacate sentence, each pleading filed by Molina in connection with that proceeding,

and after reviewing the October 2002 evidentiary hearing.  Examining the magistrate

judge's grant of habeas relief in light of the <u>entire record</u>, the Fifth Circuit found that

the "entire essence" of Molina's complaint before this Court regarding his counsel's

performance is that his counsel only briefly argued accident, self-defense, and heat of

---

[1]In his motion to vacate sentence filed on April 30, 1997, Molina challenged the effectiveness of his trial counsel on several grounds: 1) the failure to allow Molina to testify in his own defense; 2) failure  to investigate and interview witnesses (i.e., forensic experts; experts for independent examination of the tests and reports made by the FBI,and FBI's failure to conduct a nitrate test or make reports on fingerprint analysis of the prints on the revolver; paid confidential informants); 3) failure to obtain an independent expert to analyze the blood specimen taken from Molina; 4) failure to present Molina's theories of defense; 5) failure to request a jury instruction on self-defense or manslaughter; 6) failure to preserve these issues and raise them on direct appeal.  In addition to these, in his report and recommendation granting relief the Magistrate Judge's identified Molina as also challenging his counsel's performance on the grounds that counsel failed to render adequate legal assistance, failed to explain the elements of his defense during voir dire, failed to give an opening statement before  the beginning of the government's case, failed to cross-examine government witnesses inadequate voir dire examination, and presented a defense without evidentiary support. (Doc. 54, p. 5-6).

passion and instead overwhelmingly emphasized the bizarre conspiracy theory. *Molina-Uribe*, 429 F.3d at 519. To the extent that Molina argues in his present motion that the magistrate judge did not rule on each subpart of his ineffective assistance of counsel claim, in his recommendation and report the Magistrate Judge states that the sub-issues to Molina's claim of ineffective assistance of counsel are encompassed in his blanket assertion that his counsel failed to present his self defense theory and instead pursued other theories which were not supported by the evidence. (Doc. 52, p. 11). Additionally, in his order adopting the Magistrate Report and Recommendation, Judge Vela states that he conducted de novo review of the record, thus explicitly, or at the least implicitly, stating that he considered each subpart of Molina's claim of ineffective assistance of counsel when granting habeas relief. (Doc. 54).

3. As stated above, the Fifth Circuit found that the "entire essence" of Molina's complaint of his counsel's performance is that his counsel incorrectly focused the defense on an implausible conspiracy theory. *Molina-Uribe*, 429 F.3d at 519. The United States filed a comprehensive and lengthy brief before the Fifth Circuit on direct appeal from Judge Vela's grant of habeas relief, which discussed each subpart of Molina's ineffective assistance of counsel claim in great detail in its argument and which is attached hereto as Appendix A. After reviewing the entire record on appeal

(including the briefs of both parties filed before the Fifth Circuit on Molina's 1989 original direct criminal appeal), after reviewing the appellate briefs and hearing oral argument in this case, the Fifth Circuit found no support for Molina's claim of ineffective assistance of counsel based on a "complaint or finding that defense counsel wrongfully failed to discover or present any evidence favorable to Molina-Uribe; or wrongfully failed to have excluded any evidence harmful to him; or wrongfully conceded any fact or point of law harmful to him; or that the jury was not adequately instructed on all elements of the offense and all available defenses, including accident, self-defense, and heat of passion." *Id*. The Fifth Circuit thus determined the adequacy of counsels' performance based on the entire record supporting defense counsels' defense strategy for recommending that Molina not testify and that he avoid suborning perjury, reasons to emphasize whatever doubts Molina had to the sufficiency of the government's evidence and to advance what plausible defense theories Molina could advance to the jury.

4.    Congress provides under 28 U.S.C. § 2244(a), that a district court is not required to entertain an application for writ of habeas corpus "if it appears that the legality of such detention has been determined by a judge or court of the United States on a prior application for a writ of habeas corpus and the petition presents no new ground not heretofore presented and determined, and the judge of the court is satisfied

that the ends of justice will not be served by such inquiry." *United States v. Tubwell*, 37 F.3d 175, 178 (5th Cir. 1995). With regard to the decision by trial counsel to not investigate further expert testimony regarding blood splatter, fingerprints on guns or the shock effect of a gunshot wound to the leg, the United States argued before the Fifth Circuit that this comports with reasonable professional judgment, and that Molina did not demonstrate in his post-conviction attack what evidence an additional investigation by counsel would prove under the facts of this case. *See* Appendix A, Brief of the United States, pp. 56-58. This subpart was thus considered by the Fifth Circuit when reversing the orders entered by Judge Vela vacating Molina's conviction for first degree murder.

As the Fifth Circuit held in *United States v. Rich*, 141 F.3d 550, 551-552 (5th Cir. 1998), "[t]here is a trend among circuit courts to look beyond the formal title affixed to a motion if the motion is the functional equivalent of a motion under § 2255." Under the guise of sub-issues not ruled upon by the magistrate judge, what Molina in effect requests this Court to do is to entertain a successive motion to vacate sentence and allow him to reurge the issues that he raised before the Fifth Circuit on the government's appeal, and/or to present evidence that he did not introduce at the evidentiary hearing and then to reassess the Fifth Circuit's holding based on whatever new arguments or evidence he elects to present. In its order remanding "for further

proceedings as appropriate," the Fifth Circuit did not order this Court to hold another evidentiary hearing or to reopen this collateral attack to address unresolved issues presented in the original motion. To the contrary, the Fifth Circuit resolved Molina's claim of ineffective assistance of counsel directly against Molina, reversed the orders entered by Judge Vela, and remanded to this Court to reinstate the verdict of conviction and the sentence previously imposed, which is the request that the United States made in the conclusion of its brief.

[2] This Court complied with the Fifth Circuit's remand "for further proceedings as appropriate"on September 27, 2006, by "vacat[ing] the December 5, 2003 order of Judge Vela Adopting the Report and Recommendation of the Magistrate Judge, and the January 26, 2004 order of Judge Vela vacating the judgment and reinstat[ing] the conviction for the offense of First Degree Murder and the judgment (and all of its terms, including the life sentence entered on May 13, 1987 and conditions) in Cause No. 1:87cr0001-001." (Doc. 69).

The limited scope of the Fifth Circuit's remand precludes consideration of any other claims and reassessment of issues already decided. *Goodwin v. Johnson,* 224 F.3d 450, 457 (5th Cir. 2000). Unless Molina can satisfy the requirements for

_____

[2]*See* Brief of United States, p. 58 ("In our conclusion, the United States requested the Fifth Circuit "to vacate the Order below and to reinstate the convictions and sentences imposed against Molina." )

successive petitions under 28 U.S.C. § 2255, which the United States submits that he does not, this Court should deny Molina's request for this Court to reassess the Fifth Circuit's holding and dismiss this motion under 28 U.S.C. § 2243(a) and 28 U.S.C. § 2255.

Respectfully submitted,

DONALD J. DeGABRIELLE, JR.
United States Attorney

JAMES L. TURNER
Chief, Appellate Division
United States Attorney


/s/ Paula C. Offenhauser
PAULA C. OFFENHAUSER
Assistant United States Attorney
Resident Bar # 15220500
910 Travis Street, Suite 1500
P.O. Box 61129
Houston, Texas 77208-1129
(713) 567-9101

## CERTIFICATE OF SERVICE

I, Paula C. Offenhauser, Assistant United States Attorney, certify that this response has been served by placing it in the United States mail postage prepaid, on October 27, 2006, to Mr. Jeffrey L. Wilde, Assistant Federal Public Defender, 600 E. Harrison Street # 102, Brownsville, Texas 78520.


/s/ Paula C. Offenhauser
PAULA C. OFFENHAUSER
Assistant United States Attorney


APPENDIX A

NO. 04-40534

_____

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.

FELIPE MOLINA-URIBE,
Defendant-Appellee.

_____

On Appeal from the United States District Court
For the Southern District of Texas
Brownsville Division, Criminal No. B-87-01, Civil No. B-97-097

_____

BRIEF OF PLAINTIFF-APPELLANT

_____

MICHAEL T. SHELBY
United States Attorney

JAMES L. TURNER
Assistant United States Attorney

PAULA C. OFFENHAUSER
Assistant United States Attorney
910 Travis, Suite 1500
P.O. Box 61129
Houston, Texas 77208
(713) 567-9364

## STATEMENT OF ORAL ARGUMENT

The United States appeals the Order of the district court entered on January 26, 2004, vacating the judgment of conviction and life sentence imposed on Molina-Uribe ("Molina") on May 13, 1987, for the murder of a federal DEA agent, in violation of 18 U.S.C. § 1111 and § 1114.  The United States believes that the holding of the court below, that Molina's trial counsel violated the Sixth Amendment guarantee of effective assistance of counsel, is contrary to the precedent and the standards set by the Supreme Court and this Court, as set out in the government's brief.  The United States believes that oral argument will aid this Court in applying established precedent to the facts of this case.  The United States thus requests oral argument in this appeal under FED. R. APP. P. 34(a)(1).

# TABLE OF CONTENTS

Page

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . I

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Course of proceedings and disposition below. . . . . . . . . . . . . . . . . . . 2

    B.    Statement of facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    THE DISTRICT COURT INCORRECTLY FOUND, AS A MATTER
    OF LAW AND FACT, THAT TRIAL COUNSEL'S PERFORMANCE
    WAS DEFICIENT AND RENDERED THE TRIAL
    FUNDAMENTALLY UNFAIR. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

1)    "The Sixth Amendment guarantees criminal defendants the effective
    assistance of counsel." *Yarborough v. Gentry*, 540 U.S. 1, 5, 124 S.Ct.
    1 (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

(2)    Basic duties of counsel are to advocate the defendant's cause, to consult
    with the defendant on important decisions, and to bring to bear such
    skill and knowledge as will render the trial a reliable adversarial testing
    process. *Strickland*, 466 U.S. at 687. . . . . . . . . . . . . . . . . . . . . . . . . . 19

3)    "The Sixth Amendment guarantees reasonable competence, not perfect
    advocacy judged with the benefit of hindsight." *Gentry*, 540 U.S. at 8. . . 31

4)    "[C]ounsel has wide latitude in deciding how best to represent a client."
      *Gentry*, 540 U.S. at 5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

      A)    Molina's counsel cued the jury to the discrepancies found in the
            government's evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .38

      B)    Defense counsel portrayed the investigation as curtailed by FBI
            interference. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

      C)    Molina's counsel used additional evidence to insinuate some sort
            of undisclosed and unknown coverup. . . . . . . . . . . . . . . . . . . . . . . . 48

5)    " Focusing on a small number of key points may be more persuasive than
      a shotgun approach." *Gentry*, 540 U.S. at 7. . . . . . . . . . . . . . . . . . . . . . . 51

6)    "Competency is measured against what an objectively reasonable
      attorney would have done under the circumstances existing at the time
      of the representation." *Savino v. Murray*, 82 F.3d 593, 599 (4th Cir.
      1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

7)    "[C]ounsel has a duty to make reasonable investigations or to make a
      reasonable decision that makes particular investigations unnecessary."
      *Wiggins*, 539 U.S. at  521. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  63

CERTIFICATE OF COMPLIANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

-iii-

## TABLE OF AUTHORITIES

**Case**                                                                 **Page**

*Bell v. Cone,* 535 U.S. 685, 122 S.Ct. 1843 (2002)........................ 17

*Burger v. Kemp*, 483 U.S. 776, 107 S.Ct. 3114 (1987)...................... 17

*Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464 (1986)............... 30

*Evans v. Cockrell*, 285 F.3d 370 (5th Cir. 2002).......................... 61

*Green v. Johnson*, 116 F.3d 1115 (5th Cir. 1997)......................... 57

*Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574 (1986)........... 17, 20

*Lockhart v. Fretwell*, 506 U.S. 364, 113 S.Ct. 838 (1993)................. 18

*McInerney v. Puckett*, 919 F.2d 350 (5th Cir. 1990)...................... 57

*Michel v. Louisiana*, 350 U.S. 91, 76 S.Ct. 158 (1955). .................. 18

*Mullaney* v. *Wilbur*, 421 U.S. 684, 95 S.Ct. 1881 (2975). .................. 58

*Nix v. Whiteside,* 475 U.S. 157, 106 S.Ct. 988 (1986). .................... 28

*Patterson* v. *New York*, 432 U.S. 197, 97 S.Ct. 2319 (1977)................ 59

*Powell v. Alabama*, 287 U.S. 45, 53 S.Ct. 55 (1932). ..................... 31

*Pratt v. Cain*, 142 F.3d 226 (5th Cir. 1998). ............................. 57

*Savino v. Murray*, 82 F.3d 593 (4th Cir. 1996)........................... 57

*Smith v. Collins*, 977 F.2d 951 (5th Cir. 1992). .......................... 57

*Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052 (1984). ......... passim
*Wiggins v. Smith*, 539 U.S. 510, 123 S.Ct. 2527 (2003)................. passim

*Yarborough v. Gentry*, 540 U.S. 1, 124 S.Ct. 1 (2003). . . . . . . . . . . . . . . . . .  passim

*Yohey v. Collins*, 985 F.2d 222 (5th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . 57

*United States v. Lesina*, 833 F.2d 156 (9th Cir.  1987). . . . . . . . . . . . . . . . . . . . 58

*United States v. Lofton*, 776 F.2d 918 (10th Cir.  1985). . . . . . . . . . . . . . . . . . . 58

*United States v. Molina-Uribe*, 853 F.2d 1193 (5th Cir. 1988), *cert. denied*,
    489 U.S. 1022 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

## Rules and Statutes

18 U.S.C. § 924(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

18 U.S.C. § 1111. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

18 U.S.C. § 1112. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

18 U.S.C. § 1114. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  passim

21 U.S.C. § 841(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

21 U.S.C. § 846. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 2253. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

28 U.S.C. § 2254(d)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

28 U.S.C. § 2255. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

NO.  04-40534

———————————————————

IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————————————

UNITED STATES OF AMERICA,
Plaintiff-Appellant,

v.

FELIPE MOLINA-URIBE,
Defendant-Appellee.

———————————————————

On Appeal from the United States District Court
For the Southern District of Texas
Brownsville Division, Criminal No.  B-87-01, Civil No.  B-97-097

———————————————————

BRIEF OF PLAINTIFF-APPELLANT

———————————————————

## STATEMENT OF JURISDICTION

The United States of America, Plaintiff-Appellant, by the United States

Attorney for the Southern District of Texas, under 28 U.S.C. § 2253, Fed.  R.  App.

P.  22(b)(3), appeals from the order of the district entered (Vela, J.) on January 26,

2004, under 28 U.S.C. § 2255, in *United States v.  Felipe Molina-Uribe*, No.  CV-97-

97, vacating the judgment of conviction and life sentence imposed on Molina-Uribe

("Molina") on May 13, 1987, for the murder of a federal DEA agent, in violation of

18 U.S.C. § 1111 and § 1114. *United States v. Molina-Uribe*, No. CR-B-97-097. (2 R. 5, 30-44).

[3] The United States timely filed notice of appeal on from these orders on February 9, 2004. (2 R. 3). This Court's jurisdiction vests under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Whether the district court incorrectly found, as a matter of law and fact, that trial counsel's performance was deficient and rendered Molina's trial fundamentally unfair because the theory of defense that Molina asserts his counsel presented to the jury was unsupported by the evidence and conflicted with alternate theories of defense.

## STATEMENT OF THE CASE

**A.**    **Course of proceeding and disposition below.**

Molina was charged by indictment filed on January 5, 1987, and superseded on February 21, 1989, with conspiring to possess marihuana with intent to distribute in violation of 21 U.S.C. § 846 (Count 1); possessing with intent to distribute more than 100 kilogramso f marihuana, in violation of 21 U.S.C. § 841(a)(1) (Count 2); murder of a federal officer, in violation of 18 U.S.C. §§ 1111, 1114 (Count 3); and, use of a

_____

[3]"R." refers to the record on appeal. The volume number precedes the record reference and the page number follows. "PSR" refers to the presentence investigation report.

firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §

924(c) (Count 4). (2 R. 567-68, 490-492).    Molina pleaded guilty to the drug

trafficking charges on April 13, 1987(2 R. 321; 4 R. 197, 199-214), but proceeded to

trial by jury on Counts 3 and 4, and convicted on April 16, 1987. (2 R. 326).

Molina was sentenced on May 13, 1987, before the effective date of the

Sentencing Guidelines.  He was sentenced to life imprisonment on Count 3.    On

Counts 1 and 2, he was sentenced to two terms of 25 years in the custody of the

Bureau of Prisons, to run consecutive to each other but concurrent to the sentence

imposed on Count 3.  On Count 4, he was sentenced to five years imprisonment, to

run consecutive to all other prison sentences.  Both his convictions and sentences were

modified on August 24, 1988, by this Court on direct appeal.    *United States v.*

*Molina-Uribe*, 853 F.2d 1193 (5th Cir. 1988), *cert. denied,*  489 U.S. 1022 (1989).

His conviction on Count 2 was reversed for failure to comply with FED. R. CRIM. P.

(c)(1), with this Court's instructions that Molina be allowed to plead anew.  The

government subsequently moved to dismiss Count 2, which the court granted in

August 1989. (2 R. 186). As to Count 1, the conspiracy offense under 21 U.S.C. §

846, this Court struck the term of supervised release.  The court affirmed both

Molina's convictions and sentences on those counts 3 and 4. (2 R. 195).  Molina is

a serving a 25-year term of imprisonment on Count 1 and a consecutive 5-year term

on Count 4, which sentences were imposed to run concurrent to the life sentence imposed on Count 3.

Molina filed the instant motion to vacate under 28 U.S.C. § 2255 on April 30, 1997. (1 R. 241-277; 2 R. 140-169). The United States interpreted Molina's petition as raising ineffective assistance of counsel, in violation of the Sixth Amendment. (1 R. 217-235). Molina's motion was initially dismissed for failure to comply with the one-year limitation, but it was later reinstated and counsel appointed to represent Molina. (1 R. 146-147, 144, 200, 205, 207). For a variety of reasons the hearing was rescheduled and held on October 17-18, 2002. (9 R. 1-128; 10 R. 1-110). Post-conviction were filed. (2 R. 49-68). Molina's claims are discussed in detail in the text of the government's argument before this Court. On March 17, 2003, Magistrate Judge Black issued a report and recommendation finding Molina's counsel rendered ineffective assistance at trial. (2 R. 30-44). The court adopted the report and vacated Molina's sentence of life imprisonment. (1 R. 6).

## B.    <u>Statement of facts</u>.

The facts detailed below are contained in this Court's opinion on direct appeal. *Molina-Uribe*, 852 F.2d at 1195-1196. The government narrates below the evidence proved at trial, supplementing its rendition with facts pertinent to counsel's performance at trial and on direct appeal. To ensure continuity in its argument, and

to avoid repetition, the United States details the facts regarding the appointment of counsel, counsel's investigation and preparation for trial, counsel's presentation of Molina's defensive theories, the arguments made by counsel in support, and the evidence presented at the October 17-18, 2002 evidentiary hearing in the text of the government's argument.

The government opened this prosecution with arguing the events involved "[a] drug bust gone sour and the willful, deliberate, malicious, premeditated murder of DEA special Agent William Ramos at the hands of Felipe Molina-Uribe . . ., as the defendant attempted to escape." (4 R. 205). Molina, in an attempt to escape, grabbed the agent's revolver and attempted to wrestle it away. As the struggle ensued, the agents yelled, "We are federal drug agents." Three shots were fired, one hitting Molina in the leg and two hitting the vehicle. The prosecutor argued it was then that Molina came up from the bottom of the pile with the revolver in his left hand. Molina pushed the revolver towards Special Agent Ramos' chest, while Ramos grabbed Molina's wrist and attempted to push the revolver away. Molina fired the fourth shot, killing Ramos. (4 R. 219-221). The government argued the evidence would show that Molina "deliberately tried to force the revolver to the chest of Special Agent Ramos and that Special Agent Ramos with all his strength was trying to push the revolver away from both of them and towards the front empty seat." (4 R. 220).

On December 31, 1986, Molina and codefendant Jesus Garcia were looking for a buyer for over three hundred pounds of marijuana. Codefendant Benito Cavazos-Lamas met Molina and Garcia at Salomon's Auto Sales in McAllen, Texas, at which time Molina inquired whether Cavazos knew of a buyer for his marijuana. (4 R. 223-225, 228). At 3:00 p.m., Cavazos arranged for Molina to meet Robert "Raul" Ortiz at the Sunshine gas station in front of Salomon's, not knowing that Ortiz was a paid informant for the Drug Enforcement Administration ("DEA"). (4 R. 229, 237-39). Ortiz, in turn, contacted DEA Agent Mario Alvarez to coordinate the buy with surveillance. (4 R.239; 5 R. 454).

The meeting occurred at approximately 3:15 p.m., with Ortiz and another informant, Ernesto Rodriguez-Ramirez, arriving first, and Cavazos and Molina arriving in separate cars. (4 R. 230, 239-40). Acting as a go-between, Cavazos informed Ortiz that Molina had only a sample of the merchandise and obtained a sample from Molina at Ortiz's request. (4 R.231-32, 241-42). The transaction then was moved to the Globo parking lot at Ortiz's initiation. (4 R.231-33, 243-45). After signaling Molina, Cavazos left Ortiz in the company of Molina and Garcia for about thirty minutes. (4 R. 234, 246). At that time Molina informed Ortiz and Rodriguez that he had for sale over three hundred pounds of marijuana at a price of $550 per pound and 5400 to 5800 pills (ionamines and pasadrenes) at a price of $.60 apiece. (4

R.246-48).  Ortiz then contacted Agent Alvarez for his instructions. (4 R. 249).  When

Molina asked where the person that brought the money was coming from, Ortiz

answered, "some Cubans from New York" that "had a lot of money to make the deal,"

and wanted to make the deal fast. (4 R. 249-250).  The arrangements were that further

telephone communication would occur within an hour. (4 R. 250).  Cavazos returned

when Ortiz, Rodriguez, Molina and Garcia were leaving. (4 R.234, 250).

    Molina communicated with Ortiz and Rodriguez as scheduled.  According to

plan, they met at Junior's Supermarket in Las Milpas, Texas.  Molina was sitting in

the front passenger seat of his vehicle with one large grocery bag of marijuana in his

possession. (4 R.251-54).  The parties then met DEA agent William Ramos at the

Valley Mart parking lot in Pharr, Texas, an area also under surveillance by federal

agents (4 R.295-99; 7 R. 668), and they agreed to transact the deal at Junior's

Supermarket within the hour (4 R. 255-64, 268-69).  Molina agreed to put the drugs

in his vehicle and to thereafter exchange vehicles with Ortiz at 7:00 p.m. (4 R. 269-

71).

    Ortiz, Rodriguez and Ramos drove together to Junior's Supermarket and

checked the parking lot for a well lit area to conduct the transaction, while DEA

agents Foster Watkins, Angel Perez, Alvarez, Bennie Pierce, Walter Morrison and

Luis Saldana, set up a surveillance at about 7:05 p.m. (4 R. 299-305; 5 R. 341-42, 435;

6 R. 590, 603, 633; 7 R. 790-94, 804).  Molina arrived about 7:20 p.m. with the marijuana as scheduled and the buy was conducted in Agent Ramos' car (i.e., a government vehicle assigned to DEA Special Agent Alvarez), with Agent Ramos sitting in the driver's seat and Molina in the middle of the back seat. (4 R. 272-75, 279, 296, 301-02; 6 R. 580-82).  After a brief conversation about the money, Ortiz and Rodriguez walked to the rear of the Ramos car ostensibly to get the money from the trunk for Molina's inspection.  By pre-arrangement, the lifting of the trunk lid was the signal for a number of surveilling DEA agents to converge on Ramos' vehicle.  (4 R. 281, 300, 5 R. 344).

CI Ortiz testified as to what he saw and heard after the arrest signal was given. Ortiz testified that he partially lowered the trunk lid after the arrest signal was given, and saw Agent Ramos, who was sitting in the driver's seat, pointing the revolver at Molina.  Molina grabbed Agent Ramos' hand holding the revolver and grabbed the agent by the neck, pulling Ramos towards the back seat.  Agent Ramos yelled several times for help.  Ortiz opened the car door, pushed the seat forward, and entered the car.  Molina was lying across the back seat with his face up on the driver's side and his feet on the passenger's side.  Agent Ramos was pulled toward the back, and in a sitting position with one leg stuck between the seats and the other on the driver's side. (4 R. 283-284). As the lid was opened, Ortiz observed through the car's rear window

that Ramos had turned in his seat, drawn his revolver and pointed it at Molina, whereupon Molina grabbed Agent Ramos by the neck and hand holding the revolver, pulling him toward the back seat, and attempted to wrest the revolver from Ramos. With the car shaking from the struggle going on within and Ramos calling for help, both Ortiz and Rodriguez entered the car from the passenger's side. Rodriguez tried to grab the gun which was in Molina's left hand. At that point a shot was fired, which struck Rodriguez in the left hand.

[4]  (4 R. 281-90, 303-305; 5 R. 343-50; 6 R. 542, 565-71, 582-83; 7 R. 650-70, 692-707, 794-95).

Ortiz testified as to what was said and what occurred during the struggle. Ortiz heard Agent Ramos yell several times, "Help. Help." (4 R. 282). He testified, "when I entered the car they were fighting over the pistol," both having a hand on the gun. (4 R. 284). Ortiz grabbed Molina's right hand, pushing it down to the rear of the car towards the trunk. He told Molina "that we were Federal agents; that he

---

[4]On direct appeal, this Court found that "Rodriguez was unable to testify concerning Ortiz's statements to Molina and Ramos' statement to Molina, as testified by Ortiz, because, he testified, he wouldn't be able to say, he didn't hear anything (6 R. 569), the statements might have been made, but he was only paying attention to what he was doing at the time (6 R. 577), apparently a reference to the fact that while he was outside the car leaning through the open door, he grabbed Molina's feet, saw the gun and tried to grab it, but was struck in the hand by the first shot (6 R. 567) which caused him to give up his efforts and to move away in pain (6 R.565, 567, 576-77; 7 R. 700)." *Molina-Uribe*, 853 F.2d at 1195 n. 2.

-9-

should let go of what he had in his hand.  If he didn't he would get in serious

problems." (4 R. 285).  Ortiz heard a shot and then told Molina:

> I told him again, "Let go of what you've got or you are
> going to get fucked."...
>
> I told him, "He is a Federal agent, the one that you are
> grabbing."...
>
> And Agent Ramos told me, "I already told him that he is
> arrested and he doesn't want to pay attention."...
>
> And then two more shots were heard.

(4 R. 286).

> I told him again to let go of what he had in his hands.  I
> said, "Please let go of what you have."
>
> And then Molina said, "They want to fuck me."
>
> And I said, "Nobody is going to screw you.  We are Federal
> agents."
>
> *  *  *  *  *
>
> And they started to struggle again.

(4 R. 287).    Ortiz explained on examination by the defense that he and Agent Ramos

did not say anything about arresting the defendant before the first shot was fired.  (7

R. 705).  When asked did the struggle ever stop, Ortiz replied, "It was continuous and

fast."  (4 R.  287).  Ortiz repeated these statements on later examination by defense

counsel, adding that Molina said to him: "Me quieven chingar," which Ortiz translated

-10-

to mean, "[H]e thought we were going to hurt him." "He thought they were going to rob him or they were going to hurt him with the gun." (7 R. 700). Ortiz testified,

> That's why I told him beforehand – I anticipated and told
> him we were federal agents. I told him that several times.
> So he would let loose of what he had in his hands.

(7 R. 700).

Ortiz testified that in a continuous and fast movement, the struggle continued with Ortiz holding Molina's right hand, and Molina holding the pistol in his left hand. Ortiz described Molina as pointing the pistol to Ortiz' face, and he saw Agent Ramos' hand on Molina's left wrist. (4 R. 287-288). Ortiz described the struggle as Agent Ramos as trying to push the pistol away to the driver's side, and Molina as "forcing it to point to us," and then forcing it downward toward Agent Ramos. (4 R. 288). Ortiz did not see the pistol when the fourth shot occurred, but he felt Agent Ramos fall towards him and heard him say, "These people finally screwed – fucked me." (4 R. 289). Agent Ramos was shot in the chest. (4 R. 290).

DEA Agents Watkins, Perez and Alvarez headed in the direction of the car as the arrest signal was given, and they arrived almost immediately following the final shot. When Agent Alvarez opened the car door, he saw blood and a gun in Molina's left hand. Agent Alvarez tried to pull the gun out of Molina's hand but Molina held a firm grip. Agent Watkins entered the vehicle, pointed his revolver at Molina's head

-11-

and told him to drop the weapon.  (4 R. 289-290, 303-304; 5 R. 346; 7 R.  660-661, 670).  Agent Alvarez testified, "I grabbed the butt end of the gun with my left hand and I pushed his hand down with my right hand so I could have more leverage to pull the gun out."  (5 R. 348).  The agents forced the gun out of Molina's hand and drug him out of the car.  (5 R. 350, 353).  Molina was apprehended and read *Miranda* warnings (4 R. 281-90, 303-305; 5 R. 343-50; 6 R. 565-71, 582-83; 7 R. 650-70, 692-707, 794-95).  While standing away from the undercover vehicle, and without any solicitation from the law enforcement authorities, Molina stated in Spanish to Agent Saldana that "he didn't want to do it;" that "the gun went off by itself."  He then told Agent Saldana that he had been injured in his own leg and it was hurting him.  (7 R. 801, 805).

Agent Watkins and Ortiz made the decision to rush Agent Agent Ramos to the hospital instead of waiting for an ambulance.  Agent Ramos died at 7:35 p.m. as a result of the gunshot (4 R. 290, 305, 316; 5 R. 352), from Agent Alvarez' .38 revolver blue steel.  (5 R. 372).

## SUMMARY OF ARGUMENT

The district court incorrectly found, as a matter of law and fact, that trial counsel's performance was deficient and rendered Molina's trial fundamentally unfair. The theory of defense that Molina portrayed to the court below as the "only defense"

his counsel presented to the jury, and his argument that this theory conflicted with more persuasive alternative theories of defense, misinterprets the defense theories that Molina's counsel advocated at trial and the evidence his counsel presented.

Evaluating the performance of Molina's counsel in light of the entire trial record and the evidence adduced at the evidentiary hearing shows that trial counsel conducted an extensive pretrial discovery and engaged in comprehensive trial preparation to determine the scope of the evidence the government had, what evidence was available to the defense, and what plausible defense theories Molina could advance to the jury. *See* pp. 19-23, *infra.* Molina's argument and the District Court's finding that his counsel relied only on one theory of defense to the exclusion of alternative theories is contradicted by the record. An initial defense theory that Agent Ramos' murder may have been orchestrated by other DEA agents in such a way that would cover up the truth and lead Molina to believe himself that he may have caused Ramos to pull the trigger on the gun during the struggle did not raise a theory of defense that conflicted with self-defense or accidental killing under the facts of this case. *See* pp. 24-26, *infra.* Moreover, counsel's presentation of Molina's theory of self-defense was tempered by what Molina told them and what counsel learned during their investigation. Trial counsel had Molina examined by a top-notch polygraph examiner, the results of which indicated that Molina gave deceptive and misleading

answers.  This raised serious questions as to the truthfulness of Molina's testimony, and questions as to the effect his testifying would have on the jury's determination of his credibility.  While, on hindsight,  Molina may have wanted to tell the jury personally his own theory of defense, the likelihood that he would suborn perjury made his testimony unavailable.  *See* pp. 26-31, *infra*.

The theory of a conspiracy by DEA agents "to execute a colleague"was not a defense presented and argued to the jury to the exclusion of all other defenses. *See* pp. 31-38, *infra*.  The centerpiece of Molina's initial defense was to cue the jury to discrepancies in the government's evidence, pp. 38-39, *infra*, to show the FBI investigation curtailed the scope of the investigation, to raise inferences that the agents did so to prevent other evidence from being developed, pp. 40-48, *infra*, to insinuate to the jury there was some undisclosed reason for a coverup,  and to raise doubt as to Ortiz' integrity and veracity.  *See* pp. 48-51, *infra*.

Molina's trial counsel developed and presented Molina's theories self-defense and accidental killing before the jury.  The instructions the court incorporated and required the jury to consider self-defense, accident and heat of passion, when determining whether Molina was guilty of first degree murder, second degree murder or involuntary manslaughter, or whether in fact he was innocent of the crimes charged.  *See* pp. 51-57, *infra*.  Trial counsel's closing argument sharpened and clarified the

-14-

issues for jury to resolve in light of the defenses Molina presented at trial. *See* pp. 51-57, *infra*. Moreover, a trial strategy to request the jury be instructed on voluntary manslaughter, which required as elements the unlawful killing of a human being without malice and proof of a sudden quarrel or heat of passion, not only provided the jury with an alternative to finding Molina guilty of first or second degree murder but preserved an issue for appellate review that had not previously been resolved in this circuit and might lead to a reversal of Molina's convictions. *See* pp. 57-59, *infra*.

Finally, a decision by trial counsel to not investigate further expert testimony regarding blood splatter, fingerprints on guns or the shock effect of a gunshot wound to the leg comports with reasonable professional judgment. Molina did not demonstrate in his post-conviction attack what evidence an additional investigation by counsel would prove under the facts of this case. Molina does not demonstrate that a decision to limit further investigation into these matters, if that in fact occurred, was professionally unreasonable under the standard of *Strickland*. *See* pp. 59-61, *infra*.

## ARGUMENT

THE DISTRICT COURT INCORRECTLY FOUND, AS A MATTER OF LAW AND FACT, THAT TRIAL COUNSEL'S PERFORMANCE WAS DEFICIENT AND RENDERED THE TRIAL FUNDAMENTALLY UNFAIR.

1)    "The Sixth Amendment guarantees criminal defendants the effective assistance of counsel."  *Yarborough v. Gentry*, 540 U.S. 1, 5, 124 S.Ct. 1 (2003).

The Sixth Amendment guarantees criminal defendants the effective assistance of counsel." *Yarborough v. Gentry,* 540 U.S. 1, 124 S.Ct. 1, 6 (2003); *Wiggins v. Smith*, 539 U.S. 510,123 S.Ct. 2527 (2003); *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052 (1984).  The Supreme Court has declined to articulate specific guidelines for appropriate attorney conduct. *Wiggins*, 539 U.S. at 521.  "[T]he proper measure for attorney performance is 'simply reasonableness under prevailing professional norms.'" *Strickland*, 466 U.S. at 687.  Prevailing norms of practice are guides to determining what is reasonable, but as the Court recognizes " they are only guides." *Id.* at 688.  "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Id.,* at 688-689.

The District Court's finding that counsel rendered ineffective assistance turned on it's view that the defense theory Molina argued in the opening statement did not constitute a sound trial strategy and was not proved at trial.  There is a "strong presumption that counsel's performance falls within the 'wide range of professional assistance'," and it is the defendant's burden to prove "that counsel's representation

was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." *Kimmelman v. Morrison*, 477 U.S. 365, 381, 106 S.Ct. 2574 (1986)(citing *Strickland*, 466 U.S. at 688-689). The Supreme Court's holding in *Strickland* and the progeny of cases that followed is the reviewing court's scrutiny of counsel performance must be highly deferential. *Bell v. Cone*, 535 U.S. 685, 698, 122 S.Ct. 1843 (2002); *Burger v. Kemp*, 483 U.S. 776, 789, 107 S.Ct. 3114 (1987); *Strickland*, 466 U.S. at 689. "It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Burger,* 483 U.S. at 788 (*quoting Strickland*, 466 U.S. at 689) Reasonable competence is "not perfect advocacy judged with the benefit of hindsight." *Gentry*, 540 U.S. at 8. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

Even when a court is presented with an ineffective-assistance claim not subject to 28 U.S.C. § 2254(d)(1) deference, the standard imposed on a defendant by *Strickland* is to "overcome the 'presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Cone*, 535 U.S, at 698

-17-

(quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158 (1955))).  "[F]rom the perspective of hindsight there is a natural tendency to speculate as to whether a different trial strategy might have been more successful," *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S.Ct. 838 (1993), as "[t]here are countless ways to provide effective assistance in any given case," and "[e]ven the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689.   As the Supreme Court has repeated on more than one occasion, "counsel has wide latitude in deciding how best to represent a client." *Gentry*, 540 U.S. at 5.  Therefore "the attorney performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." *Strickland,* 466 U.S. at 688. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Wiggins*, 539 U.S. at 522 (citing *Strickland*, 466 U.S. at 690-691). "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.*

(2)    Basic duties of counsel are to advocate the defendant's cause, to consult with the defendant on important decisions, and to bring to bear such

skill and knowledge as will render the trial a reliable adversarial testing process. *Strickland*, 466 U.S. at 687.

Two basic duties imposed by the Sixth Amendment on trial counsel are the duty to advocate the defendant's cause and the duty to consult with the defendant on important decisions. *Strickland*, 466 U.S. at 687. The record supports a finding that these duties were fulfilled by Molina's counsel. Mr. Ramirez was appointed by the court to represent Molina a week after the indictment was returned. (2 R. 563). Trial was scheduled for early March 1987 (2 R. 552). Mid-February 1987, Mr. Ramirez moved the court to appoint an additional counsel and an investigator to assist him in preparing and defending a murder offense charged under a federal statute punishable by death. (2 R. 541). In Molina's pretrial motions and at the pretrial hearings Mr. Ramirez argued the prosecution was complex. He sought open discovery and the appointment of Mr. Connors as additional counsel, arguing the prosecution was complex and assistance was necessary to enable him to provide Molina with fair and effective representation. (2 R. 494, 499-501; 3 R. 2-8). Judge Vela granted each request, informing counsel that "I don't want this case to be tried without the defendant receiving the benefit of all what the law provides." (2 R. 484; 3 R. 8-10). Judge Vela recognized Mr. Ramirez to be a very competent, experienced and well respected criminal defense attorney. (3 R. 9). Mr. Ramirez chose Mr. Connors as the additional criminal defense attorney because he viewed Mr. Connors as both an

experienced criminal trial attorney and an experienced appellate attorney. (9 R. 100; 10 R. 47-48).

This is not a case where a defendant's counsel totally failed to conduct pretrial discovery or to engage in pretrial preparation, or a case where in hindsight counsel offered only implausible explanations for apparent failures. *See Morrison*, 477 U.S. at 385. Mr. Ramirez and Mr. Connors, who are referred to collectively in this brief as "defense counsel," sought open discovery, including interviewing government witnesses present at or surveilling the undercover operation, viewing all scientific and fingerprint reports and records. The court adopted an open file policy and full disclosure was made. (2 R. 410-479; 3 R. 9, 21-22; 5 R.368). Defense counsel reviewed the entire government file, examined FBI laboratory reports as they became available, and as set out below subpoenaed the relevant FBI agents to testify at trial. (3 R. 9, 13, 16-22; 5 R. 368). With regard to interviewing witnesses, the government made those witnesses available, but whether the witness would choose to speak to counsel was a decision only the witness could make. (3 R. 14-15). As counsel testified at the evidentiary hearing, they talked to the federal and state officers who would talk to them. (9 R. 100).

Defense counsel investigated Agent Ramos' performance and his reputation while in DEA employment, including the fact that Ramos at one time was a lawyer

who practiced law and "knew a lot about law," and he had been assigned by Special Agent Miley to the "Cash Crop" prosecution case, a San Antonio drug trafficking investigation. (6 R. 590-592; 7 R. 662-663). Counsel intended to put before the jury evidence that Ramos had filed a civil lawsuit against United States Attorney General Edwin Meese, et. al, Cause No. b-86-273, and that other agents had criticized him. (2 R. 383-385). They explained their investigating to Ramos' misconduct and extramarital affairs as a way to learn about Ramos' conduct while employed by DEA. (9 R. 98-101, 105-106; 10 R. 9-10, 12-13, 122-123).

During trial Judge Vela informed counsel that he had reviewed the complaint in *Ramos v. Meese, et. al,* CA-B-86-273, and found the his civil lawsuit based on employment discrimination to be irrelevant to the prosecution. Counsel was prohibited from mentioning that Ramos filed the lawsuit, but they were not prohibited from questioning witnesses as to what animosity they held against Ramos. (7 R. 663-666). As counsel explained, the evidence was not intended as direct evidence of a "conspiracy to kill Ramos," but as evidence that Ramos was not liked by his fellow agents, that he was a disgruntled DEA employee a filing lawsuit complaining of discrimination in the agency. (10 R. 10, 121-122). Officer Valdez testified he heard DEA Agent Mike Harper complain about or criticize Ramos. (6 R. 521-522). Counsel countered the testimony of two federal agents that they were unaware any

animosity or ill-feelings between Ramos and other DEA agents by raising doubts as to their statements that Ramos was their good friend and they knew him well. (6 R. 603-604; 7 R. 666-667). In response to counsel's questions both testified that they did not socialize with Agent Ramos, never visited his home, and did not know his wife.(5 R. 357, 436; 6 R. 603, 614-616; 7 R. 662; 8 R. 822).

To the extent that they could step sixteen years back in time, Mr. Ramirez and Mr. Connors explained the available defense theories stemmed from Molina's rendition of what occurred, the evidence that they were allowed to put on at trial, and the testimony they were able to draw from the government's evidence. The defensive theories they considered from Molina's version of what occurred and from their own research were: (1) Molina did not fire the weapon; (2) the gun discharged itself, and Molina had nothing to do with it; (3) the gun discharged accidentally while Molina was peripherally involved with it. (4) The alternative theory was that Molina fired the weapon in self-defense. (9 R. 97-98). The evidence of a perceived attack and struggling over the gun came out very clearly in the government's evidence. (9 R. 126). The theories of self-defense, intoxication, accidental shooting were argued and litigated at trial. (9 R. 103, 127; 10 R. 43-44).

The defensive theory that the killing was an accident came from Molina and the government's evidence. Molina did not suggest any other defense at the investigatory

stage or trial.  (9 R.  127; 10 R.  43-44).  The version Molina gave at the evidentiary hearing portrayed an accidental firing of the weapon during the struggle.  Molina testified that after Rodriguez left to get the money, Ramos laughed as if he was "mocking" him and then pointed a gun at him. His first reaction was to raise his hands and to grab the gun with his left hand.  Molina claimed his leg was hit when the first bullet discharged.   He "fought and fought until everything finished, was finished." He testified that at some point, he could not say exactly when, someone came into the vehicle, grabbed his right hand and folded it, and then began beating him.  (10 R.  86-87).  That after he was hurt, two more bullets were fired, then a fourth shot, and Agent Ramos made a horrible expression.  (10 R.  87).

Molina's argument below was that his counsel presented only one theory of defense; that is, a conspiracy of DEA agents to execute their colleague.  (1 R.  71). Molina said he gave counsel the alternate theories of self-defense and accident, theories he claimed were not developed or argued by counsel at trial, and theories which he believed conflicted with the conspiracy theory.  Molina testified his counsel prevented him from testifying to present to the jury his belief that the killing was an accidental discharge from the weapon because his counsel believed that the theory of self-defense and accident would conflict with their story that a DEA agent murdered Agent Ramos.  (1 R.  72).

-23-

To begin, defense counsel's aim at trial was to show the jury Molina's perception of what had happened in way that did not undermine Molina's credibility. (9 R. 104). Molina's version of what occurred and his theory of an accidental discharge of the weapon when he reacted to what "Molina" perceived as a dangerous situation does not conflict with a theory of defense that an unknown agent orchestrated Ramos' murder to occur in such a way that no one, not even Molina, would know what happened and would not suspect an underlying conspiracy. In fact, by showing the jury the evidence inferred some unknown unidentified DEA agent likely killed Agent Ramos Molina's, counsel created an inference that the murder was carried out in such a way as to place the blame on Molina if the events occurred as planned. There was no dispute in the evidence that the drug trafficking deal was an undercover investigation carefully planned and carried out by federal agents. Molina believed he was negotiating with big a Cuban drug dealer from New York; there was nothing atypical in how the delivery was being done. Once the deal was completed and Ortiz got out the car supposedly to get the money, an act that deviated from what was originally planned, the events that followed happened in the matter of seconds. Ramos laughed, then pointed the gun at Molina. (10 R. 103).

Molina laid out his perception of what had happened and what he told trial counsel at the evidentiary hearing. Molina testified at the evidentiary hearing as to

what he believed: "I didn't kill nobody.... I didn't kill anyone. It was an accident. I don't even know how it happened."(10 R. 100). Molina grabbed hold of the gun with his left hand: "It was just a reaction. That's all it was. I was by myself." (10 R. 101). When asked if he grabbed Ramos around the neck with his other hand and pulled him into the back seat on top of him, Molina testified: "It's very possible, but I don't recall. It's very possible." (10 R. 102). "I think, and this is my opinion, I think I helped Mr. Ramos pulls the trigger because – I'm not saying that he shot me, but the bullet was discharged the moment I grabbed the gun." (10 R. 103). He disclaimed having control over the gun. (10 R. 103-104). When asked if he was convinced that the agent was killed by other agents, Molina replied: "I didn't know anything. They know everything. I don't know nothing. (10 R. 104). As discussed below, Molina's counsel in fact structured Molina's defense to include Molina's perception of what had happened, in such a way as to show the jury that Molina was stunned, that there was a possibility the gun discharged during an unanticipated struggle over a gun, and that Molina could not say whether his attempt to grab the gun out of Ramos' hand caused Ramos to pull the trigger. This is not inconsistent with trial counsel arguing to the jury that the evidence supported a finding that Agent Ramos was murdered by a conspiracy to eliminate him. From this inference the jury

could then infer that the unknown unidentified conspirators wanted "Molina" to believe that he may have killed Agent Ramos by accident.

The defensive theories that counsel could present to the jury were tempered with what counsel learned during their investigation, the evidence they had and their duty to not suborn perjury at trial. (9 R. 119). As Mr. Ramirez explained, they presented the Molina's defenses in a "chronological sequence, in a rational, sensible sequence what transpired when, whom, by what means, where." (9 R. 108). As Mr. Connors explained, "so much of it's a judgment call by the lawyer based on the facts in his case." (10 R. 65). Mr. Ramirez and Mr. Connors testified at the evidentiary hearing that they fully questioned Molina as to the events that occurred, that they discussed with Molina possible defensive theories, and they listened to Molina's own theories. As Mr. Ramirez explained, "I usually don't rely exclusively on the representations of a criminally accused. I deal on the independent investigations to what may be exposed, what is relevant and what is not. (9 R. 980-99). Counsel had Molina examined pretrial by a qualified polygraph examiner to ascertain his veracity and to "to get to the meat of the coconut on the defense of self-defense." (9 R. 105, 107-108; 10 R. 46-47). As he further explained, as a criminal defense attorney he would not perpetrate a fraud on the court or the jury. (9 R. 106). The results of the examination showed deception and misleading answers. (9 R. 107).

Defense counsel recommended to Molina that he not testify but not for the reason that Molina argued to the court below, which was that counsel told him not to testify because admitting to an accidental killing or self-defense would destroy their theory of a conspiracy by DEA agents to execute their colleague. (10 R. 89). First, there is nothing in this record to show or even suggest that counsel prevented Molina from testifying at trial. Counsel informed the court before the trial began that they had advised Molina that "it is his right to take the stand and testify;" that they advised him not to testify; that "he had indicated that he does not wish to take the stand," and that "he wishes to follow his attorney's advice." (4 R. 182). Judge Vela immediately responded with specific questions to Molina, and Molina personally informed the court that he did not wish to take the stand, and that counsel's statement to the court was correct. (4 R. 183; 9 R. 109). Counsel testified at the evidentiary hearing that they told Molina the decision was his, and he chose not to testify. (9 R. 124-125; 10 R. 47). Molina never claimed before, during or after trial that his decision to not testify was involuntary, and he did not raise such issue on direct appeal. (10 R. 82).

Molina testified at the evidentiary hearing that he relied on his counsel's advice not to testify. (10 R. 92-97). Defense counsel expounded in greater detail at the hearing that their reason for advising him not to testify was to avoid suborning perjury. As explained above, the polygraph results indicated deception and

misleading answers; counsel advised Molina to not commit perjury before the jury. (9 R. 124-125; 10 R. 45-46). To the extent that Molina now perceives their advice not to testify as foregoing a better defense tactic – that is, for him to personally tell the jury what happened and what was said, the Sixth Amendment does not permit counsel to suborn perjury before the jury or the court. *Nix v. Whiteside*, 475 U.S. 157, 166, 106 S.Ct. 988 (1986) ("In *Strickland,* we recognized counsel's duty of loyalty and his "overarching duty to advocate the defendant's cause. Plainly, that duty is limited to legitimate, lawful conduct compatible with the very nature of a trial as a search for truth. Although counsel must take all reasonable lawful means to attain the objectives of the client, counsel is precluded from taking steps or in any way assisting the client in presenting false evidence or otherwise violating the law.") While, on hindsight, Molina may have wanted to tell the jury personally his own theory of defense, the likelihood that he would suborn perjury made his testimony unavailable.

Moreover, Mr. Ramirez testified that the prosecutor "did everything within his power to waive a red flag and invite him to get up there. (9 R. 126; 10 R. 45). AUSA Wolfe testified that the government expected Molina to assert self-defense as his theory and rebutted that theory with the evidence it presented. (9 R. 80). The government believed that a guilty verdict would turn on the fact that, in the matter of a minute, the gun was in Molina's hand, pressed directly into Agent Ramos's chest and fired. (9 R.

-28-

80-81). Moreover, the prosecutors elected not to introduce at trial the statements he made to FBI Agent Franco while in the hospital. (2 R. 412-412, 472-478; 3 R. 141-142). If Molina had testified before the jury that "he was scared and . . . an Anglo officer had pulled him out by the hair of the car at the crime scene, shooting scene, and that officer had said, "If the law doesn't kill you, I will kill you" (3 R. 144), there was a risk that the government would call Pharr City Police Officer Juan Moreno and Officer Ruben Villescas to testify that Molina did not make those statements at his interview with FBI Agent Antonio Franco at 1:50 p.m. the next day, January 1, 1987. The only thing they recalled Molina as saying was that someone grabbed him by his hair. (3 R. 160-161; 4 R. 177). Thus, to the extent his counsel told Molina "the government lawyers were going to tear me apart" if he testified (10 R. 94), and that testifying would destroy his credibility (10 R. 90), the government could impeach Molina with his prior statements. Trial counsel could have reasonable viewed that as particularly damaging. *Darden v. Wainwright*, 477 U.S. 168, 186, 106 S.Ct. 2464 (1986) ("Any attempt to portray petitioner as a nonviolent man would have opened the door for the State to rebut with evidence of petitioner's prior convictions. This evidence had not previously been admitted in evidence, and trial counsel reasonably could have viewed it as particularly damaging.")

Furthermore, as Mr. Connors explained, they could only speculate as to what Molina would say if he testified.  (10 R. 47) ("It scared me that we might be in a perjury situation if Mr. Molina got up there and – or he'd just admit the darn killing, you know" Why are you having a trial if you're going get on the stand and say I killed the officer and, basically, it wasn't self defense.  It might have been by accident.  But that's where we had some problems with the perjury issue, possibly, if it was an accidental killing.") Testimony that Molina "thought we [the undercover agents] were going to hurt him," that "they were going to rob him or they were going to hurt him with the gun" came from Ortiz on direct examination by defense counsel. (7 R.  700). Agent Saldana testified that after being pulled from the car, Molina stated  "he didn't want to do it" and"the gun went off by itself."  Defense counsel did not introduce any evidence to refute that testimony, and it comported with Molina's defense of accidental killing or self-defense  (7 R.  801, 805; 9 R. 126), showing that " in the heat of the moment without --incapable of cool reflection, [Molina] will speak the truth." (9 R. 111).  Knowing that Molina's answers at the polygraph examination indicated deception and misleading answers, and  factoring in what consequences could arise from perjured testimony, that Mr. Ramirez and Mr. Connors advised him to not testify is a testament to their professionalism and knowledge as criminal defense lawyers. The Sixth Amendment imposed on counsel a duty "to bring to bear such skill and

knowledge as will render the trial a reliable adversarial testing process." *Strickland*,

466 U.S. at 688; *Powell v. Alabama*, 287 U.S. 45, 68-69, 53 S.Ct. 55 (1932).

3)    "<u>The Sixth Amendment guarantees reasonable competence, not perfect
      advocacy judged with the benefit of hindsight.</u>"  *Gentry*, 540 U.S. at 8.

The District Court reversed Molina's conviction for the murder of Agent Ramos

based on a finding that counsel predicated Molina's "entire defense on a theory that

is not only bizarre, be devoid of evidentiary underpinnings."   The Magistrate Judge

who presided over the evidentiary hearing found "there was no strategy when a

completely idiosyncratic theory of defense was used in place of a viable and

supportable theory." (1 R. 45).  Recognizing that judicial scrutiny of Molina's claim

is highly deferential, the court found that "defense counsel's choices fell outside the

wide range of reasonable professional practice."   (1 R. 46).   The District Court

accepted Molina's argument that counsel presented only one defense to the jury:   "A

conspiracy to execute their colleague by the DEA agents." (1 R. 71, Molina's post

hearing brief, at 3).   The court perceived this defense as "predicated on the idea that

Ramos was disliked by his fellow law enforcement agents for a number of different

reasons" and "that they "orchestrated a sting operation in order to kill Ramos", but

unclear was to whether the agents shot Ramos directly or whether the agents "planted

the gun in the vehicle in hopes that Molina would use it to kill Ramos." (1 R. 36).

The court also found self-defense was a more viable and supportable defense, but that

counsel did not actually put on evidence to support it. (1 R. 46). The court, however, does not elucidate what evidence was not discovered by counsel or what evidence was not introduced by counsel at trial that would support a theory of self-defense.

The district court agreed with Molina, who testified at the evidentiary hearing "that he did not understand why his attorney was pursuing this defense when there was no evidence to support it." (1 R. 36). In his post hearing brief, Molina argued his counsel "did not employ or attempt to employ the services of a ballistic expert, medical expert or accident reconstruction expert that could lend credence to his theory of defense." (1 R. 70). He argued that the conspiracy theory required evidence of "at least the possibility of more than four bullets fired, more than one gun discharged, more than one bullet penetrating the body of the victim and a different configuration of the protagonist in the back seat of the vehicle." (1 R. 70). Molina's argument and his testimony at the evidentiary hearing were that Mr. Ramirez chose only one theory of defense. (1 R. 71). Molina concedes in his brief that the "alternative theories of self-defense and accident appear in the record because they are undisputable facts," and that the jury was instructed on those defense theories. His complaint with counsel is that nowhere in the record "does defense counsel develop" any evidence a self-defense, intoxication or crime of passion. Molina's position is that his counsel was "more worried about supporting his unbelievable theory of defense than defending his

client from a charge that carried a minimum sentence of life in prison." (1 R. 72). He faults counsel for choosing only an "incredible theory of defense" to the exclusion of all others and giving only passing reference to the more viable defenses at closing. (1 R. 73-74).

4)    "[C]ounsel has wide latitude in deciding how best to represent a client."
       *Gentry*, 540 U.S. at 5.

The theory of a conspiracy by DEA agents "to execute a colleague"was not a defense presented and argued to the jury to the exclusion of all other defense. The trial strategy developed by Molina's counsel was to work with the facts they investigated, to put before the jury evidence which supported Molina's defense theories, and to use the evidence put on by the government to Molina's advantage. The prosecutors operated an open file policy in this case and allowed defense counsel to view its version of the facts. Defense counsel pressed for open discovery both pretrial and at trial, and the district court granted their requests. This prosecution presented a very difficult case to defend. Molina was charged with premeditated murder of a federal officer in violation of 18 U.S.C. §1111 and § 1114 (1984), an offense that carried a minimum sentence of life imprisonment. The defensive theories of accident and self-defense were developed through the government's witnesses, and the prosecution boiled down to the jury making a credibility choice as to what exactly happened in the moments surrounding the shooting. The jury was entitled to believe

-33-

Ortiz' testimony that he and Agent Ramos repeatedly told Molina they were federal agents, this is an arrest and to let go of the gun, and to find that Molina made a conscious and deliberate decision to evade apprehension.    The jury was equally entitled to disbelieve Molina's statements made to federal agents after being apprehended that he did not want to kill Agent Ramos and the gun had discharged by itself during the struggle.    Molina immediately grabbed the gun pointed at him and pulled Ramos into the back seat.    With Molina in possession of the gun and while Ramos had a hand on Molina's wrist trying to push the gun hand to the side, Molina forced the gun to Ramos' chest and fired the fourth shot fatally wounding him. *Molina-Uribe*, 853 F.2d at 1195.    Agent Ramos died within minutes of the shooting.

Defense counsel began Molina's opening statement [5] with telling the jury that he agreed with AUSA  Milner's claim that "this was  a simple case of the anatomy of murder, a foul murder," that there "was a foul premeditated, malicious murder committed on December 31, 1986, where the life of Special Agent William Ramos, the good officer, was taken," and he told the jury that "Officer Ramos was not only murdered, he was executed,""eliminated," and "in fact assassinated."(5 R. 406).    But, while in a single sentence counsel drew the jury's

---

[5]Molina's counsel did not waive opening statement.  He deferred Molina's opening until after the government rested.

attention to the most horrible thing that could happen to a federal agent fulfilling his role as a law enforcement officer, Mr. Ramirez told the jury that the defense would show what the government did not prove and what defensive theories the government's evidence did not eliminate. Mr. Ramirez argued the evidence would show that Agent Ramos' blood sample leaked and became damaged en route to the FBI laboratory in Washington, D.C.; there was no laboratory tests for drugs, neurotoxins or strychnine; there were more than four bullet holes in the vehicle, evidence of more than two persons in the car, the weapon used to kill Agent Ramos belonged to Agent Alvarez; that Molina shot in the leg, there was no gun powder residue on Molina's hands, and the agents did not do the atomic absorption analysis testing to verify that Molina fired the weapons, even though ordered by two police departments. Mr. Ramirez argued the evidence that the government did not show the jury, that there was another confidential informer present at the scene and other agents who did not testify. (5 R. 406-410). Mr. Ramirez ended with stating that "[w]e intend to show through the evidence, specifically through the Government's own evidence, that there was an elimination and there was a most foul murder committed on [December] 31, 1986, and a life was taken." (5 R. 410). Simply stated, Mr. Ramirez's opening statement to the jury was that there is reasonable doubt in this prosecution, and he asked the jury "to very meticulously, very carefully, very

deliberately, evaluate the evidence that will be submitted to you under the Court's guidance and instructions." (5 R. 410).

"When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect," for as the Supreme Court held earlier in *Strickland,* "counsel is 'strongly presumed" to make decisions in the exercise of professional judgment." *Gentry*, 540 U.S. at 8 (quoting *Strickland*, 466 U.S. at 690). Molina's counsel did not use a conspiracy theory defense to the exclusion of alternate theories of defense; rather, counsel asked the jury to find Molina not guilty of premeditated murder, and to then find that he did not commit voluntary manslaughter. With the exception of Molina, the necessary witnesses were all law enforcement offices or FBI laboratory experts. The killing occurred in the moments between Ortiz getting out of the undercover vehicle, signaling the surveillance agents by opening the trunk, Agent Ramos pointing a gun at Molina and telling him he is under arrest, and Ortiz interceding on Ramos' request for help. There were three persons in the car when the shooting occurred, Ortiz, Agent Ramos and Molina. The government's prosecution rested on showing the jury the events leading up to the shooting, that what the agents told Molina evidenced an arrest by law enforcement officers, and that Molina's intent when the arrest occurred was to kill Ramos.

In Mr. Ramirez and Mr. Connor's view, the evidence turned on the jury finding Ortiz not credible and believing Molina's version of what actually happened. The centerpiece of Molina's initial defense was to cue the jury to discrepancies in the government's evidence, to show the FBI investigation curtailed the scope of the investigation, to raise inferences that the agents did so to prevent evidence from being developed, to insinuate to the jury there was some undisclosed reason for a coverup, and to raise doubt as to Ortiz' integrity and veracity.   As detailed below, the record supports that this is what defense counsel presented and argued to the jury at trial. The next stage in Molina's defense was to show the jury that the discharge of the weapon was an accident, that Molina reacted to an unexpected turn of events by "trying to keep himself from getting shot, in what he believed to be a drug deal gone bad." (1 R. 36).  As argued above, the polygraph examination indicated to defense counsel that Molina's answers to the questions he was asked were deceptive and misleading.  Defense counsel introduced Molina's defense that he believed Ramos was trying to steal the marihuana and hurt him with the gun by calling Ortiz as a defense witness after the government rested its case and the defense countered that evidence.  Ortiz testified Molina told him he ""thought we were going to hurt him," that "they were going to rob him or they were going to hurt him with the gun." (7 R. 700).  DEA Agent Saldana, who was called by the defense, testified that immediately

after the shooting Molina told him "the gun went off by itself."   The point the United States makes here is that Molina's counsel ended his defense with what his counsel told the jury at the beginning: The government did not obtain all the evidence to prove the truth and did not show the jury the entirety of what it found; that the "the government's version that is being brought before you is not what happened." (8 R. 904).

A)    Molina's counsel cued the jury to the discrepancies found in the government's evidence.

Through evidence introduced by defense counsel on direct examination of its witnesses, and with cross-examination of the government witnesses, defense counsel cued the jury to the discrepancies found in the government's evidence.  Pathologist Santos, the government witness who performed the autopsy on Agent Ramos, testified that Agent Ramos died from a contact gunshot wound, that is, a weapon discharged while firmly placed against the skin of the chest. Defense counsel cross-examined Dr. Santos extensively about measurements of the muzzle and abrasive impression, the effect of hollow point bullets on contact and how the bullet would expand or disperse on contact through the hole.    (5 R. 522-526).   Dr. Santos testified on cross-examination that he could not tell from the autopsy which gun fired the fatal shot (5 R. 426); that he could not eliminate Agent Ramos as being shot and killed by a .38 caliber weapon (5 R. 431); that he gave  the blood samples, the urine samples and the

-38-

bullet extracted from Agent Ramos' body to FBI Agent Franco, who was later

identified as the federal case agent assigned to this investigation, but he had no idea

what was done with that evidence.

[6] (5 R. 428). Pharr Police Investigator Javier Gonzalez could not explain two black

holes shown in the photographs of Agent Ramos' body (6 R. 555-557; Def. Exh. 24-

25). The defense counsel informed the court that the medical testimony would show

that the injury to Agent Ramos's body did not comport with the .38 bullet wounds.


B)   <u>Defense counsel portrayed the investigation as curtailed by FBI</u>
     <u>interference</u>.

Defense counsel's aim was to show to the jury that the FBI or unidentified law

enforcement officers curtailed a full investigation of the facts. The defense put before

the jury testimony from which the jury could infer that FBI Agent Antonio Franco, the

case agent "sitting next to the prosecutor" at trial and "in charge of the overall

investigation" (5 R. 379, 383), did not request the FBI laboratory in Washington,

D.C., to test all the evidence obtained from the crime scene. FBI Special Agent W.

Howard McCook, an FBI supervisor, testified on cross-examination by the defense

that FBI laboratory reports made in Washington, D.C. would include requested

---

[6]Defense counsel requested to ask Dr. Santos whether he had perform the autopsy on Sante
Bario, another DEA agent killed by a DEA agent, arguing at the bench conference that "this is not
the first agent that has been killed by its own agency." The court denied his request. (5 R. 429).

examinations of "firearms, chemical analysis, hairs and fibers, serological analysis, gunshot residue analysis, fingerprints" (5 R. 382); that the FBI has "some of the best laboratory people in the world."  (5 R. 384).   Agent McCook testified that he could not say whether the four shots fired in the car were from government's exhibit 13, the weapon identified as being removed from Molina's hands.  He stated this  "could be determined by the laboratory." (5 R.  379).  When asked by defense counsel for further explanation, Agent McCook testified that the laboratory people could tell whether they pin impressions were made by the firearm pin of the weapon used to shoot Agent Ramos, but that the "empties" were removed from that weapon by Agent Franco.

---

[7]Defense counsel asked questions to take the cross-examination one step further:

Q:    So in order for this jury to absolutely make certain that these four empties were fired from that weapon, the laboratory people would have to tell them the pin impressions were made by that firing pin, would they not?

A:    That would be a correct assumption, yes, except those things came from that weapon.  There were removed from that particular weapon.

Q:    Removed by whom?

A:     Those were removed by Agent Franco.

Q:    In your presence?

A:    Yes, sir.

Q:    All right.  So then you know that these empties were removed from that cylinder?

A:    From that weapon, yes, sir.

7

Defense counsel brought out at trial or raised inferences that there was blood taken from the crime scene not accounted for by FBI investigation, evidence not presented by the government at trial and inconsistency in the evidence the government presented at trial. The multi-page reports introduced as defense exhibits 2-4 were FBI laboratory reports regarding chemical analysis, hair and fibers analysis, serological analysis, gunshot residue analysis, a latent fingerprint analysis and serological analysis. (5 R. 470-471, 475-476). FBI Special Agent Paul D.Bigbee, the FBI laboratory technician called by the defense and who performed only the FBI serological analysis (5 R. 476), testified that certain blood samples obtained from Agent Ramos leaked from the vial during shipment to the FBI Laboratory. (6 R. 487-488; 7 R. 729). FBI Special Agent William Albrecht, the specialist in the firearm identification called by the defense, testified that the serological examinations of hair and fibers was discontinued after the case agent spoke to the FBI examiner in the FBI

---

Q:      Of course, you don't know how they came to be placed in that weapon?

A:      No, sir, I don't.

Q:      And the laboratory can tell us with certain degree of specificity if those rounds were fired by that weapon. Can the FBI do that?

A:      Yes, sir.

(5 R. 380-381).

-41-

laboratory. As developed by the questions asked by defense counsel, the FBI examination depended on the information submitted by the agents and the information given by the agents to the examiner. (7 R. 745-747).

Defense counsel asked questions on both direct and cross examination and introduced evidence to raises inferences that the FBI conducted inadequate testing of the firearm and gun powder residue. Defense counsel emphasized in its examination of Ortiz that both Molina and Agent Ramos had their hands on the weapon. (7 R 698). FBI Special Agent Donald G. Havekost, who was also assigned to the FBI laboratory in Washington, D.C., testified that gunshot residue examinations ("atomic absorption" test, "neutron activation analysis" test, and the paraffin test, the latter of which Agent Havekost testified was outdated) were done on Agent Ramos, and the primer residue was present. Agent Havekost received no sample taken from Molina's hand; thus, this testing was not done on Molina. (7 R. 777-781, 788-789). As Agent Havekost explained on cross-examination by the government, if the sample is not taken within a couple of hours after the discharge the expectation of finding firearm discharge residue is low (7 R. 784-785); thus, he explained that it is critical to get samples as soon as possible after the discharge of the firearm. (7 R. 784). Through the testimony of Officer Valdez, defense counsel brought out that Pharr Police Sergeant Villescas requested gun residue tests, such as a paraffin test and atomic absorption analysis, be

-42-

conducted on the Molina ("the victim at the hospital") and Agent Ramos ("the officer at the funeral home"). (6 R. 519-520, 523).

Agent Watkins testified on cross-examination by the defense that he was given a paraffin test, but that he did not know whether Ortiz, Rodriguez or any other DEA agent was given such a test. (7 R. 657). Ortiz testified that he was not tested for paraffin or gunpowder residue. (7 R. 706). When asked by defense counsel, Ortiz admitted that he found and touched the second weapon inside the floor on the driver's side, which was identified as Agent Ramos' weapon. He testified that he put the weapon back on the floor and told the agents standing beside him what he had done. (7 R. 671-672, 702, 706-707; Gov. Exh. 17). Joe Hyatt, a fingerprint specialist for FBI, testified for the defense that 22 fingerprints, 13 palm prints and 5 impressions were submitted for laboratory examination, and Molina's fingerprints were not found. Defense counsel brought out on direct examination that the fingerprints of Ortiz and Rodriguez were not submitted for examination. (7 R. 712-717). In response to questions asked by the court, Hyatt testified that no prints or impressions taken from the weapons were submitted for examination. When Hyatt examined the gun itself, he found no latent prints. Hyatt explained that struggling with the gun or forcibly removing the gun from a hand could wipe away any print on the gun. (7 R. 721-724).

On redirect examination by defense counsel, Hyatt testified that wiping the item would greatly destroy latent prints.  (7 R.  725).

Defense counsel raised questions for the jury to consider about the number of bullets actually fired and bullet projectiles found in the car.  According to Officer Valdez, the defense exhibit  photographs of the vehicle showed four bullet holds in the seat, bloody boot prints, and belt buckle covered with blood.  (6 R. 508-510, 512-514; Def. Exh. 15-19).  During his inspection, he found a bullet hole on the passenger side head rest and the passenger side door panel (6 R. 530; Def. Exh. 20-22).   On redirect examination, defense counsel fully explored the officer's testimony on the government cross-examination that he found evidence of four shots in the vehicle, which he described as possible entry and exit holes (6 R. 524), asking the officer to explain how those bullet holes came into existence (6 R. 537-540, 543-546), questions which required the government to go into a more extensive cross-examination.  (6 R. 547-551).   Officer Valdez testified that he removed car seat linings and submitted them to the FBI, but he did not have laboratory results to indicate a finding.   (6 R. 535-536).  The defense elicited testimony that Officer Valdez did not lift of the seat completely to see if there were any bullets underneath. (6 R. 540-542).  Defense counsel continued on further redirect examination about submitting bullet fragments to the FBI laboratory with questions about "coverup."   (6 R. 543-546).

-44-

Confidential informer Rodriguez, whose did not testify for the government, testified for the defense that he was shot in the hand with a gun fired inside the vehicle. (5 R. 445-446).  Rodriguez testified that he ran to the car door, grabbed Molina's foot, saw the gun in Molina's hand, and tried to grab it.  He was half-in and half-out of the car when he felt the first discharge from the gun.  (6 R. 565-566). Defense counsel explored this further and elicited testimony from Rodriguez that he was standing outside the car when he heard the first shot. (6 R. 567-568).  On defense cross-examination, Agent Watkins testified Rodriguez was standing outside the car when he arrived.  (7 R.  650).  Officer Valdez testified on defense examination that there was blood on the outside of a Pinto stationwagon parked near the crime scene. (6 R. 502, 510, 516).  FBI Agent Bigbee testified that he found blood stains consistent with Agent Ramos and Molina' blood type, stains "not consistent with either one of them" (6R. 492), and stains he could not identify.  (6 R. 495-496).  The government countered this with testimony on Rodriguez' cross-examination that he was shaking his bleeding hand after he was shot and pulled it out of the car.   (6 R. 586).

Defense counsel had previously questioned DEA Special Agent Foster Watkins about training police officers in the use of silencers.  (6 R.  643-644).  Counsel then asked Agent Albrecht to what type of weapons silencers are attached, to which he replied that most are attached to semi-automatic pistols as opposed to revolvers.  The

gun used to shoot Agent Ramos (Gov. Exh. 13), as well as the other gun found in the vehicle (Gov. Exh. 17), were revolvers. (7 R. 774). In response to defense questions, FBI Agent Albrecht testified that the towel removed from the undercover vehicle, which was identified in the FBI laboratory report as Q56, showed a "pattern of lead residue chemically developed on Q56 [] consistent with what would be expected if a firearm like K2 was discharged withe adjacent to or wrapped in Q56."

[8] (5 R. 477; 7 R. 753-754, 775).

On questions asked by defense counsel, Officer Valdez testified that the DEA, the FBI, the Pharr Police Department, the Sheriff's Office, and Hildalgo County District Attorney's Office were all brought to the crime scene and hospital to obtain and secure evidence. (6 R. 502-504, 646; 7 R. 690). DEA Special Agent Kenneth A. Miley testified that he had heard the Sheriff's Office had videotaped a reconstruction of the events. (7 R. 690-691). Officer Valdez identified Officer Villescas as the Pharr Police Department case officer assigned to this for this shooting (6 R. 546), and he testified on recross-examination by the government that he and Sergeant Villescas worked with FBI Agent Franco in their investigation. (6 R. 551-

---

[8]The court questioned Agent Albrecht further, asking if he made a test to determine exactly how the towel was situated or whether it was possible to determine. Agent Albrecht answered that determination could not be made. He found enough residue to testify that the towel was in close proximity to the weapon, but not how the towel was folded or wrapped or whether it was around the weapon at the time it was fired. (7 R. 759-760).

552).  Officer Valdez testified on further redirect examination by the defense that he

heard Case Agent Franco telling DEA agents at the hospital that he did not want the

agents there, or in the words of defense counsel, Agent Franco told the DEA agents

"we don't want a coverup."

_____

      [9][Defense Counsel] Q:  Immediately after you got yourself involved in this investigation was
the word "coverup" heard by you?

A:      Not specifically mentioned, no, sir.

Q:      Okay.  Not specifically mentioned.  How about generally mentioned?

A:      The only time I ever heard anybody say anything was Mr. Franco at the hospital, telling
      DEA agents he didn't want them there for the same reason.  That's the only time.

Q:      In other words, we don't want a coverup?

A:      That is right.

(6 R. 553).

[Prosecutor] Q:  "If I understand that correctly, that's what Agent Franco said at the hospital
      when he was asking DEA to step aside so he could continue with the investigation?

A:      What happened, you were getting a lot of officers involved and some agents came over there
      to help and he told them he didn't want them there.  And that's the only time I ever heard
      anybody say anything.  He didn't want anybody messing with anything.  Too many people
      helping.

Q:      Did he say he didn't want it to come back or there be an accusation that there was a coverup?

A:      Like a coverup.

Q:      And he was going to control it?

A:      Yes.

(6 R. 554).

[9]  (6 R. 553).  He also testified that he was  present at the DEA headquarters when Ortiz and Rodriguez were writing out their statements. (6 R.  517-519, 575).  When called by the defense, FBI Agent Juan Gonzalez testified that he alone interviewed Rodriguez that evening.   Rodriguez did not remember anyone say, "We are federal agents" or "You are under arrest." (7 R. 709-710).

C)    Molina's counsel used additional evidence to insinuate some sort of undisclosed and unknown coverup.

Other witnesses were called by defense counsel to insinuate or raise an inference that there was some sort of undisclosed and unidentified coverup.  Defense counsel asked the jury to consider  why the DEA agents took Agent Ramos to the McAllen Medical Center emergency room rather than the McAllen General Hospital, which Molina portrayed to the jury as a closer location.  (4 R. 444-453, 459; 6 R. 497-502, 504-506, 607-613).   Defense counsel brought this issue to light with the testimony of Agent Watkins that Agent Ramos was pronounced dead ten minutes after they got  to the emergency room.  (6 R. 639).  According to Agent Pierce, Ortiz was a paid confidential informer, who could have been paid as much as $50,000 (5 R. 463-464, 468-469).  While Agent Alvarez testified on rebuttal that Ortiz received regular expenses and weekly money ranging about $250 to $300 a week. (8 R. 818), Ortiz testified that he was paid $5000 working for the DEA on a particular case.  (7 R. 703).  Defense counsel brought out through the testimony of several DEA agents and police

-48-

officers that "Beto Lopez", another DEA confidential who did not testify for the government at trial, was present at the crime location that night and in close proximity to Agent Ramos. (5 R. 438, 444, 465; 6 R. 584, 593, 596; 7 R. 703). The defense connected CI Beto Lopez to Agent Alvarez. DEA Agent Walter Morrison testified that Beto Lopez also was supervised by Agent Alvarez (6 R. 593, 596). Agent Alvarez was the DEA case agent in charge of the drug trafficking investigation. It was Agent Alvarez' vehicle that Agent Ramos used during the drug trafficking transaction. Agent Alvarez owned the gun Agent Ramos pointed at Molina and killed Agent Ramos. Agent Alvarez supervised Ortiz and Rodriguez. (5 R. 454-455).

Agent Pierce, who wrote a report that he surmised was given to Agent Franco (5 R. 453), was supervised by Assistant Special Agent in Charge Kenneth Miley. (5 R. 453, 455-456). Agent Miley was called by the defense. He testified on direct examination that, as the second line supervisor in charge of the McAllen district office, he coordinated the handling of the investigation. Agent Miley made no report about the shooting incident, but read the reports written by investigators from the FBI, DEA, Pharr Police Department, Hidalgo County Sheriff's Office, and the District Attorney Office. (5 R. 456; 7 R. 685, 688-690). As defense counsel asked on direct examination, "So the only way you can tell us who shot Agent Ramos is from the reports and the investigators?" Agent Miley replied, "That is correct." (7 R. 691).

The defense put before the jury testimony that no DEA saw Agent Ramos get shot, that nobody from DEA could tell who shot Agent Ramos or who pulled the trigger. (5 R. 462-463; 6 R. 596; 6 R. 605, 647; 7 R. 774).  As Agent Pierce testified, "I can only tell them who I was told that shot him."  (5 R. 462).

Defense counsel also brought out that there were other agents surveilling the crime scene who the government did not present at trial.  Defense counsel elicited on direct examination of agents and officers that DEA Agent Rick Saldana was present on that night.  (6 R. 584).  The government did not call Agent Saldana as a government witness.  It was not until the defense called him as a witness, and after he testified on direct examination that he immediately prepared a report about this incident and gave it to his supervisor Agent Pierce (7 R. 795), that the government inquired about statements made by Molina after he was apprehended.  Agent Saldana testified that Molina said to him in Spanish, "he  didn't want to do that thing and that the gun had gone off by itself."  (7 R. 801).

5)      "Focusing on a small number of key points may be more persuasive than a shotgun approach."  *Gentry*, 540 U.S. at 7.

The Magistrate Judge's finding that Molina's counsel used a conspiracy theory as his defense to the exclusion of all others is contradicted by defense counsel's closing argument.  As a prelude to the government's argument in this section, the United States points out that Molina was indicted for premeditated murder of a federal

officer, in violation of 18 U.S.C. §1111 and § 1114 (1984), an offense which carried a statutory range of life or death if convicted of first degree murder, and a range of any term of years to life if convicted of second degree murder.  A conviction for a lesser-included offense of voluntary manslaughter carried a maximum statutory range of 10 years, an offense defined by statute as "the unlawful killing of a human being without malice" and "[u]pon a sudden quarrel or heat of passion."     Molina's counsel stridently fought for and succeeded in obtaining a jury instruction on self-defense for first degree murder, second degree murder and voluntary manslaughter, an instruction given to the jury before closing arguments began and in greater detail after the argument closed.  (8 R. 870-871, 935, 937-939, 941-943).   The jury was instructed with both degrees of murder that the government must prove Molina did not act out self-defense.  (8 R. 937-939, 942-944).   Self-defense was defined as a doing serious bodily injury or causing a death in a "situation in which there is created in that individual a fear" and "the person engages in a defense of his life or his body." (8 R. 870).  "If the defendant was not the aggressor, if the defendant was not the aggressor [*written twice in the original*] and had reasonable grounds to believe and actually did believe that he was in imminent danger of death or serious bodily harm from which the could save himself only by using deadly force against his assailant, he had the right to employ deadly force in order to defend himself."  (8 R.  942).  The jury was

-51-

instructed that to convicted of voluntary manslaughter required proof that the defendant acted in a sudden heat of passion cause by adequate provocation. (8 R. 869-870, 939). This required the government to prove the homicide was committed without legal justification or excuse; that the defendant must have injured the deceased in the heat of passion, caused by adequate provocation and without malice; that "heat of passion includes rage, resentment, anger, terror, and fear," and "provocation . . . as might naturally induce a reasonable man in the passion of the moment to lose self-control and commit the act on impulse and without reflection." (8 R. 94). As the court had informed counsel at the charging conference, the instruction on accident was included in the court's charge on intent. (8 R. 828).

As to a self-defense instruction, Mr. Connors argued at the charging conference that the evidence showed an apparent danger – "a gun being pointed at him and he does something to protect himself, which is part of self-defense." (8 R. 826). When asked about Molina's request for these instructions when "in the course of the matter you have in effect told this jury that your man didn't do the shooting (8 R. 828), Mr. Ramirez stated Molina's defensive theories with greater clarity:

> That is the initial primary defense brought to the jury and we believe that the Government's own evidence supports that, the scientific evidence and all the factual evidence brought before them. However, assuming that, Your Honor, is the matter of the Government eliciting from their own witnesses other actions. As matter of law, the

> defendant would be entitled to the matter of accident from
> their own statements, their own witnesses, that it was an
> accident and the gun discharged itself.

(8 R. 828). When asked about his opening statement "something to the effect that this was plot to assassinate the deceased," Mr. Ramirez explained: "Yes. And in essence there was a coverup." (8 R. 829). With the judge's response "I don't see a scintilla of evidence in that regard," counsel ultimately explained that the initial primary defense was that "[o]ur man didn't do the killing." (8 R. 830). When asked if their proposition was, "If the defendant didn't kill anybody, they have to find him not guilty, if someobody else did it," counsel replied, "The bottom line would be that." (8 R. 831). Molina's request for jury instruction on self-defense and accident rested on counsel's argument that the evidence showed Molina reacted out of fear or apprehension that an attack was being perpetrated on him and the discharge accidentally went off.. (8 R. 829-831). When asked if the "Court will be denying us the theory in opening statement, Judge Vela told counsel: "You can argue anything you want to the jury. You are entitled to go before the jury on anything that's defensive. (8 R. 832).

As the Supreme Court said in *Gentry*, "deference to counsel's tactical decisions in his closing presentation is particularly important because of the broad range of legitimate defense strategy at that stage. Closing arguments should 'sharpen and

clarify the issues for resolution by the trier of fact,' but which issues to sharpen and how best to clarify them are questions with many reasonable answers." *Gentry*, 540 F.3d at 7. Mr. Connors began his closing argument reminding the jury to do what Mr. Ramirez argued at opening, to meticulously, very carefully, very deliberately, evaluate the evidence the evidence introduced at trial (8 R. 888-881); he then focused the jury's attention on evidence showing that Molina had no malice or premeditation. Agent Ramos and Molina were in "a heck of a struggle," emphasizing to the jury that Molina was shot in the leg and told Agent Saldana after being shot, "I didn't want to do it. The gun just went off." (8 R. 882-883). The "Cuban buyer from New York" pointing a gun in his face when his cohorts got out of the car to get the money caused a reasonable expectation that the drug dealers were going to rob him and hurt him with the gun, and then Molina reacted to protect himself. "[I]f a gun is pointed at you, depending on how the circumstances are, a reasonable person in those same circumstances can use force and fight back . . . ." (8 R. 886). He asked the jury to believe the shooting was an accident and to believe what Molina told Ortiz and Agent Saldana was true. (8 R. 887-888). Mr. Connors ended his argument by telling the

jury Rodriguez and Ortiz "aren't telling you the truth about everything. And the physical evidence shows you that," drawing into question Ortiz' testimony.[10] (8 R. 888-889).

Mr. Ramirez began his argument by reminding the jury that Molina did not have to prove his innocence, that the jury's duty was to determine whether the government proved Molina's guilt beyond a reasonable doubt. (8 R. 890-891). He then concentrated his argument on what the government did not prove and the flaws in its evidence: The efforts of Pharr Police officers to investigate this crime were curtailed by the FBI investigators (8 R. 892); the autopsy photographs of a "muzzle impression" ten centimeters in diameter suggested a hollow bullet and two holes instead of one(8 R. 893-895, 900-901); the FBI did not do laboratory analysis to test what bullets were fired, where they impacted, or which bullets shattered (8 R. 895-898), test physical evidence to determine if Molina actually fired the gun (8 R. 901-902, 904); that there were discrepancies in the government's evidence(8 R. 902-903). Mr. Ramirez did call this a simple conspiracy, "a conspiracy will more of a coverup.

_____

[10]"See how it didn't happen the way Ortiz would want you to believe. . . . Two more hours in the courtroom lying ain't going to hurt nothing. That's what I do for a living. . . . So with that thought I believe you will find that it is the truth that Ortiz lied to you here in the courtroom on a very important factor in this lawsuit. And this lawsuit boils down for this man to get a guilty Ortiz has got to be telling you the truth. And that's a guilty on the sudden passion, because Ortiz told you about that. But they don't even have that."

Instigated by whom?  I don't know."  (8 R. 904).  "And the Government's version that is being brought to you is not what happened."  (8 R. 905).

6)    "Competency is measured against what an objectively reasonable attorney would have done under the circumstances existing at the time of the representation."  *Savino v. Murray*, 82 F.3d 593, 599 (4th Cir. 1996).

"Given the almost infinite variety of possible trial techniques and tactics available to counsel, this circuit is careful not to second guess legitimate strategic choices."  *Yohey v. Collins*, 985 F.2d 222, 227 (5th Cir. 1993).  Having a wide range of professionally competent assistance "necessarily allows for situations in which each of two opposite courses of action may properly fall within the ambit of acceptable professional conduct."  *Smith v. Collins*, 977 F.2d 951, 960 (5th Cir. 1992).  The fact that another lawyer might have developed different strategies or made different calls does not necessarily show ineffective assistance. *McInerney v. Puckett*, 919 F.2d 350, 353 (5th Cir. 1990).  "A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness'."  *Pratt v. Cain*, 142 F.3d 226, 230 (5th Cir. 1998) (quoting *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997)).

Defense counsel's trial strategy to request the jury be instructed on voluntary manslaughter,

[11] which required as elements the unlawful killing of a human being without malice and proof of a sudden quarrel or heat of passion, not only provided the jury with an alternative to finding Molina guilty of first or second degree murder but preserved an issue for appellate review that had not previously been resolved in this circuit. Molina argued on direct appeal that the absence of sudden quarrel and heat of passion upon provocation is an essential element of first and second degree murder, and that the evidence was insufficient for the jury to find there was an absence of heart of passion, resting on the thought that this Court might adopted the Ninth and Tenth Circuit's analysis in *United States v. Lofton*, 776 F.2d 918 (10th Cir. 1985) and *United States v. Lesina,* 833 F.2d 156 (9th Cir. 1987), and find that under *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881 (2975), the government bore the burden of proving beyond a reasonable doubt the absence of heat of passion or sudden quarrel where that defense is raised. This Court found Molina's case to be factually and legally analogous to the Ninth and Tenth Circuit's holdings, and it conducted a comprehensive and lengthy analysis of this issue on direct appeal. The Court ultimately adopted the government's argument that the Ninth and Tenth Circuits had

---

[11]The offense of manslaughter under 18 U.S.C. § 1112 is incorporated into 18 U.S.C. § 1114.

extended the Supreme Court's holding in *Mullaney* beyond the context of burden-shifting statutory schemes, and that a more restrictive reading of *Mullaney* was required in light of the Supreme Court's subsequent holding in *Patterson v. New York*, 432 U.S. 197, 97 S.Ct. 2319 (1977). *See United States v. Molina-Uribe*, Cause No. 87-2510, *Appellant's brief* at 8-33, and *Appellee's brief,* at 10-28. Molina thereafter petitioned the Supreme Court for certiorari review.

Thus, defense counsel's trial strategy was not only premised on convincing the jury that Molina did not act with malice or premeditation, but also with setting up the possibility that if the jury found Molina guilty of first degree murder, an offense carrying a sentence of life or death, that there was a possible chance for reversal on appeal. The issue on appeal set by *Strickland* is whether defense counsel's performance was objectively reasonable and within the wide range of reasonable professional assistance. That Molina's counsel calculated into their trial strategy the possibility of reversal on appeal if Molina was convicted of first degree murder is objectively reasonable performance.

7)    "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins*, 539 U.S. at 521.

As stated at the opening of the United States' argument, "strategic choices made after less than complete investigation are reasonable precisely to the extent that

reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins*, 539 U.S. at 521. The district court's finding that experts could have shown that Molina's fingerprints were not on the gun overlooks FBI Agent Hyatt's testimony that he examined the gun itself and found no latent prints. (7 R. 721-724). That an expert could have examined blood splatter patterns, or that another defense counsel when viewing the record sixteen years later would recommend videotaping a reconstructed version of the events to show the jury how the gun would have to be put to Agent Ramos' chest to show what the autopsy photographs revealed, overlooks the fact that Molina's counsel personally viewed the crime scene, examined the interior of the car and traced the trajectory patterns, examined carefully the medical records and autopsy report, and put that evidence before the jury. Molina did not demonstrate in his post-conviction attack what evidence an additional investigation by counsel would prove.

While Molina faults counsel for not investigating whether expert testimony regarding "shock effect" on gunshot victims would support Molina's theory of self-defense and accidental killing, Molina did not present any evidence at the evidentiary hearing demonstrating what that expert testimony would be or how it would bolster these defenses under the facts proved by the government at trial. Unsupported claims

regarding an uncalled and unnamed expert witness are speculative and disfavored by this circuits as grounds for demonstrating ineffective assistance of counsel. *Evans v. Cockrell*, 285 F.3d 370, 377 (5th Cir. 2002). Molina presented only the testimony of Mr. Sheldon Weisfeld, a criminal defense attorney in Brownsville, Texas, who gave his own opinion about what effect on the jury expert testimony has on the jury.

## CONCLUSION

As the United States Supreme Court holds, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689 (internal citations omitted). Molina's counsel "plainly put to the jury the centerpiece of his case": that the government's evidence, what the federal agents said when asked by Molina's counsel on either direct or cross-examination about that evidence, and what Molina said to Agent Saldana after being pulled out of the car "come from the truth chair;" that the government did not present all the evidence that comes with this case, and Ortiz, the only witness who heard Agent Ramos tell Molina he was a federal agent and was arresting him, was not a credible witness. The record

-60-

in this case shows that the trial tactics and strategic choices of Molina's trial counsel were made after a thorough investigation of law and facts relevant to the plausible options and evidence they had.    The court below erred as a matter of law and fact in finding that Molina's counsel rendered ineffective assistance in violation of the Sixth Amendment.    The United States requests this Court to vacate the Order below and to reinstate the convictions and sentences imposed against Molina.

Respectfully submitted,

MICHAEL T.  SHELBY
United States Attorney


_____

PAULA C. OFFENHAUSER
Assistant United States Attorney

## CERTIFICATE OF SERVICE

I, Paula C. Offenhauser, Assistant United States Attorney, hereby certify that a true and correct copy of the foregoing Record excerpts as required by 5th Cir. R. 31.1, has been served by placing the same in the United States Mail, postage prepaid, on this day, November 23, 2004, addressed to: Federal Public Defender Marjorie A. Meyers, P.O. Box 61508, Houston, Texas 77208-1508.


_____
PAULA C. OFFENHAUSER
Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE

_____Pursuant to Fifth Circuit R. 32.2.7(c), I certify this appellate brief complies with the type-volume limitations of Rule 32.2.7(b). Exclusive of portions exempted by Rule 32.2.7(b)(3), this brief contains 15105 words printed in Times New Roman, 14 point font, produced by Corel Wordperfect 9.0 software. An electronic version of this brief and/or a copy of the word printout will be provided to the Court upon request. I understand that a material misrepresentation in completing this certificate or the circumvention of the type-volume limits sets forth in Rule 32.2.7 may result in the striking of this brief and the imposition of sanctions against me.


_____
PAULA C. OFFENHAUSER
Assistant United States Attorney